David M. Monachino (DM 1527)
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

Michael D. Wexler, Esq. (to be admitted *pro hac vice*)
Jason P. Stiehl, Esq. (to be admitted *pro hac vice*)
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000



Attorneys for Plaintiff ITW Tech Spray, L.L.C.

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

'JUDGE CROTTY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ITW Tech Spray, L.L.C.,

                      Plaintiff,

       v.

Tech Spray Management Company, L.L.C.,
Richard Russell and Rita Russell,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ECF Case**

07 Civ. _____ **07 CIV 6676**

**COMPLAINT**

Plaintiff ITW Tech Spray L.L.C. ("Plaintiff" or "ITW Techspray"), through its attorneys,

Seyfarth Shaw LLP, as and for its Complaint against Defendants Tech Spray Management

Company, L.L.C., Richard Russell and Rita Russell (collectively, "Defendants" or "the

Owners"), allege as follows:

I.    **INTRODUCTION**

    1.    Illinois Tool Works Inc., through a subsidiary, ITW Tech Spray, L.L.C.

(collectively "ITW" or "ITW Techspray"), paid millions of dollars to the Defendants to purchase

Tech Spray L.P., a manufacturer of chemicals and products for the electronics industry. ITW did

so based upon the Defendants making certain representations and warranties and allegedly

fulfilling certain obligations to disclose information and documents critical to evaluating Tech

Spray L.P. and a purchase price. Ultimately, it was discovered that the Defendants failed to

deliver to ITW correspondences and a contract entered into one month prior to the sale of Tech

Spray L.P. obligating Tech Spray L.P. to a 46% price increase in a raw material, failed to provide

ITW with notice of a significant increase in the price of raw materials, failed to disclose prior to

the sale that key leaders were leaving Tech Spray L.P. and failed to disclose that the Defendants'

son ran a personal business in competition with Tech Spray L.P. out of Tech Spray L.P. As a

result of the Defendants chicanery and failure to fulfill their obligations, ITW Tech Spray, L.L.C.

was damaged.

## II.   **NATURE OF ACTION**

2.     This action seeks substantial compensatory and punitive damages, as well as legal

fees and special damages, against the Owners arising out of, among other things, the Owners'

fraudulent misrepresentations made in connection with the "Acquisition and Sale Agreement"

(the "ASA") dated January 13, 2006, between ITW Tech Spray L.L.C, as purchaser, and the

Owners, as sellers, of all the Owners' interests in Tech Spray, L.P. ("Techspray[1]"), as well as

breaches of multiple obligations and warranties contained in the ASA.

3.     As a result of the Owners' acts of wrongdoing and breaches in connection to the

ASA, Plaintiff has been damaged in excess of $10.5 million dollars, and, the Owners' improper

---

[1] "Techspray" will be used throughout to refer generally to the business of Tech Spray L.P. pre and post sale.

conduct prior to and subsequent to the acquisition caused Plaintiff to incur significant additional costs and expenses.

III.  **PARTIES**

4.     Plaintiff ITW Tech Spray L.L.C. is a Delaware Corporation and has its principal business office in Glenview, Illinois.  ITW Tech Spray L.L.C.'s sole member, Illinois Tool Works Inc. ("ITW"), is a Delaware Corporation with its principal place of business in Glenview, Illinois.

5.     Upon information and belief, Defendant Tech Spray Management Company L.L.C. is a limited liability company with its principal place of business in Amarillo, Texas. Its members are Defendants Richard Russell and Rita Russell.

6.     Upon information and belief, Defendants Richard Russell and Rita Russell are citizens of Arizona.

IV.  **JURISDICTION AND VENUE**

7.     This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states and the matter in controversy exceeds $75,000.00, excluding interest and costs. This Court has supplementary jurisdiction pursuant to 28 U.S.C. § 1367.

8.     This Court has personal jurisdiction over Defendants and venue is proper in this District under 28 U.S.C. § 1391, because the parties contractually agreed to litigate this dispute in the Southern District of New York, and the parties subjected themselves to jurisdiction in this District through implementation of the terms of the ASA in New York City, New York. Moreover, upon information and belief, the Owners transacted business within the State and County of New York.

3

## V.    ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.    Techspray's Business

9.    Techspray specializes in the design and manufacture of electronic cleaners, desoldering braid, temporary solder masks and other consumables for electronic manufacture, rework and repair.

10.    For many years, Techspray performed extensive research in formulating, blending and packaging a wide variety of chemicals and assorted support products for the electronics industry.

11.    One of Techspray's leading products is aerosol based solutions which are used to clean lenses, keyboards and circuit boards. For example, Techspray manufactures an aerosol canned product that blows propellant onto a camera lens to clean the lens without smudging or scratching the lens.

