

# ACQUISITION AND SALE AGREEMENT

This Acquisition and Sale Agreement ("Agreement") is made this 13th day of January, 2006 by and among ITW Tech Spray L.L.C., a Delaware limited liability company, or its wholly-owned nominee (the "Purchaser"), having its principal office at 3600 West Lake Avenue, Glenview, Illinois 60026-1215 and Tech Spray Management Company, L.L.C., a Texas limited liability company ("TS") and Richard G. Russell and Rita Russell, individuals (collectively, the "Russells"), TS and the Russells being the owners ("Owners") of all of the equity and ownership interest in Tech Spray, L.P., a Texas limited partnership, having its principal office at 1001 NW 1st Avenue, Amarillo, Texas (the "Partnership").

**WITNESSETH:**

WHEREAS, the Partnership is engaged, directly and through one or more of its Subsidiaries (as defined herein), in the business of marketing and manufacturing specialty repair, maintenance and production support products for industrial, electronic and consumer markets worldwide, including but not limited to solvents, dusters, swabs and brushes, solder tips, shears, desoldering braid, solder pots, maintenance, repair and operation supplies and production supplies ("Business");

WHEREAS, the Owners own, in the aggregate, all of the equity and ownership interest in the Partnership;

WHEREAS, the Partnership, directly or indirectly, owns, except as noted on Schedule 3.2, one hundred percent (100%) of the issued and outstanding capital stock of the Subsidiaries;

WHEREAS, the parties hereto wish to provide for the acquisition of the equity and ownership interest in the Partnership by the Purchaser in accordance with the terms and conditions hereinafter set forth; and

WHEREAS, the Owners and Purchaser desire to make certain representations, warranties and agreements in connection with the acquisition and sale contemplated herein (the "Transaction") and also wish to set forth various conditions precedent to the consummation of the Transaction.

**NOW,** THEREFORE, in consideration of the mutual covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby, the parties hereto agree as follows:

## 1. TRANSACTION.

**1.1 Partnership Interest.** At the Closing, as that term is defined in Section 8.1 hereof, Purchaser shall acquire from the Owners and the Owners shall sell to Purchaser all of the ownership and equity interest in the Partnership (collectively, the "Partnership Interest") for the consideration and upon the terms and conditions hereinafter set forth.



1.2 **Price**. In consideration of the sale and transfer of the Partnership Interest to Purchaser, and subject to the adjustment mechanism as set forth in Section 1.5 hereof, Purchaser shall pay the Owners at the Closing the sum of Thirty Six Million Dollars ($36,000,000) (the "Purchase Price"), less the Assumed Debt, as defined in Section 1.4, and less the Escrowed Funds, as defined in Section 6.8. The parties acknowledge that the Purchase Price may be increased or decreased after Closing, based on the Closing Balance Sheet (as defined in Section 1.5.1) in accordance with the provisions set forth in Section 1.5.

1.3 **Disbursements**. On the Closing Date the Purchaser shall disburse the Purchase Price, less Escrowed Funds and Assumed Debt by wire transfer in immediately available funds in accordance with Exhibit 8.2.2. All disbursements shown on Exhibit 8.2.2 by the Partnership, if any, shall be reflected in the Closing Balance Sheet.

1.4 **Assumed Debt.** The term Assumed Debt shall mean all debt of the Companies and all debt encumbering the assets of the Companies at Closing, as more specifically described on Schedule 1.4 attached hereto.

1.5 **Purchase Price Adjustment**.

**1.5.1** Within thirty (30) days following the Closing Date, the Owners shall cause the preparation and delivery to Purchaser of a consolidated balance sheet for the Partnership as of the close of business on the Closing Date, which shall be prepared on a basis consistent with the preparation of the Financial Statements (as defined in Section 3.8) and the Partnership's past practices as if its fiscal year ended on the Closing Date, excluding the preparation of year-end statement of cash flows and footnotes (the "Closing Balance Sheet").

**1.5.2** The inventory valuation of the Closing Balance Sheet shall be based on a physical inventory count conducted by the parties on or before the Closing, the results of which shall be included in the Closing Balance Sheet (the "Inventory"). The Inventory shall be counted and valued in accordance with generally accepted accounting principles ("GAAP") as consistently and historically applied by the Partnership and net of applicable inventory reserves (the "Reserves"). There shall be three (3) separate classes of Reserves, which shall be hereinafter referred to as the "Reserve Classes."

Reserve Classes shall be calculated as follows: If any inventory on hand, excluding work in progress and any and all tooling and spare parts, of any stock keeping unit (a "SKU") exceeds the amount of inventory of that SKU used within the 12 month period prior to the Closing, and if there has been some usage within the 12 month period prior to the Closing, then a Reserve Class of 50% shall be assigned to that SKU. If there has been no usage of any inventory on hand of any SKU within the 12 month period prior to the Closing, a Reserve Class of 100% shall be assigned to that SKU. All other SKUs shall be assigned a Reserve Class of 0%.