12.    Techspray manufactures aerosol spray cleaners by combining a specific ratio of specified chemicals with a propellant, placing the cleaner solution in an aerosol can, labeling the can and shipping the can to its distributors or direct customers in boxes containing multiple cans. One of the propellants commonly used by Techspray is called 134a.

13.    Techspray sells its cleaners and other products under its own name and private labels.

14.    Private labeling is the name given to the process by which manufacturers produce their product, but place the label of another company on the finished product so that the other company can call the product its own.

15.    For example, a person might check into a hotel or fly on an airplane in which he or she may be given a bottle of water displaying the airline's or hotel's logo on it. That bottle of

4

water was likely produced by a well known bottler of water, but the airline or hotel ordered the water with its own label on it instead.

16.     In private labeling situation, the company ordering the private label product many times will actually insist on very specific modifications to the standard product produced by the manufacturer.

17.     Some companies require the specific modifications for quality reasons, others for cost reasons and still others for marketing reasons.

18.     The specific requirements of private label customers are called the customers specifications and this information is recorded on the bill of materials.

19.     The bill of materials outlines in great detail the specific requirements of Techspray's customer for private label chemical cleaners.

20.     In turn, Techspray develops a formula and a method by which it can produce its chemicals to meet the specifications in the bill of materials.

21.     Techspray captures its formula and method to fulfill the bill of materials in a standard operating procedure specific to each private label customer.

22.     Techspray spent years developing its chemicals and spent hundreds of thousands of dollars, if not millions, developing the composition of its chemicals.

23.     Likewise, Techspray devotes considerable time and resources to developing chemicals that meet the specific requirement of its private label customers and the standard operating procedures to fulfill the bills of materials.

24.     Many times, multiple attempts of trial and error are needed to find the right combination of chemicals to meet a customer's specific requirements.

5

25.     The price at which Techspray sells its products to its customers is another key factor in the success of Techspray. Its pricing is affected by supply costs and margins.

26.     Techspray's formulas, methods, margins, pricing, bills of material, standard operating procedures and supply costs are proprietary to Techspray and are only available to Techspray employees.

27.     The private label business of Techspray accounts for a substantial portion of Techspray's business.

28.     Techspray is a leader in customer support and service through the use of a well trained sales and support staff.

B.     **The Owners Hid a Significant Price Increases and Subsequent Amendments to Key Contracts Just Prior to the Sale of Techspray to ITW**

29.     In 2005, the Owners decided to sell Techspray with the assistance of John Grimes and his firm Growth Capital Partners ("GCP").

30.     During the summer of 2005, ITW began negotiations with the Owners to purchase Techspray through an entity ITW created called ITW Tech Spray, L.L.C.

31.     During late 2005, GCP, on behalf of the Owners, opened a virtual data room ("VDR") containing significant information about Techspray including: contracts, financial documents, employment agreements, sales projections and other documents.

32.     The VDR was opened to facilitate ITW's due diligence of Techspray.

33.     In addition to other documents, the VDR contained "Significant Supplier Contracts."

34.     Identified amongst the Significant Supplier Contracts were contracts significant to Techspray's business between Arkema (formerly known as ATOFINA Chemicals, Inc.) and Techspray for the supply of the aerosol propellant known as 134a.

6

35.    134a is the propellant used in aerosol solvents and dusters, a significant component of Techspray's business.

36.    The price of 134a can affect the cost of Techspray's finished products and consequently the profitability of Techspray's products.

37.    ITW was provided access to the VDR to review Techspray's Significant Supplier Contracts.

38.    The VDR contained the original supply contract with Arkema, effective from July 1, 2002 through June 30, 2003, setting the price of 134a at $1.62 per pound, and requiring Techspray to purchase a minimum of 3,400,000 pounds.

39.    The VDR contained the first amendment to the supply contract with Arkema, effective July 1, 2003, and setting the price of 134a at $1.55 per pound.

40.    The VDR contained the second amendment to the supply contract, effective July 1, 2004 through December 31, 2004, setting the price of 134a at $1.49 per pound.

41.    The VDR contained the third amendment to the supply contract, effective December 31, 2004 through December 31, 2005, setting the price of 134a at $1.815 per pound.

42.    Notably, many of the contracts between Arkema and Techspray were executed after the expiration of the previous contract.

43.    Subsequent to the execution of the third amendment beginning in approximately October – November 2005, Grant Russell, the Owners' son and President of the private-label division of Techspray, and Arkema negotiated a fourth amendment to the supply contract.

44.    ITW was never informed of these negotiations, never supplied with any documents indicating a new price was being negotiated and was never informed of a significant price increase in the cost of the raw material-134a.