The Reserve is the sum of the product of the applicable Reserve Class percentage and the Inventory value on-hand for each SKU. For purposes of calculating the Reserves for

the Inventory of Plato GMBH, each SKU shall be assigned the same Reserve Class as was assigned to that SKU in valuing the inventory located at Amarillo. A detailed listing of SKU's and their resulting Reserves shall be delivered as a schedule to the Closing Balance Sheet.

**1.5.3** During the thirty (30) day period following Closing, the Purchaser shall cooperate with the Owners and shall allow the Owners reasonable access to the books and records of the Partnership for the purpose of preparing the Closing Balance Sheet. Additionally, the Purchaser shall allow the Owners reasonable access to certain employees of the Partnership, including, but not limited to Mr. Sam Spradlin, for the purpose of preparing the Closing Balance Sheet. In the event the Owners fail to deliver the Closing Balance Sheet as required above, the Purchaser shall have the right to prepare or have prepared such Closing Balance Sheet.

**1.5.4** Unless Purchaser gives written notice of a good faith objection to the Closing Balance Sheet before the close of business on the 20th business day after the Purchaser's receipt thereof, the Closing Balance Sheet shall become final and binding upon Purchaser and the Owners as of that 20th business day ("Final Report Date"). If Purchaser (by written notice before the close of business on such 20th day) objects in good faith to the Closing Balance Sheet and if Purchaser and the Owners do not reach agreement on the Closing Balance Sheet within twenty (20) days after notice of objection, then the matter objected to (and only such matter) shall be submitted to BDO Seidman, independent certified public accountants ("Accountants"), who shall act as an arbitrator and shall resolve the dispute and submit a written statement of such resolution within twenty (20) days, which statement shall be binding on all parties and the date of such statement shall be the Final Report Date. Each of the parties hereto shall bear all costs and expenses incurred by it in connection with such arbitration, except that the fees and expenses of the Accountants hereunder shall be borne equally by the Owners and Purchaser.

**1.5.5** If the Net Worth (as hereinafter defined) of the Partnership shown on the Closing Balance Sheet is less than the Net Worth of $16,739,173 set forth on the Partnership's balance sheet dated September 30, 2005 attached as Schedule 1.5.5, then the amount of the deficiency shall be paid to Purchaser by the Owners by wire transfer of immediately available funds within five (5) business days following the Final Report Date. There shall be no upward adjustment.

**1.5.6** For purposes of this Section 1.5, "Net Worth" shall mean total assets less total liabilities (excluding debt), as set forth on Schedule 1.5.5 and as computed in accordance with GAAP as consistently and historically applied by the Partnership., except for the valuation of Inventory as provided in Section 1.5.2.

**2.** **PERSONAL REPRESENTATIONS AND WARRANTIES**. Each of the Owners, jointly and severally, represents and warrants that at the Closing:

**2.1** Such Owner is the sole beneficial owner, free and clear of any lien, claim or

encumbrance, except as set forth in Schedule 2.1 of all of the Partnership Interest listed after such Owner's name on Schedule 2.1 attached hereto, and has full capacity and authority to enter into and perform this Agreement and to transfer good and valid title of the Partnership Interest free and clear as aforesaid.

**2.2** No options, warrants, rights, contracts, subscriptions, commitments or undertakings of any kind have been or will be granted by such Owner which relate to the purchase or sale of any of the present or additional interest in the Partnership as of the time of Closing. Notwithstanding the foregoing, on the 3rd day of September 2003, the Partnership issued two (2) warrants, one to Jefferson Capital Partners I, L.P. and the other to Texas Growth Capital Fund, L.P. (the "Warrants"). Before Closing, the Warrants shall be terminated.

**2.3** This Agreement constitutes the valid and binding agreement of such Owner enforceable in accordance with its terms.

**2.4** No authorization, consent or approval of or filing with any public body or authority is necessary on the part of the Owners in connection with the consummation by the Owners of the Transaction contemplated by this Agreement.

**3.** **REPRESENTATIONS AND WARRANTIES OF OWNERS RELATING TO THE PARTNERSHIP AND THE SUBSIDIARIES**. The Owners, jointly and severally, represent and warrant to Purchaser that:

**3.1** **Organization**. The Partnership is a limited partnership duly formed, validly existing and in good standing under the laws of the State of Texas. The Partnership has all requisite limited partnership power and authority to execute, deliver and perform this Agreement and to consummate the Transaction contemplated hereby. The Partnership is duly qualified as a foreign limited partnership to do business, and is in good standing, in each jurisdiction where the failure to be so qualified would have a material adverse effect on the Partnership's business, assets, results of operations or financial condition. A list of each such jurisdiction is attached hereto as Schedule 3.1.