7

45.    On December 12, 2005, one month prior to the closing of the purchase of Techspray by ITW, Sam Spradlin, the CFO of Techspray, executed a fourth amendment to the supply contract obligating Techspray (and, because of the purchase of Techspray one month later, ITW) to pay $2.65 a pound for 134a.

46.    This was a 46% increase in the price per pound from one year earlier.

47.    In addition, the minimum quantities increased for the first time from 3.2 million pounds to 4.3 million pounds, representing a 26% increase.

48.    On December 2, 2005, well prior to the sale of Techspray, Arkema sent a letter to Sam Spradlin forwarding the finalized fourth amendment to the Arkema contract with Techspray for execution by Techspray.

49.    On December 12, 2005, Sam Spradlin executed the fourth amendment to the Arkema contract with Techspray. On December 12, 2005, the executed fourth amendment was forwarded to Arkema with a letter from Techspray's Bill Koskie to Kirsten Makel of Arkema.

50.    The correspondence between Techspray and Arkema regarding the negotiations and execution of the fourth amendment to the Arkema contract with Techspray and the actual fourth amendment were never placed in the VDR.

51.    Neither the correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray nor the actual fourth amendment contract were provided to ITW prior to the sale of Techspray to ITW.

52.    Richard Russell did not provide the physical correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

8

53.     Richard Russell did not provide the fourth amendment document to the contract between Arkema and Techspray to ITW or the Plaintiff prior to the sale of Techspray to ITW.

54.     Rita Russell did not provide the physical correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

55.     Rita Russell did not provide the fourth amendment document to the contract between Arkema and Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

56.     Grant Russell did not provide the physical correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

57.     Grant Russell did not provide the fourth amendment document to the contract between Arkema and Techspray to ITW or the Plaintiff prior to the sale of Techspray to ITW.

58.     Sam Spradlin did not provide the physical correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

59.     Sam Spradlin did not provide the fourth amendment document to the contract between Arkema and Techspray to ITW or the Plaintiff prior to the sale of Techspray to ITW.

60.     James Witcher did not provide the physical correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

61.     James Witcher did not provide the fourth amendment document to the contract between Arkema and Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

9

62.     Bo Maurer did not provide the physical correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

63.     Bo Maurer did not provide the fourth amendment document to the contract between Arkema and Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

64.     Bill Koskie did not provide the physical correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

65.     Bill Koskie did not provide the fourth amendment document to the contract between Arkema and Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

66.     No employee of Techspray provided the physical correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

67.     No employee of Techspray provided the fourth amendment document to the contract between Arkema and Techspray to ITW or the Plaintiff prior to the sale of Techspray to ITW.

68.     No representative of the Owners provided the physical correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

69.     No representative of the Owners provided the fourth amendment document to the contract between Arkema and Techspray to ITW or the Plaintiff prior to the sale of Techspray to ITW.

CHI 11268655.1

70.    Richard Russell did not orally inform ITW or Plaintiff that Techspray was negotiating or had entered into a fourth amendment to the supply contract between Arkema and Techspray prior to the sale of Techspray to ITW.

71.    Rita Russell did not orally inform ITW or Plaintiff that Techspray was negotiating or had entered into a fourth amendment to the supply contract between Arkema and Techspray prior to the sale of Techspray to ITW.

72.    Grant Russell did not orally inform ITW or Plaintiff that Techspray was negotiating or had entered into a fourth amendment to the supply contract between Arkema and Techspray prior to the sale of Techspray to ITW.

73.    Sam Spradlin did not orally inform ITW or Plaintiff that Techspray was negotiating or had entered into a fourth amendment to the supply contract between Arkema and Techspray prior to the sale of Techspray to ITW.

74.    James Witcher did not orally inform ITW or Plaintiff that Techspray was negotiating or had entered into a fourth amendment to the supply contract between Arkema and Techspray prior to the sale of Techspray to ITW.

75.    Bo Maurer did not orally inform ITW or Plaintiff that Techspray was negotiating or had entered into a fourth amendment to the supply contract between Arkema and Techspray prior to the sale of Techspray to ITW.

76.    Bill Koskie did not orally inform ITW or Plaintiff that Techspray was negotiating or had entered into a fourth amendment to the supply contract between Arkema and Techspray prior to the sale of Techspray to ITW.

77.    Prior to the sale of Tech Spray L.P. to ITW, but after the execution of the fourth amendment, Spradlin was specifically asked by ITW's auditors whether any changes had

11

occurred regarding the pricing, contracts, or supplier relationships, to which he responded that none had occurred.

78.     Prior to the sale of Tech Spray L.P., to ITW, but after the execution of the fourth amendment, management of Techspray was asked whether any changes had occurred regarding the pricing, contracts, or supplier relationships, to which it responded that none had occurred.