**3.2** **Affiliates**. Schedule 3.2 contains a complete and accurate list of all entities including corporations, partnerships, limited liability companies, associations, joint stock companies, trusts, joint ventures or unincorporated organizations in which the Partnership has a direct or indirect ownership interest (the "Subsidiaries"; collectively the Partnership and the Subsidiaries shall be referred to as the "Companies"). Each of the Subsidiaries is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation as set forth in such Schedule and has the corporate or other power to carry on its business as now being conducted. The Partnership is or will be immediately prior to Closing directly or indirectly the record and beneficial owner of and has or will have immediately prior to Closing good and valid title to all of the issued and outstanding capital stock of each of the Subsidiaries. All of the issued and outstanding capital stock of the Subsidiaries is validly issued, fully paid and non-assessable, and as of Closing will be free and clear of all liens, claims,




encumbrances, security agreements, equities, charges and restrictions. There are no outstanding options, commitments or other rights of any nature that relate to the issuance, sale, purchase or redemption of any shares of capital stock of any of the Subsidiaries. All of issued and outstanding shares of capital stock have been issued in compliance with all applicable laws of their respective States or Countries of incorporation and, to the extent applicable, regulations of the Securities and Exchange Commission. The Partnership does not have a direct or indirect ownership interest in any other entity. Subject to applicable law the Partnership shall deliver to the Purchaser the organizational documents and records of the Subsidiaries at Closing. Each Subsidiary is duly qualified as a foreign corporation to do business, and is in good standing, in each jurisdiction where the failure to be so qualified would have a material adverse effect on such Subsidiary's business, assets, results of operations or financial condition. Schedule 3.2 also contains a list of each such jurisdiction.

3.3 **Officers and Directors**. Schedule 3.3 sets forth the name and title of each officer and director of each of the corporate Subsidiaries and the directors of the foreign Subsidiaries immediately prior to Closing. The directors of the Companies shall tender their resignations effective as of the Closing.

3.4 **Organizational Documents**. True and correct copies of all of the Organizational Documents, as that term is hereinafter defined, in effect on the date hereof and as of the Closing of each of the Companies organized in the United States have been delivered to Purchaser. True and correct copies of the Articles of Incorporation, including all amendments thereto, and by-laws for the Companies organized outside the United States will be delivered to Purchaser within forty-five (45) days after the Closing Date, and to the extent necessary, the Owners shall have access to the Companies' records to satisfy this requirement. For purposes of this Agreement, "Organizational Documents" means (i) the articles or certificate of incorporation and the bylaws of a corporation; (ii) the partnership agreement and any statement of partnership of a general partnership; (iii) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (iv) the articles of organization and regulations of a limited liability company; and (v) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a partnership (limited or general), corporation, association, joint stock company, trust, joint venture or limited liability company; and (vi) any amendment to the foregoing.

3.5 **Capitalization of the Partnership Interest**. The authorized Partnership Interest is as set forth in Schedule 2.1. The Owners are the registered and beneficial owners of the Partnership Interest. The Partnership Interest is free and clear of all encumbrances. No authorization or consent of any person is required in order to consummate the transactions contemplated by this Agreement by virtue of any such person having an equitable or beneficial interest in the Partnership or the Partnership Interest. There are no outstanding options, warrants, calls, commitments or plans by the Owners to admit new partners to the Partnership; to make distributions to the Owners; or to purchase, redeem, or retire any outstanding Partnership Interest; nor are there outstanding any



securities or obligations that are convertible into or exchangeable for legal or beneficial interest in the Partnership.

3.6 **No Conflicts**. The execution, delivery and performance by the Owners of this Agreement, and the consummation of the Transaction contemplated hereby, do not and will not conflict with or result in a violation of or a default under (with or without the giving of notice or the lapse of time or both) (*i*) any law applicable to the Companies; (*ii*) the Agreement of Limited Partnership of the Partnership or any of the Organizational Documents of any of the Subsidiaries; (*iii*) any provision of, or any grant to any third party the right to terminate or result in the acceleration of any obligation under, any governmental license or other authorization, loan document, agreement, contract, mortgage, lien, lease, instrument, order, arbitration, award, judgment, decree or other instrument to which the Companies or any of them is a party or by which any of them may be bound or affected, or (*iv*) affect the Companies' qualifications to carry on their respective businesses, except in the case of clauses (*i*) and (*iii*), for such violations or defaults which would not have a material adverse effect on the business, properties, financial condition or operations of the Companies.