79.     Prior to the sale of Tech Spray L.P. to ITW, but after a significant increase in the price of the 134a, the Owners, Grant Russell, Sam Spradlin, James Witcher, Bo Maurer and Bill Koskie did not inform ITW orally or writing of a significant increase in the price of 134a or that a fourth amendment to the supply contract between Arkema and Techspray had been negotiated or signed.

C.     **The Owners Hid the Imminent Departure of Two Key Employees**

80.     Prior to closing, Richard Russell, required that ITW offer employment contracts to four key employees: Grant Russell, Jimmy Witcher, Sam Spradlin, and Bo Maurer.

81.     Of those four, three were given substantial closing bonuses by the Owners if the deal between ITW and the Owners closed.

82.     Specifically, the Owners required that ITW give Spradlin an employment contract.

83.     Spradlin, however, also received a closing bonus from the Owners of $135,000.

84.     Likewise, the Owners required that ITW give Jimmy Witcher, the President of Techspray, an employment contract.

85.     Witcher, however, also received a closing bonus from the Owners of $625,000.

86.     Both Spradlin and Witcher signed employment agreements prior to closing.

87.     On information and belief, the Owners' insistence that ITW provide employment contracts to Spradlin and Witcher was a ruse to create the appearance that these individuals were

12

going to continue to be employed at Techspray since ITW would not have purchased Techspray if its leadership left.

88.     Witcher tendered his resignation on Monday, January 16, 2006, one business day following the sale of Techspray to ITW and after he received the $625,000 closing bonus promised to him by the Owners if the sale transaction closed.

89.     Spradlin tendered his resignation the following day, on Tuesday, January 17, 2006, once again after the sale closed and he received the $135,000 closing bonus promised to him by the Owners if the transaction closed.

90.     Both Witcher and Spradlin received their very large closing bonuses upon closing and the Owners received thirty-six (36) million of dollars.

D.     **Grant Russell, the Owners' Son, Refuses to Divest Himself of His Interest in a Competing Business and Refuses to Sign His Agreed Upon Employment Agreement**

91.     One day prior to closing, ITW discovered that Grant Russell was running a competing business within Techspray, using Techspray resources.

92.     Immediately after discovering this fact, ITW requested that Grant Russell divest himself of his interest in that company and sign an employment agreement to that effect.

93.     Prior to closing, Grant Russell agreed to divest himself of the company and enter into an employment agreement as negotiated by his attorneys.

94.     However, two business days after closing, Grant Russell refused to sign the employment agreement.

95.     Grant Russell also refused to divest himself of the competing company.

96.     Immediately after the closing, Grant Russell collected Techspray's: (1) vendor lists, which identified the supplies and suppliers of the components for various products, (2) bills of materials detailing the specific proprietary components of the private-labeled products, (3)

13

pricing information for raw materials, and (4) the standard operating procedures for private label customers detailing customers' specific requirements.

97.    Grant Russell also requested employees to provide him with formula specifications and lab samples for products produced for private-label customers, as well as information regarding finished goods assembly of various cleaning kits and billing procedures.

98.    Grant Russell collected information that he previously had not asked for and told ITW Techspray employees that he was doing so to take ITW Techspray's private label business from ITW Techspray for his own competing business.

99.    In return for information, Grant Russell promised to reward employees with new employment and salary if they helped him in any way possible.

100.    ITW Techspray discovered Grant Russell's improper actions and terminated him on or about February 2, 2006.

101.    Grant Russell also received from the Owners a $625,000 bonus upon the closing of the sale of Techspray.

102.    Subsequently, ITW Techspray has been forced to file litigation against Grant Russell in Arizona for improper removal of confidential information, his use of the information to improperly compete against ITW Techspray, and his improper attempt to solicit ITW Techspray employees.

E.    **The Owners Breach Numerous Obligations and Make Untrue Representations and Warranties**

103.    On January 13, 2006, ITW acquired all of the equity and ownership in Techspray for $36 million dollars, pursuant to the Acquisition and Sale Agreement ("ASA"), attached hereto and incorporated herein as Exhibit A.

14

104.    Through the ASA, the Owners of Techspray were obligated to perform certain

tasks and the Owners were required to make, and in fact made, numerous warranties,

representations and covenants pertinent to this matter.