3.7 **Authorization**. The execution and delivery of this Agreement, and the consummation of the Transaction contemplated hereby have been duly authorized by the Owners, and no other proceedings on the part of Owners are necessary to authorize this Agreement and the consummation of the Transaction contemplated hereby. This Agreement constitutes a valid and binding agreement of Owners enforceable in accordance with its terms. No authorization, consent or approval of, or filing with, any public body or authority is necessary or required to be obtained or made in connection with the execution and delivery of this Agreement or for the consummation of the Transaction contemplated hereby

3.8 **Financial Statements**. Attached hereto as Schedule 3.8 are true and complete copies of the Partnership's audited consolidated financial statements as of June 30, 2005, consisting of the balance sheet and related statements of income, retained earnings and cash flows for the year then ended (the "Audited Statement"). Also, attached hereto as a part of Schedule 3.8 are interim financial statements for the period ending November 30, 2005 (the "Interim Statement") (collectively the Interim Statement and the Audited Statements are hereinafter referred to as the "Financial Statements"). The Audited Statements have been certified by the independent certified public accounting firm of Clifton Gunderson LLP and have been prepared in accordance with United States GAAP consistently applied throughout the periods indicated. The Interim Statements have been prepared in accordance with United States GAAP and consistently applied throughout the periods indicated. To the Knowledge (as hereinafter defined) of the Owners, the Financial Statements (including any related notes) present fairly the financial position of the Companies as of the respective dates and the consolidated results of operations (and on an annual basis the related cashflows) as of such dates for the periods therein set forth.

3.9 **Tax Liabilities**. The Companies have filed or will file all federal, state, county,

local and foreign income, excise, property, sales and other tax returns which are required to be filed that relate to periods ending on or before the Closing and have paid or will pay all taxes, including, but not limited to, income, unitary, sales, use, ad valorem, franchise, withholding, payroll, excise, property, custom, duty or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or penalty, which have become due, whether pursuant to such returns or otherwise, or become payable with respect to tax periods ending on or prior to the Closing or pursuant to any assessment which has or becomes payable. Except as disclosed on Schedule 3.9 no agreements, waivers or other arrangements with any governmental agency providing for an extension of the time for filing any returns or the assessment of any tax or deficiency are presently in effect or contemplated, and no power of attorney with respect to any taxes is currently on file with the Internal Revenue Service or any other governmental agency. There are no actions, suits, proceedings or investigations or claims now pending or, to the Knowledge of the Owners, threatened against the Companies or any of them in respect of any tax or assessment and there is no reasonable basis for any such assertion of which the Partnership is or reasonably should be aware, nor are there any matters under discussion between the Companies or any of them and any federal, state or local authority relating to any taxes or assessments asserted by any such authority against any of the Companies. The federal and state tax returns for the fiscal years ended June 30, 2003, June 30, 2004 and June 30, 2005 are included in Schedule 3.9 and represent true, correct and complete copies of the original returns as filed by the Companies with the appropriate governmental authority. The applicable statutes of limitation related to United States income and information tax returns for the Partnership have expired for all past years and periods through the fiscal year ended June 30, 2002. Adequate reserves, as computed in accordance with GAAP as consistently and historically provided by the Partnership, have been provided in the Financial Statements with respect to the taxes of the Companies.

**3.10 No Undisclosed Liabilities**. The Companies have no material liability or obligation (and, to the Knowledge of the Owners, there is no reasonable basis for the assertion of liability) of any nature whether known or unknown, absolute, accrued, contingent, or otherwise and whether due or to become due, which is not shown or which is in excess of the amount shown or reserved for on the latest audited balance sheet (including footnotes) included in the Financial Statements (the "Balance Sheet") (and which should have been, if known at the time, shown on the Balance Sheet in accordance with GAAP historically and consistently applied by the Partnership), other than liabilities referred to in this Agreement, including the Schedules attached hereto, or reasonably incurred in the ordinary course of its business consistent with prior practice after the date of the Balance Sheet, that individually or in the aggregate will have a material adverse effect on the assets, properties, results of operations or financial condition of the Companies or any of them. Except as disclosed on Schedule 3.10, none of the employees of the Companies is now, or will by the passage of time hereinafter become entitled to receive any, retirement benefits (including pension, health, and life insurance) or severance or seniority pay, attributable to services rendered prior to the date of the Balance Sheet, the liability for which has not been accurately recorded in the Financial Statements without regard to materiality or prior practice.