105.    Specifically, the Owners warranted and represented that since September 30,

2005, Techspray had not:

> Section 3.11.6 ... had any change in its relations with its employees, agents,
> customers or suppliers or with any governmental authorities or self-regulatory
> organizations, which would in each case have a material adverse effect on the
> Companies individually or in the aggregate;
>
> Section 3.11.12 ...made any purchase commitment in excess of the normal,
> ordinary and usual requirements or at any price in excess of the then current
> market price, or made any change in selling, pricing, advertising or personnel
> practices of the Partnership or Subsidiaries inconsistent with its prior practice;
>
> Section 3.11.13 Suffered any change, event or condition which, in any case or in
> the aggregate, has had or reasonably may be expected to have a material adverse
> effect on the Partnership's or any of the Subsidiaries' condition, properties, assets,
> liabilities, or operations, including, without limitation, any change in the
> Partnership's or such Subsidiary's revenues, costs, backlog or relations with its
> employees, agents, customers, or suppliers ....;

(ASA, Ex. A.)

106.    The Owners were obligated to and/or represented that they had provided:

> Section 3.14.1. Each contract, agreement or commitment... for the purchase of
> inventories, equipment, raw materials, supplies, services or utilities which
> involves payments or receipts by the Companies of $25,0000 or more per annum
> and... iii) is otherwise material to the assets, business, results of operations or the
> financial condition of the Companies individually or in the aggregate; ....

(ASA, Ex. A.)

107.    The Owners were obligated to and/or represented that the documents referenced

in 3.14.1:

> have been delivered by the Owners to Purchaser and are true and complete and
> include all amendments, supplements or modifications thereto.

(ASA, Ex. A.)

108.    Through Section 3.35, the Owners assured that no "representation or warranty...

will contain any untrue statement of material fact or omits or will omit to state a material fact

necessary to make statements contained therein not misleading." (ASA, Ex. A.)

109.    The Owners also had an affirmative duty to make an inquiry regarding the terms,

obligations, representations and warranties expressed in the ASA with their key managers,

including: (1) Grant Russell, (2) Sam Spradlin, (3) James Witcher, (4) Bo Maurer, and (5)

Techspray's plant mangers.

110.    Specifically, Section 9.32 provides (emphasis added):

> Where any representation or warranty contained in this Agreement is expressly
> qualified by reference to the Owners' Knowledge, information or belief, Owners
> confirm that they have no knowledge that such representation or warranty is not
> true and correct to the same extent provided in such representation or warranty
> and that have made due and diligent inquiry as to the matters that are the subject
> of such representations and warranties, including due inquiry of appropriate
> members of management of the Companies including **Grant Russell, James
> Witcher, Sam Spradlin,** Bo Maurer and the plant managers at each of the
> Companies facilities, and nothing has come to their attention during the course of
> such inquiry or otherwise which cause such party in the exercise of due diligence,
> to believe that such representation and warranty is not true and correct in all
> material respects.

(ASA, Ex. A.)

111.    Through the ASA the Owners represented and warranted that the Owners in fact

fulfilled their obligations under the ASA and made due inquiry.

112.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita

Russell made due inquiry of Sam Spradlin to ascertain whether Techspray had entered into any

contracts and/or incurred any changes that would have or may be expected to have a material

adverse effect on Techspray's assets, liabilities, operations, revenue, costs or relations with its

suppliers.

16

113.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Sam Spradlin to ascertain whether all physical contracts or agreements for the purchase of raw materials or supplies exceeding $25,000 or more per annum and all supplier contracts including all amendments thereto were supplied to ITW.

114.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Grant Russell to ascertain whether Techspray had entered into any contracts and/or incurred any changes that would have or may be expected to have a material adverse effect on Techspray's assets, liabilities, operations, revenue, costs or relations with its suppliers.

115.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Grant Russell to ascertain whether all physical contracts or agreements for the purchase of raw materials or supplies exceeding $25,000 or more per annum and all supplier contracts including all amendments thereto were supplied to ITW.

116.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of James Witcher to ascertain whether Techspray had entered into any contracts and/or incurred any changes that would have or may be expected to have a material adverse effect on Techspray's assets, liabilities, operations, revenue, costs or relations with its suppliers.

117.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of James Witcher to ascertain whether all physical contracts or agreements for the purchase of raw materials or supplies exceeding $25,000 or more per annum and all supplier contracts including all amendments thereto were supplied to ITW.

17

118.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Bo Maurer to ascertain whether Techspray had entered into any contracts and/or incurred any changes that would have or may be expected to have a material adverse effect on Techspray's assets, liabilities, operations, revenue, costs or relations with its suppliers.

119.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Bo Maurer to ascertain whether all physical contracts or agreements for the purchase of raw materials or supplies exceeding $25,000 or more per annum and all supplier contracts including all amendments thereto were supplied to ITW.

120.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Bill Koskie to ascertain whether Techspray had entered into any contracts and/or incurred any changes that would have or may be expected to have a material adverse effect on Techspray's assets, liabilities, operations, revenue, costs or relations with its suppliers.