3.11 **Changes in Condition.** The Companies have conducted their respective businesses only in the ordinary course consistent with their prior practice and have not since September 30, 2005, or such other date as specifically noted:

**3.11.1** Incurred any obligation or liability, absolute, accrued, contingent or otherwise, whether due or to become due, except current liabilities incurred in the ordinary course of business and consistent with its prior practice, none of which liabilities in any case or in the aggregate, adversely affects in any material respect the assets, properties, liabilities or financial condition of the Companies or any of them;

**3.11.2** Discharged or satisfied any lien, charge or encumbrance other than those then required to be discharged or satisfied, or paid any obligation or liability, absolute, accrued, contingent or otherwise, whether due or to become due other than current liabilities shown on the Financial Statements and current liabilities incurred since the Financial Statements in the ordinary course of business and consistent with its prior practice;

**3.11.3** Mortgaged, pledged or subjected to a lien, charge, security interest or other encumbrance or restriction on any of its property, business or assets, whether tangible or intangible;

**3.11.4** Sold, transferred, leased to others or otherwise disposed of any of its assets, canceled or compromised any debt or claim, or waived or released any right of substantial value, in each case except in the ordinary course of business;

**3.11.5** Received any notice of termination of any contract, lease or other agreement or suffered any damage, destruction or loss which, in any case or in the aggregate, has had or may reasonably be expected to have a material adverse effect on the assets, operations or prospects of the Companies individually or in the aggregate;

**3.11.6** Encountered any labor union organizing activity, had any actual or threatened employee strikes, work stoppages, slow-downs or lock-outs, or had any change in its relations with its employees, agents, customers or suppliers or with any governmental authorities or self-regulatory organizations, which would in each case have a material adverse effect on the Companies individually or in the aggregate;

**3.11.7** Transferred or granted any rights under, or entered into any settlement regarding the breach or infringement of, any United States or foreign license, patent, copyright, trademark, trade name, invention or similar rights, or modified any existing rights with respect thereto;

**3.11.8** Since September 30, 2005, made any change in the rate of compensation,



commission, bonus or other direct or indirect remuneration payable, or paid or agreed or orally promised to pay, conditionally or otherwise, any bonus, extra compensation, pension or severance or vacation pay to any shareholder, director, officer of any of the Companies or employee, salesman, distributor or agent of any of the Companies, except as disclosed on Schedule 3.11 or in the ordinary course of business (and in no case has an increase exceeded 10%) and consistent with prior practice;

**3.11.9** Issued or sold any ownership interest or other securities, or issued, granted or sold any options, rights or warrants with respect thereto, or acquired any capital stock or other securities of any corporation or any interest in any business enterprise or otherwise made any loan or advance to or investment in, any person, firm or corporation;

**3.11.10** Except as disclosed on Schedule 3.11.10, made any capital expenditures, commitments, additions or betterments which individually are in excess of $25,000 or in the aggregate are in excess of $100,000;

**3.11.11** Instituted, settled or agreed to settle any litigation, action or proceeding before any court or governmental body;

**3.11.12** Failed to replenish its inventories and supplies in a normal and customary manner consistent with its prior practice, or made any purchase commitment in excess of the normal, ordinary and usual requirements or at any price in excess of the then current market price, or made any change in selling, pricing, advertising or personnel practices of the Partnership or Subsidiaries inconsistent with its prior practice;

**3.11.13** Suffered any change, event or condition which, in any case or in the aggregate, has had or reasonably may be expected to have a material adverse effect on the Partnership's or any of the Subsidiaries' condition, properties, assets, liabilities, or operations, including, without limitation, any change in the Partnership's or such Subsidiary's revenues, costs, backlog or relations with its employees, agents, customers, or suppliers; or

**3.11.14** Entered into any transaction, contract or commitment other than in the ordinary course of business.

**3.12** **Insurance.** The Partnership has disclosed in Schedule 3.12 a list of all insurance policies maintained by the domestic Companies on their respective properties, assets, business and personnel (specifying the insurer, the amount and duration of the coverage, the type of insurance including, but not limited to whether each such policy is based on claims made or occurrence, premium allocation, the policy number and any pending claims thereunder). True and complete copies of each such policy have been delivered to Purchaser. The Subsidiaries located outside of the United States shall provide true and complete copies of each such insurance policy within forty-five (45) days of the



Closing Date. Schedule 3.12 also contains all claims for insurance losses in excess of $25,000 per occurrence, filed by the Partnership or any of the Subsidiaries during the two (2) year period immediately preceding the Closing, including, but not limited to Worker's Compensation, automobile, general and product liability. The Companies, individually and in the aggregate, have not received written notice that they or any of them are in default with respect to any provision contained in any insurance policy, nor has any one of them failed to pay any premiums thereunder or to give any notice or present any claim thereunder in due and timely fashion and, the Companies are not in default with respect to any such policies. To the Knowledge of the Owners, there is no occurrence that may result in a claim in excess of twenty five thousand dollars ($25,000) against or by the Companies or any of them with respect to which such claim has not been asserted. Adequate reserves, as computed in accordance with GAAP as consistently and historically provided by the Partnership, have been provided in the Financial Statements with respect to any self insured claims pending and any such claims which may be reasonably expected based upon the Companies' prior experience.