121.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Bill Koskie to ascertain whether all physical contracts or agreements for the purchase of raw materials or supplies exceeding $25,000 or more per annum and all supplier contracts including all amendments thereto were supplied to ITW.

122.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Techspray's plant managers to ascertain whether Techspray had entered into any contracts and/or incurred any changes that would have or may be expected to have a material adverse effect on Techspray's assets, liabilities, operations, revenue, costs or relations with its suppliers.

CH1 11268655.1

123.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Techspray's plant managers to ascertain whether all physical contracts or agreements for the purchase of raw materials or supplies exceeding $25,000 or more per annum and all supplier contracts including all amendments thereto were supplied to ITW.

124.    Sam Spradlin informed Richard Russell and/or Rita Russell prior to the closing of the sale of Techspray to ITW that Techspray entered into a fourth amendment to the supply contract between Arkema and Techspray for 134a calling for a price increase in 134a.

125.    Sam Spradlin provided Richard Russell and/or Rita Russell with copies of the fourth amendment to the supply contract between Arkema and Techspray prior to the closing of the sale of Techspray to ITW.

126.    Grant Russell informed Richard Russell and/or Rita Russell prior to the closing of the sale of Techspray to ITW that Techspray entered into a fourth amendment to the supply contract between Arkema and Techspray for 134a calling for a price increase in 134a.

127.    Grant Russell provided Richard Russell and/or Rita Russell with copies of the fourth amendment to the supply contract between Arkema and Techspray prior to the closing of the sale of Techspray to ITW.

128.    James Witcher informed Richard Russell and/or Rita Russell prior to the closing of the sale of Techspray to ITW that Techspray entered into a fourth amendment to the supply contract between Arkema and Techspray for 134a calling for a price increase in 134a.

129.    James Witcher provided Richard Russell and/or Rita Russell with copies of the fourth amendment to the supply contract between Arkema and Techspray prior to the closing of the sale of Techspray to ITW.

19

130.    Bo Maurer informed Richard Russell and/or Rita Russell prior to the closing of the sale of Techspray to ITW that Techspray entered into a fourth amendment to the supply contract between Arkema and Techspray for 134a calling for a price increase in 134a.

131.    Bo Maurer provided Richard Russell and/or Rita Russell with copies of the fourth amendment to the supply contract between Arkema and Techspray prior to the closing of the sale of Techspray to ITW.

132.    Bill Koskie informed Richard Russell and/or Rita Russell prior to the closing of the sale of Techspray to ITW that Techspray entered into a fourth amendment to the supply contract between Arkema and Techspray for 134a calling for a price increase in 134a.

133.    Bill Koskie provided Richard Russell and/or Rita Russell with copies of the fourth amendment to the supply contract between Arkema and Techspray prior to the closing of the sale of Techspray to ITW.

134.    Employees of Techspray informed Richard Russell and/or Rita Russell prior to the closing of the sale of Techspray to ITW that Techspray entered into a fourth amendment to the supply contract between Arkema and Techspray for 134a calling for a price increase in 134a.

135.    Employees of Techspray provided Richard Russell and/or Rita Russell with copies of the fourth amendment to the supply contract between Arkema and Techspray prior to the closing of the sale of Techspray to ITW.

136.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Sam Spradlin to ascertain whether he would remain as an employee of Techspray after the sale.

20

137.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of James Witcher to ascertain whether he would remain as an employee of Techspray after the sale.

138.    On information and belief, prior to the closing of the sale of Techspray to ITW, Sam Spradlin informed Richard Russell and/or Rita Russell that he would not remain as an employee of Techspray after the sale.

139.    On information and belief, prior to the closing of the sale of Techspray to ITW, James Witcher informed Richard Russell and/or Rita Russell that he would not remain as an employee of Techspray after the sale.

140.    Prior to the closing of the sale of Techspray, the Owners did not disclose to Plaintiff that Sam Spradlin and/or James Witcher were going to leave the employ of Techspray after the sale closed.

141.    Plaintiff, in reliance upon the Owners' fulfilling their obligations under the ASA as well as the representations and warranties made by the Owners and their counsel, purchased Techspray from the Owners.

**F.    Nearly Six Months after Closing the Transaction,**
**ITW Learns about the New Contract with Arkema**

142.    In June 2006, after noticing a significant decrease in operating income, ITW Techspray conducted an investigation as to the cause of this decrease.

143.    Through this investigation, ITW discovered for the first time the price increase in 134a that Grant Russell negotiated, Sam Spradlin executed and the Owners did not reveal to ITW.

21

144.    ITW also discovered written correspondence and a written contract (the fourth amendment) increasing the price of 134(a) which had never been provided to ITW by the Owner's or any Techspray employee.