**3.13 Trademarks and Patents.**

**3.13.1** The Companies have disclosed in Schedule 3.13 a list of all United States and foreign registered patents, trademarks, copyrights and applications therefor and all state registered trade names and trademarks and applications therefor owned or used by one or more of the Companies. The Companies own (or possess adequate and enforceable royalty-free licenses or other rights to use) all trademarks, trade names, patents, copyrights, service marks, service names, software, inventions, trade secrets, know-how, formulas and processes and other proprietary rights and corresponding foreign counterparts necessary to the conduct of their respective business and such use does not conflict with the rights of others.

**3.13.2** Except as set forth on Schedule 3.13.2, no proceedings are pending, or, to the Owners' Knowledge, have been instituted or threatened which challenge the validity of the ownership by the Companies or any of them to such trademarks, trade names, patents, copyrights and applications. None of the Companies has entered into any patent or trademark license, technology transfer, or non-competition agreement relating to their respective businesses except as set forth in Schedule 3.13.2. Except as set forth on Schedule 3.13.2, the Owners have no Knowledge of infringement of any of the Companies' intellectual property rights.

**3.13.3** To the Knowledge of the Owners, neither the Partnership nor any of the Subsidiaries is infringing upon or otherwise acting adversely to any copyrights, trademarks, trademark rights, service marks, service names, trade names, patents, patent rights, licenses, trade secrets, software or know-how of any third party to the extent such possible infringement would have a material adverse effect on the Partnership or the Subsidiaries. There are no existing or, to the Owners' Knowledge, threatened patent, trademark, software, infringement, opposition, interference or other intellectual property related lawsuits by, or against, the



Companies or any of them, nor are there any outstanding notices, to the Companies or by the Companies or any of them to another, regarding possible patent infringement of either a patent or trademark owned by one of the Companies or the licensed patent or trademark of a third party.

**3.13.4** The Companies have performed all the obligations required to be performed by them to date and, to the Knowledge of the Owners, are not in default under any license agreement. The Companies have complied and are in compliance in all material respects with all applicable registered user laws or regulations. To the Knowledge of the Owners, no employee of any of the Companies has disclosed or made available to any third party any trade secrets of the Companies under circumstances constituting a breach of confidentiality.

**3.14** **Contracts**. Schedule 3.14 lists specifically each of the following contracts, agreements, commitments and other documents (other than those of a type disclosed in some other schedule hereto) to which any of the Companies is a party or by which any of the Companies, or their respective properties or assets is in any way bound, including all amendments and supplements thereto and modifications thereof:

**3.14.1** Each contract, agreement or commitment in respect of the sale of products or the performance of services, or for the purchase of inventories, equipment, raw materials, supplies, services or utilities, which involves payments or receipts by the Companies of $25,000 or more per annum, and (*i*) is not terminable by the Companies at any time and without cause or penalty; or (*ii*) is otherwise material to the assets, business, results of operations or the financial condition of the Companies individually or in the aggregate;

**3.14.2** Each sales agency, dealer, representative, distributorship, brokerage or franchise agreement which is not terminable by the Companies within ninety days from the date hereof without cause, payment or penalty;

**3.14.3** Each employment, collective bargaining, union, non-competition or secrecy agreement (including any non-competition or secrecy agreements routinely obtained by the Partnership or the Subsidiaries from their respective employees);

**3.14.4** Each loan or credit agreement, security agreement, guaranty, indenture, mortgage, pledge, conditional sale or title retention agreement, equipment obligation, lease purchase agreement or other instrument evidencing indebtedness;

**3.14.5** Each partnership, joint venture, joint operating or similar agreement; and

**3.14.6** Each contract, agreement or commitment (other than those of the type covered by the aforementioned subsections of this section) which involves payment or receipts by the Partnership or any of the Subsidiaries of Twenty Five

Thousand Dollars ($25,000) or more and is not terminable by the Partnership or any of the Subsidiaries at any time upon thirty (30) days or less prior written notice without cause, payment or penalty.

All of said contracts, agreements, commitments and undertakings are valid, binding and in full force and effect. There exists no default by the Companies or, to the Knowledge of the Owners, by another party thereto. Additionally, to the Knowledge of the Owners, no event has occurred which with the passage of time or giving of notice would constitute a material default under any such contract, agreement, commitment or undertaking. No purchase commitment of any of the Companies is in excess of its ordinary business requirements or, to the Knowledge of Owners, at a price in excess of market price at the date of such commitment. Copies of all of the documents described in the aforesaid Schedule, and of each other schedule delivered pursuant to this Agreement, have been delivered by the Owners to Purchaser and are true and complete and include all amendments, supplements or modifications thereto.