## COUNT I
### (Breach Of Contract)

145.    Plaintiff incorporate by reference the allegations made in paragraphs 1 through 144, as fully set forth herein.

146.    On January 13, 2006, ITW and the Owners entered into a binding contract known as the ASA.

147.    Plaintiff paid the Owners $36,000,000 per the terms of that contract based upon the Owners allegedly fulfilling their obligations, as well as the Owner's representations and warranties.

148.    Plaintiff fully and satisfactorily performed all conditions, covenants and acts required under the ASA.

149.    Per the terms of the contract, the Owners were to provide Plaintiff with all information regarding any changes in the manner in which Techspray conducted its business, including, but not limited to, copies of all contracts, including all amendments, between Techspray and its suppliers, material changes in the business including leadership departures, notice of significant price increases in raw materials and/or information regarding business dealings affecting the revenues, assets, liabilities and costs of Techspray such as the sweetheart terms Grant Russell was receiving for his carefully hidden personal business entity.

150.    The Owners failed to notify ITW of significant changes, failed to make information and documents available to ITW and/or hid the information.

22

151.    As a result of the Owners' failure to provide notice of a significant increase in the cost of a raw material and failure to provide all information and documents required under the contract, including, but not limited to, the fourth amendment to the Arkema supply contract, leadership changes and/or Grant Russell's personal competing business, the Owners breached the ASA and as a result of said breaches Plaintiff was damaged in that the purchase price for Techspray was overvalued by at least $10,500,000. Had all of the information and notice identified herein been provided to Plaintiff, the purchase price for Techspray would have been far less because Techspray's on-going expenses would have been substantially greater and its profitability substantially less than in previous years and in projected revenues.

152.    ITW Techspray is entitled to the benefit of its bargain, in that it is entitled to the value of the Owners' business had their representation and warranties been true.

153.    Additionally, as a result of the increased supply costs and departure of key employees, Plaintiff also incurred additional expenses, including but not limited to, replacing employees, relocating employees, placing additional managers on site at ITW Techspray and losing customers.

154.    By reason of the foregoing, Plaintiff is entitled to in excess of $10,500,000, together with interest thereon.

## COUNT II
### (Fraud)

155.    Plaintiff incorporate by reference the allegations made in paragraphs 1 through 144, and paragraphs 146 through 154, as fully set forth herein.

156.    The Owners' representation regarding the completeness of the contracts provided to Plaintiff were false when made.

23

157.    The Owners' representation that there had been no change in the relationship with suppliers (Arkema) was false when made.

158.    The Owners' representation that it had not made any change in pricing inconsistent with their prior practice was false when made.

159.    The Owners' representation that they had not made any change in purchasing commitment in excess of the normal requirement was false when made.

160.    The Owners' representation that they had not suffered any changes in costs was false when made.

161.    The Owners' representation that there were no significant price increases in supply costs was false when made.

162.    The Owners' representation that they had provided every contract and amendments was false when made.

163.    The Owners' representation that they had delivered a true and correct copy of all contracts and amendments was false when made.

164.    The Owners' statement that no "representation or warranty… will contain any untrue statement of material fact or omits or will omit to state a material fact necessary to make statements contained therein not misleading" was false when made.

165.    The Owners' representation that they made due inquiry with Grant Russell was false when made.

166.    The Owners' representation that they made due inquiry of Sam Spradlin was false when made.

167.    The Owners' representation that they made due inquiry of Jimmy Witcher was false when made.

24

168.    The Owners' representation that they made due inquiry of Bo Maurer was false when made.

169.    The Owners were specifically asked whether any material changes had occurred in the operation of the business of Techspray, to which they responded that no changes had occurred.

170.    The Owners' request that ITW provide an employment agreement for Jimmy Witcher as a requirement of closing, knowing that Witcher would depart days after the closing in any event, was misleading.

171.    The Owners' request that ITW provide an employment agreement for Sam Spradlin as a requirement of closing, knowing that Spradlin would depart days after the closing in any event, was misleading.

172.    The Owners failed to disclose that Grant Russell, one of the key members of management, had been operating an independent business utilizing Techspray resources, confidential and proprietary information.

173.    The Owners' requirement that an employment agreement for Grant Russell was a necessity for closing, with knowledge that Grant Russell would refuse to divest himself of this independent business and immediately enter into competition with Techspray, was misleading.

174.    The Owners' knew their representations and warranties to ITW Techspray were false when made or were made with reckless indifference for the truth so that ITW Techspray would be induced to complete the purchase of Tech Spray, L.P.