**3.15** **Claims**. Except as set forth on Schedule 3.15, (*i*) no suit, action or claim has been made, or to the Owner's Knowledge is threatened; (*ii*) no investigation or inquiry by any administrative agency or governmental body has been made, or to the Owners' Knowledge is threatened; and (*iii*) there is no legal, administrative or arbitration proceeding, pending or threatened in writing or, to the Owners' Knowledge, otherwise threatened, against the Companies or any of them or any of their respective properties, assets or business or to which the Companies or any of them is a party. Schedule 3.15 specifies each suit, action, claim, investigation, inquiry or proceeding of a type referred to in this Section involving a claim for more than $25,000 pending at any time during the past five (5) years. There is no outstanding order, writ, injunction or decree of any court, administrative agency or governmental body or arbitration tribunal, issued in a proceeding to which the Partnership or a Subsidiary was a party or of which the Owners otherwise have Knowledge, against the Companies or any of them or the Partnership Interest or any of the, capital stock, properties or assets of the Companies.

**3.16** **Employee Benefit Plans**.

**3.16.1** Set forth in Schedule 3.16.1 is a list of all pension profit sharing, bonus, disability, welfare or group insurance, deferred compensation, option, paid vacation and all other presently effective employee benefit plans, agreements or commitments, written or oral (if any), of the Companies ("Employee Benefit Plans").

**3.16.2** A copy of each Employee Benefit Plan as amended to the date hereof has been delivered to the Purchaser, together with audited financial statements and actuarial reports, if any, Form 5500, if required, for the most recent three plan years of each such plan and the most recent IRS determination letter (or application therefore) for any such plan which is an Employee Pension Plan within the meaning of Section 3(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"). Except as set forth in Schedule 3.16.2, (i) each



Employee Pension Plan has been amended for the GUST requirements (defined in IRS Revenue Procedure 2001-55) and submitted for an IRS determination that it continues to be qualified under Section 401(a) of the Internal Revenue Code, or (ii) the Companies have adopted a master or prototype plan which was submitted for an IRS determination under the circumstances specified under Section 19.03 of Revenue Procedure 2000-20. Each Employee Benefit Plan that is intended to be Qualified (i) has been amended to reflect the GUST requirements (defined in IRS Revenue Procedure 2001-55) and was timely submitted for an IRS determination that it continues to be Qualified under Section 401(a) of the IRC, or (ii) constitutes a master or prototype plan which was timely submitted for an IRS determination under the circumstances specified under Section 19.03 of Revenue Procedure 2000-20. All necessary amendments to each Employee Benefit Plan that is intended to be Qualified (reflecting the Economic Growth and Tax Reconciliation Reform Act of 2001 and all subsequent laws and agency-promulgated rules) have also been timely made. All necessary amendments for changes on how such Employee Pension Plans are administered under the Economic Growth and Tax Reconciliation Reform Act of 2001 and subsequent laws and agency promulgated rules have also been timely made.

**3.16.3** Except as set forth as part of Schedule 3.16.3, all Employee Benefit Plans are in compliance with the terms of the applicable plan documents and the provisions of ERISA and have complied with the reporting and disclosure requirements of applicable federal and state laws and regulations.

**3.16.4** Except as set forth as part of Schedule 3.16.4, (i) no Employee Benefit Plan or related trust has had a "reportable event" as such term is defined in ERISA nor has any such plan or any "fiduciary" or "party-in-interest" or "disqualified person" entered into any non-exempt "prohibited transaction" as such terms are defined in ERISA or the Internal Revenue Code; (ii) no partial or complete termination, or permanent discontinuance of contributions has occurred; (iii) no amendments have been made which were not the subject of a favorable IRS determination letter; (iv) all reports, together with all supporting statements, opinions, certifications and schedules, required pursuant to ERISA or the Code have been duly and timely filed with the appropriate governmental agencies; (v) all notices required to be provided to participants and beneficiaries by the Companies pursuant to ERISA or the Code have been duly and timely provided; and (vi) each Employee Benefit Plan has been administered and operated substantially in accordance with its terms and applicable laws.

**3.16.5** Except set forth on Schedule 3.16.5 there are no third party contract, agreements or arrangements with respect to any Employee Benefit Plan which may not be canceled or liquidated with no more than sixty (60) days advance notice or which, upon liquidation assesses a surrender charge, penalty, back-end load or market value adjustment.