175.    The Owners knew or should have reasonably known that their intentional misstatements and improper actions would require Plaintiff to incur significant special damages outside of the parameters ASA, including, but not limited to, professional, attorney and other

25

fees and costs, as a direct result of their fraud, especially in regard to Grant Russell operating a competing business utilizing ITW Techspray's confidential and proprietary information and Jimmy Witcher's and Sam Spradlin's immediate departure from the company.

176.     Additionally, as a result of the Defendants fraud, Plaintiff also incurred additional special damages, expenses and/or losses, including but not limited to, replacing employees, relocating employees, placing additional managers on site at ITW Techspray and loss of customers and goodwill.

177.     All of the above representations, warranties and statements by Defendants, and its management, were knowingly false when made or made with reckless indifference for the truth so that ITW Techspray would rely upon the representations, warranties and statements.

178.     Plaintiff justifiably acted in due and reasonable reliance on the above representation and warranties by expending time and effort to enter into the ASA, by basing their valuation of the company upon these warranties and representations, and/or by foregoing other business opportunities based upon these warranties and representations.

179.     At the time the aforesaid warranties and representations were made by the Defendants, Plaintiff were not aware of the falsity of these statements, and believed them to be true.

180.     Defendants derived substantial economic benefit as a result of their fraud, and Defendants' conduct was undertaken with malice and intent, oppression and fraud, for their own personal gain, thereby justifying an award of exemplary and punitive damages against them.

181.     On information and belief, Defendants' egregious conduct and malfeasance have caused Plaintiff damages in excess and/or outside of any contractual limitation contained in the ASA.

182.    As a proximate result of the Defendants' fraudulent conduct as aforesaid, Plaintiff has been damaged in an amount in excess of $10,500,000 in compensatory damages, plus punitive damages in the amount of $20,000,000, as well as special damages to be proven at trial. Plaintiff will seek leave of Court to amend the Complaint to insert this amount when it becomes known, or upon further proof thereof.

## COUNT III
### (Reimbursement Of Attorneys' Fees)

183.    Plaintiff incorporate by reference the allegations made in paragraphs 1 through 144, paragraphs 145 through 154, and paragraphs 156 through 182 as fully set forth herein.

184.    Paragraph 9.1 of the ASA provides, in relevant part:

[T]he Owners, individually and jointly agree that, notwithstanding the Closing and regardless of any investigation made by or on behalf of Purchaser or of any information Purchaser may have in respect thereof, the Owners will indemnify and save and hold harmless from and against any cost, expense, damage, liability, loss or deficiency suffered or incurred (including but not limited to all reasonable costs and expenses, including reasonable attorney's fees, incurred by Purchaser in connection with any action, suit, proceeding, demand, assessment or judgment incident to any of the matters indemnified against in this Section 9.1) by Purchaser or arising out of or resulting from, and will pay purchaser on demand the full amount (except as set forth below) of any sum which Purchaser may be obligated to pay and shall reasonably have paid in respect of:

9.1.1 Any inaccuracy in any representation or the breach of any warranty by the Owners in or pursuant to this Agreement;

185.    Plaintiff incurred, and, upon information and belief, will continue to incur attorneys' fees and costs associated therewith in an amount not presently ascertainable, as a result of the Defendants' breaches of the ASA and fraud.

186.    As a result of Defendants' breaches of the ASA and fraud, ITW Techspray made a claim and request for indemnification upon Defendants for which Defendants are refusing to satisfy.

27

187.    Pursuant to the terms of the ASA, Defendants are obligated to reimburse Plaintiff'

attorneys' fees, costs and expenses incurred in pursuing its claims, in an amount to be

determined at trial.

VI.    **RELIEF REQUESTED**

WHEREFORE, ITW Tech Spray L.L.C. respectfully demands Judgment against

Defendants as follows:

(a)    On Count I, in the amount of at least $10,500,000, together
with interest thereon;

(b)    On Count II, in an amount to be determined by the Court, but
believed to exceed $10,500,000 in compensatory damages,
and punitive damages in the amount of $20,000,000, as well
as special damages in an to be determined at trial;

(c)    On Count III, awarding Plaintiff attorneys' fees and costs
incurred in an amount to be determined at trial;

(d)    For the costs and disbursements of this action; and

(e)    For such other and further relief as this Court may deem just
and proper.

Dated:    New York, New York
July 23, 2007

SEYFARTH SHAW LLP

By: _____
David Monachino (DM-1527)
Michael D. Wexler, Esq.
  (to be admitted *pro hac vice*)
Jason P. Stiehl, Esq.
  (to be admitted *pro hac vice*)
620 Eighth Avenue
New York, New York 10018-1405
Telephone: (212) 218-5500
Facsimile: (212) 218-5526

Attorneys for Plaintiff ITW Tech Spray, L.L.C.

28