**3.16.6** The Companies have no liability, jointly or otherwise, for any



withdrawal liability demanded or yet to be demanded under Title IV of ERISA by any multi-employer plan for a complete or partial withdrawal from such plan by any member of a control group of employers (within the meaning of Section 4001(b) of ERISA) of which the Companies are a member.

**3.16.7** There are no actions, suits, or claims (other than routine claims for benefits) pending or threatened or, to the Knowledge of the Owners, any facts which could give rise to any such actions, suits or claims against any Employee Benefit Plan or the assets thereof.

**3.16.8** Except as set forth on Schedule 3.16.8, no Benefit Plan of the Companies is a "defined benefit pension plan" as defined in Section 3(35) of ERISA subject to Title IV of ERISA, and no Benefit Plan of the Companies is subject to the minimum funding standards of Section 302 of ERISA. For each plan listed in Schedule 3.16.8, the last three years' actuarial valuations have been furnished to Purchaser. In addition, to the extent such plan is not reflected in the Financial Statements such plan(s) actuary shall be directed to prepare a FAS 87 valuation report as of the Closing Date using assumptions determined by Purchaser.

**3.17 Foreign Employee Matters**

**3.17.1** Schedule 3.17 hereto lists each non-governmental retirement and welfare benefit plan for employees of the Companies located outside of the United States (the "Foreign Benefit Plans"). Except as set forth on Schedule 3.17.1, each Foreign Benefit Plan and each fund, if any, maintained thereunder has been established, operated, administered, maintained and invested, as the case may be, in material compliance with all laws applicable thereto and the respective requirements of each such Plan's governing documents, all other applicable pension benefits legislation, and all applicable regulations, rules and policies in relation thereto.

**3.17.2** The Companies have heretofore delivered to Purchaser correct and complete copies of (i) each Foreign Benefit Plan; (ii) if applicable, the most recent actuarial valuation report available, whether or not filed, with respect to each such Plan; (iii) the most recent funding and investment management agreements with respect to each such Plan and all amendments thereto; (iv) the most recent summary description for employees with respect to each such Plan; and (v) the two most recent annual reports filed in respect of each such Plan.

**3.17.3** Full payment has been or will be made of all premiums, contributions and other amounts required by the applicable documents governing any Foreign Benefit Plan, or any applicable laws, regulations, rules and policies in relation thereto to be paid by the Companies or any of them under the terms of each such Plan as of the Closing Date.



**3.17.4 There** are no pending or, to the Owners' Knowledge, any written threat of claims against or in respect of any of the Foreign Benefit Plans, whether by any governmental agency, or employee, or beneficiary or otherwise (other than routine claims for benefits).

**3.17.5** No Foreign Benefit Plan provides for benefits including, without limitation, death or medical benefits (whether or not insured), with respect to any past or present employees of the Companies or any of them beyond their retirement or termination of service.

**3.17.6** Except as set forth on Schedule 3.17.6 or as otherwise specifically set forth in this Agreement or required by law, Purchaser shall not assume any liability to any employee, beneficiary or other person or entity in connection with any Foreign Benefit Plan or by reason of any action or inaction by the Companies or any of them or any administrator or fiduciary or other person or entity with respect to any Foreign Benefit Plan, whether before or after the Closing Date, as a result of the Transaction.

**3.17.7** There are no third party contracts, agreements or arrangements with respect to any Foreign Benefit Plan which may not be canceled or liquidated with no more than sixty (60) days advance notice or which, upon liquidation assesses a surrender charge, penalty, back-end load or market value adjustment.

**3.18 Minute Book and Ownership Ledger**. The Minute Books of each corporate Subsidiary contain correct and complete minutes of all annual and special meetings of the officers and directors, including any consents in lieu thereof, and the signatures therein are the true signatures of the persons purporting to have signed them. The Ownership Ledgers of the Companies are complete.

**3.19 Leases**. There is set forth in Schedule 3.19 a description of every lease or agreement under which any of the Companies is a lessee of, or holds or operates any real property owned by any third party, including the Owners. Accurate and complete copies of each such lease have been delivered to Purchaser. Except as specifically set forth in Schedule 3.19, each such lease or agreement is in full force and effect and constitutes the legal, valid and binding obligation of the respective parties thereto.

**3.20 Personal Property**. The machinery and equipment and other personal property ("Personal Property") owned, leased or used by the Companies in their respective businesses are in good working order and repair (reasonable wear and tear excepted), adequate to operate the business of the Companies as presently conducted, and in material conformity with all applicable ordinances, regulations and other laws. Their operation within the previous one year period has not violated any applicable federal, state or local law, statute, ordinance or regulation relating to the protection of the environment or condition of employment, nor has any written notice of any claimed violation of any such laws, statutes, ordinances or regulations been served on any of the Companies. All Personal Property is located at facilities controlled by the Companies