and no Personal Property is in the possession of others.

3.21 **Title of Property**. The Companies have good and marketable title to all of their respective Personal Property, and the Personal Property constitutes all of the personal property required or necessary to conduct the business of the Companies. None of the Personal Property is subject to any mortgage, pledge, lien, charge, security interest, encumbrance, restriction, lease, license, easement, or liability of any nature whatsoever, except (*i*) mortgages or security interests shown on the Financial Statements as securing specific liabilities or obligations, or (*ii*) liens for current taxes and assessments not yet due or payable or taxes the validity of which are being contested in good faith by appropriate proceedings, or (*iii*) those restrictions, easements and imperfections of title and encumbrances, if any, which, individually or in the aggregate, (a) are not substantial in character, amount or extent and do not detract from the value of the properties subject thereto in their current use in the business of the Companies, and (b) do not interfere with either the present and continued use of such property or the conduct of the Companies' normal operations; in each case in the same manner as the business of the Companies is currently conducted (the aforementioned exceptions collectively referred to as "Permitted Encumbrances").

3.22 **Inventory**. Except as reserved on the Financial Statements in accordance with GAAP as historically and consistently applied by the Partnership and each of the Subsidiaries, and to the Knowledge of Owners, all items of the Partnership's and Subsidiaries' inventory and related supplies (including raw materials, tool room supplies, work-in-process and finished goods) are accurately valued and properly reflected on the Financial Statements consistent with past practices and are merchantable, or suitable and useable for the production or completion of merchantable products, for sale in the ordinary course of business as first quality goods at normal mark ups. All inventory is located at facilities controlled by the Companies.

3.23 **Real Property**. There is set forth in Schedule 3.23 a description of all real property, including buildings and other improvements thereon owned by the Companies or any of them (the "Real Property"). The Real Property, together with the real property leased and listed on Schedule 3.19, constitutes all the real property required to conduct the business of the Companies as conducted within the previous one (1) year period and there are no liens, claims or encumbrances which would have a material adverse effect on the operation of any of the Companies' businesses. There are no claims made or, to the Knowledge of the Owners, threatened by any federal, state or municipal or other authorities in connection with the Real Property for any violation of any applicable law, ordinance or regulation which would adversely affect the conduct or business of the Companies in any material respect. To the Knowledge of the Owners, all buildings and structures included in the Real Property are in good operating condition, normal wear and tear excepted, and all such Real Property conforms with all applicable ordinances, regulations, zoning and other laws in all material respects.

3.24 **Receivables**. All receivables of the Companies (including accounts receivable, loans receivable and advances) that are reflected in the Financial Statements and all

such receivables of the Companies that will have arisen since the date thereof, shall have arisen only from bona fide transactions in the ordinary course of the Companies' operation of their respective businesses and shall be (or have been) fully collected when due, or in the case of each account receivable, within 365 days after it arose, without resort to litigation, in the aggregate face amounts thereof except to the extent of the normal allowance for doubtful accounts consistent with the Companies' prior practices and as reflected on the most recent annual Financial Statement.

**3.25  Bank Accounts and Powers**. Schedule 3.25 lists (*i*) all accounts, safe deposit boxes and current receivable collection boxes maintained by the Companies at any bank or other financial institution and the names of the persons currently authorized to effect transactions in such accounts and pursuant to such resolutions or with access to such boxes; and (*ii*) the names of all persons, firms, associations, corporations or business organizations holding general or special powers of attorney from the Companies and a brief description of the terms thereof.

**3.26  No Guarantees**. None of the obligations or liabilities of the Companies are guaranteed by, or subject to a similar contingent liability of, any other person, firm or corporation, nor have the Companies or any of them guaranteed, or otherwise become contingently liable for, the obligations or liabilities of any other person, firm or corporation.

**3.27  Compliance with Applicable Laws**. The Companies have complied in all material respects with all laws, regulations, injunctions, decrees and orders applicable to them or to the operation of their respective businesses and have received no written notice of any alleged violation of any such law, regulation, injunction, decree or order for which the failure to comply would, in any individual case or in the aggregate, have a material adverse effect on the businesses of the Companies or any of them. To the Knowledge of Owners, neither the ownership or the use of Companies' properties in the business, nor in the conduct of the business, has within the previous twelve (12) month period conflicted with the rights of any other person, firm or corporation or violates, with or without the giving of notice or the passage of time, or both, or will violate, conflict with or result in, a default, right to accelerate or loss of rights under, any terms or provisions of the Organizational Documents of any of the Companies as presently in effect, or any lien, encumbrance, mortgage, deed of trust, lease, license, agreement, understanding, law, ordinance, rule or regulation, or any order, judgment or decree to which the Companies are a party or by which any of them may be bound or affected.

**3.28  Labor Matters**.

    **3.28.1**  Schedule 3.14 sets forth an accurate and complete list of all employment agreements, collective bargaining agreements, works council agreements, union contracts or similar types of agreements (including, without limitation, any side letters) by which any of the Companies is bound or covered. Accurate and complete copies of all such agreements and contracts have been delivered to Purchaser prior to the date of this Agreement.

 

**3.28.2** There is no strike or union organizational activity or any allegation, charge or complaint received of employment discrimination, unfair labor practice or other similar occurrence, pending or, to the Knowledge of the Owners, threatened against any of the Companies nor, have the Companies operated their respective businesses in such a way which, to the Knowledge of the Owners, would give rise to any such allegation, charge, or complaint.

**3.28.3** All employees have been properly classified and no person is treated as an independent contractor or third party agency employee who should be treated as an employee under the laws of the country in which such individual performs services. Leased employees in the United States within the meaning of Section 414 (n) of the Internal Revenue Code have had their service as leased employees recognized for purposes of applicable Employee Benefit Plans in accordance with the terms of such plans and Internal Revenue Code Section 414(n).

**3.28.4** The Partnership has delivered to Purchaser an accurate and complete list setting forth the current annual salary for the Companies' employees, and copies of bonus plans and a listing of all employee compensation in the previous one (1) year.

**3.29** <u>Environmental Matters</u>. Except as set forth on <u>Schedule</u> 3.29 and in Schedule 9.1.6:

**3.29.1** The Companies have not deposited or caused to be deposited, on, in, under or about any production or any other facility, including without limitation into the ambient air, surface water, groundwater, land surface or subsurface strata, any solvents, pollutants, chemicals, flammables, contaminants, gasoline, petroleum products, crude oil, explosives, radioactive materials, hazardous materials, hazardous wastes, industrial or other toxic waste or substances, polychlorinated biphenyls or related or similar materials, asbestos or any material containing asbestos, any underground storage tanks, any air, soil or water contamination or any other substance or material (collectively, the "Hazardous Substances") in violation of or in a manner which creates a material liability under any applicable federal, state or local governmental law, rule, regulation or ordinance, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Section 1801, et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Sections 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. Sections 1251 et seq.), the Clean Air Act (42 U.S.C. Sections 7401 et seq.); the Toxic Substances Control Act as amended (15 U.S.C. Sections 2601 et. seq.), the Clean Water Act, as amended (33 U.S.C. Sections 1251 et. seq.) (collectively, all such laws, rules ordinances or regulations shall be referred to herein as the "Environmental Laws"). The Owners have no Knowledge of the existence of Hazardous Substances on, in, under or about the

Page 18



Real Property or other property owned or controlled by the Companies at any time, other than naturally occurring Hazardous Substances;

3.29.2    The Companies have not used any production or any other facility owned or leased by them to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce, process or in any manner deal with Hazardous Substances, except in material compliance with applicable Environmental Laws;

3.29.3    There are no Hazardous Substances located on property owned by others that originated from the Companies' owned or leased production facilities that were disposed of not in material compliance with applicable Environmental Laws or that to the Owners' Knowledge are presently not in compliance with applicable Environmental Laws;

3.29.4    The Companies (a) hold all required registrations, permits, licenses, variances, exemptions, approvals and other authorizations which are required for each of them under federal, state and local laws and regulations relating to pollution or protection of the environment, including, but not limited to, all Environmental Laws and including all laws relating to emissions, discharges, releases, or threatened release of Hazardous Substances or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances, which are legally required for the operation of the businesses of the Companies as presently conducted or the ownership of the properties and assets of the Companies as of the date hereof (collectively the "Permits"); and (b) are in compliance with the terms of all Permits in all material respects;

3.29.5    The Companies are in compliance with all other limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in the Environmental Laws or contained in any regulation, code, plan, order, decree, judgment, injunction, notice or demand letter issued, entered, promulgated or approved thereunder in all material respects; and

3.29.6    There is, and for the last five (5) years has been, no civil, criminal or administrative action, suit, demand, claim, hearing, notice of violation, investigation, proceeding, notice or demand letter pending, or to the Knowledge of the Owners, threatened against the Companies or any of them relating in any way to (*i*) the Environmental Laws or any regulation, code, plan, order, decree, judgment, injunction, notice or demand letter issued, entered, promulgated, or approved thereunder, or (*ii*) relating to the release into the environment by any of the Companies of any Hazardous Substances whether or not occurring at or on a site owned, leased or operated by any of the Companies.

3.30    **Absence of Certain Business Practices**.  To the Knowledge of Owners, neither the Companies nor any officer, employee or agent of the Companies, nor any other person acting on their respective behalf, has given any gift or similar benefit to any



customer, supplier, governmental employee or other person who is in a position to help or hinder the business of the Companies (or assist in connection with any actual or proposed transaction) which (a) would subject the Companies or any of them to any damage or penalty in any civil, criminal or governmental litigation or proceeding; (b) if not given in the past, would have had a material adverse effect on the assets, business or operations of the Companies as reflected in the Financial Statements; or (c) if not continued in the future, would adversely affect in any material respect the Companies' assets, business, or operations, or which would subject any of the Companies to suit or penalty in any private or governmental litigation or proceeding.

3.32  **Brokers**.  Neither the Owners nor the Companies have directly or indirectly dealt with anyone acting on their behalf in the capacity of a finder or broker (or investment advisor) and neither has incurred, and shall not incur, any obligation for any finder's, broker's or investment advisor's fee or commission in connection with the transactions contemplated by this Agreement, except for employment of Growth Capital Partners, for which the Owners and not the Companies will be responsible for payment of all fees.

3.33  **Warranty Accruals**.  The Warranty Accruals provided in the Financial Statements are sufficient to cover all outstanding warranty claims based upon historical practices of the Partnership.

3.34  **Import and Export Compliance**.  The Companies have paid, or have made provision in the Financial Statements for the payment of, all material duties, tariffs, customs, penalties, merchandise processing fees or other payments required to be paid by them or any of them with respect to the importation or exportation of any merchandise by each of the Companies, and, to the Knowledge of Owners, each of the Companies is in material compliance with United States and foreign laws and regulations governing the importation or exportation of merchandise.

3.35  **Accuracy of Information**.  No representation or warranty made by the Owners and no certificate or document furnished or to be furnished by or on behalf of the Owners to Purchaser pursuant to this Agreement contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained therein not misleading.

3.36  **Ownership of Real Property.**  Prior to Closing, Partnership shall have transferred all right, title and interest in real property owned by the Partnership to Triple R Realty, L.P. In the event such transfers have not been completed prior to Closing, the Owners, or their designee, shall accept transfer of all right, title and interest in such real property.

4.  **REPRESENTATIONS AND WARRANTIES OF PURCHASER.**  Purchaser represents and warrants to the Owners that:

4.1  **Organization**.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the corporate power to



carry on its business as it is now being conducted. Purchaser is duly qualified as a foreign corporation to do business, and is in good standing, in each jurisdiction where the failure to be so qualified would have a material adverse effect on its business, assets, results of operation or financial condition.

4.2    **No Conflicts**. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transaction contemplated hereby, do not and will not conflict with or result in a violation or a default under (with or without the giving of notice or the lapse of time or both) (*i*) any law applicable to Purchaser; (*ii*) the Certificate of Incorporation, By-laws or other organizational documents of Purchaser; (*iii*) any provision of, grant to any third party the right to terminate or result in the acceleration of any obligation under, any governmental license or other authorization, loan document, agreement, contract, mortgage, lien, lease, instrument, order, arbitration award, judgment or decree to which Purchaser is a party or by which Purchaser may be bound or affected; or (*iv*) affect Purchaser's qualification to carry on its business, except, in the case of clauses (*i*) and (*iii*), for such violations or defaults which would not have a material adverse effect on the business, properties, financial conditions or operations of Purchaser.

4.3    **Corporate Power**. Purchaser has the corporate power to enter into this Agreement and to carry out the obligations hereunder. The execution and delivery of this Agreement, and the consummation of the Transaction contemplated hereby have been duly authorized by the Board of Directors of Purchaser, and no other corporate proceedings on the part of Purchaser are necessary to authorize this Agreement and the consummation of the Transaction contemplated hereby. No authorization, consent or approval of, or filing with, any public body or authority is necessary for the consummation of the Transaction contemplated by this Agreement. This Agreement constitutes a valid and binding agreement of Purchaser enforceable in accordance with its terms.

4.4    **Brokers**. Purchaser has not directly or indirectly dealt with anyone acting on its behalf in the capacity of a finder or broker (or investment advisor) and has not incurred, and shall not incur, any obligation for any finder's, broker's or investment advisor's fee or commission in connection with the transactions contemplated by this Agreement.

4.5    **Accuracy of Information**. No representation or warranty made by Purchaser and no certificate or document furnished or to be furnished by or on behalf of Purchaser to the Partnership or any of the Owners pursuant to this Agreement contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained therein not misleading.

5.    **COVENANTS BY THE OWNERS**. During the period from the date of this Agreement to the Closing, except as otherwise consented to by Purchaser in writing or referred to in this Agreement, the Owners will cause the Companies with respect to 5.1.1 and will not authorize the Companies to, with respect to 5.1.2 to 5.1.8 to:

**5.1.1**  Carry on their businesses in, and only in, the usual, regular and ordinary course in substantially the same manner as heretofore conducted and, to the extent consistent with such businesses, use all reasonable efforts to (*i*) preserve intact their present business organization, (*ii*) keep available the services of their present officers, employees, agents and independent contractors, (*iii*) preserve their relationships with customers, suppliers and others having business dealings with them to the end that the good will and going businesses shall be unimpaired at Closing; and (*iv*) cooperate with Purchaser with reasonable efforts to assist Purchaser in obtaining the consent of any landlord or other secured party to any lease or contract with the Companies where the consent of such landlord or other third party may be required by reason of the Transaction. Without limiting the generality of the foregoing prior to the Closing, the Companies will not, without Purchaser's prior written approval:

**5.1.2**  Amend their respective Organizational Documents or change the number of directors of any of them;

**5.1.3**  Acquire by merging or consolidating with, or agreeing to merge or consolidate with, or purchase substantially all the assets of, or otherwise acquire any business or any company, corporation, partnership, association or other business organization or division thereof;

**5.1.4**  Sell, lease or otherwise dispose of any of its assets, except in the ordinary course of business and, except for the transfer of assets which are not material individually or in the aggregate to the assets, business, results of operations or financial condition of the Companies or any of them;

**5.1.5**  Declare, set aside, make or pay any dividend or other distribution in respect of their Partnership Interest or purchase or redeem, directly or indirectly, any Partnership Interest;

**5.1.6**  Issue or sell any ownership interest of any class or any options, warrants, conversion or other rights to purchase any such ownership interests or any securities convertible into or exchangeable for such ownership interests;

**5.1.7**  Incur any additional indebtedness for borrowed money or issue or sell any debt securities other than in the ordinary course of business consistent with prior practice; and

**5.1.8**  Grant to any officer or employee any increase in compensation in any form in excess of the amount in effect as of the date of this Agreement, or any severance or termination pay, or enter into any employment agreement with any officer or management employee except with the consent of Purchaser.

**5.2**  **Adverse Change**. The Owners will cause the Partnership to promptly advise Purchaser orally and in writing of any change in the financial condition, properties,

Page 22

assets, liabilities, operations or business of the Companies which is or, may reasonably be expected to be materially adverse to any aspect of any of the Companies' businesses.

5.3  **Consultation**.  The Owners shall cause the Partnership to consult with Purchaser with respect to (*i*) the cancellation of material contracts, agreements, commitments or other understandings or arrangements to which any of the Companies is a party, including, without limitation, purchase orders for any material item of inventory and commitments for material capital expenditures or improvements, (*ii*) the commencement of the orderly and gradual discontinuance of particular items or operations, and (*iii*) any material changes in the purchasing, pricing or selling policy of the Companies; provided, however, that nothing contained in this Section 5.3 shall require the Owners to take or fail to take any action that, in the Owner's reasonable judgment, is likely to give rise to a substantial penalty or a claim for damages by any third party against the Owners or the Companies, or is likely to result in losses to any of the Companies, or is otherwise likely to prejudice in any respect or to interfere with the conduct of the Companies' businesses and operations in the ordinary course consistent with prior practice, or is likely to result in a breach by the Owners or the Companies of their respective representations, warranties or covenants contained in this Agreement (unless any such breach is first waived in writing by Purchaser).

6.  **ADDITIONAL AGREEMENTS.**

6.1  **Expenses**.  Whether or not the Transaction is consummated, all costs and expenses incurred in connection with this Agreement and the Transaction contemplated hereby shall be paid by the party incurring such expense. It is expressly understood and agreed that for purposes of this provision the parties hereto are the Purchaser and the Owners and not the Companies.

6.2  **Publicity**.  At all times throughout and prior to the Closing, each party shall promptly advise and cooperate with and, except as required by law, obtain the consent of the other prior to issuing, or permitting any of the Companies, their subsidiaries, directors, officers, employees or agents, to issue any press release or other information to the press or any third party with respect to this Agreement or the Transaction contemplated hereby; provided that the foregoing shall not preclude communications or disclosures necessary (*i*) to implement the provisions of this Agreement; (*ii*) to allow each party to consult with such party's legal or financial advisors; (*iii*) to allow each party to consult with such party's immediate family; (*iv*) to comply with the HSR Act; or (*v*) to make such other disclosures as may be required by law. Following the Closing, no party will, except as permitted in the immediately preceding sentence, disclose the price terms of the Transaction without the consent of the other parties.

6.3  **Confidentiality**.  Purchaser shall hold, and shall take all reasonable steps to cause its officers, directors, employees, representatives and advisors to hold in strict confidence and not use for its or their own benefit except in connection with this Agreement and the transactions contemplated hereby the documents and information furnished to it or them concerning the Companies and any analysis, reports or other

materials derived therefrom (collectively, the "Confidential Information") and, if this Agreement is terminated, shall, upon written request, cause all such Confidential Information and all copies thereof to be destroyed or returned immediately to the Companies or the Owners.

6.4  **Regulatory Filings.** Purchaser and the Owners shall take all such actions as shall be reasonably necessary and will file and use their best efforts to have declared effective or approved, all documents and notifications with any government or governmental authority reasonably necessary or appropriate, in the opinion of Purchaser and its counsel and in the opinion of the Owners and their counsel, for the consummation of the Transaction contemplated hereby.

6.5  **Notification of Certain Matters.** Each party shall give prompt notice to the other of (*i*) the occurrence or failure to occur of any event, which occurrence or failure such party believes would be reasonably likely to cause any representation or warranty on the part of such party contained in this Agreement to be untrue or inaccurate in any material respect as of the day of Closing, and (*ii*) any material failure of such party to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by such party hereunder.

6.6  **Additional Agreements.** Subject to the terms and conditions provided herein and to fiduciary obligations under applicable law as advised by counsel, each of the parties hereto agrees to use all reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective as promptly as practicable the Transaction contemplated by this Agreement and to cooperate with each other in connection with the foregoing, including using best efforts to obtain all necessary consents, approvals and authorizations as are required to be obtained under any federal, state or foreign law or regulations, to defend all lawsuits or other legal proceedings challenging this Agreement or the consummation of the Transaction contemplated hereby, to cause to be lifted or rescinded any injunction or restraining order or other order adversely affecting the ability of the parties to consummate the Transaction contemplated hereby, and to effect all necessary registrations and filings.

6.7  **Escrow.** The term "Escrowed Funds" shall mean Three Million Dollars ($3,000,000) to be withheld from the Purchase Price by ITW and deposited by ITW in an escrow account for a period of eighteen (18) months with Bank of America. The terms of the escrow are set forth in an Escrow Agreement substantially in the form attached hereto as Schedule 6.7. The indemnification obligations under Section 9 may be satisfied by claims against the Escrow, but shall not be limited to the amount of the Escrow.

6.8  **Covenant Not-To-Compete.**

6.8.1  "**Competitive Business**" means the business of marketing and manufacturing specialty repair, maintenance and production support products for

industrial, electronic and consumer markets worldwide, including but not limited to solvents, dusters, swabs and brushes, solder tips, shears, desoldering braid, solder pots, maintenance, repair and operation supplies and production supplies.

6.8.2   In consideration of the payment of the Purchase Price, and in order to induce Purchaser to enter into this Agreement and to consummate the Transaction contemplated hereby, the Owners hereby covenant and agree that for a period of five (5) years from and after the Closing Date they shall not directly or indirectly, (a) own, manage, operate, control, provide financing or otherwise engage directly or indirectly in a Competitive Business, or (b) solicit any customers of the Companies or ITW Chemtronics for any Competitive Business. The foregoing shall not be deemed to prevent the Owners from owning up to three percent (3%) in value or in voting power of the stock of any corporation which is engaged in any Competitive Business after the Closing if the stock of such corporation is listed on any national securities exchange or traded in the over-the-counter market in the United States of America.

6.8.2   Owners acknowledge that Purchaser would not have an adequate remedy at law for a breach of this covenant and hereby consent to the enforcement of this covenant by Purchaser by means of a temporary and/or permanent injunction issued by any court having jurisdiction thereof and agree that in any such court proceeding Purchaser shall be entitled to assert any claim it may have for damages resulting from the breach of this covenant in addition to seeking injunctive relief.

6.8.3   This covenant shall be construed as covering competition in each of the separate states, countries and other geographic areas in which the Companies and ITW Chemtronics conduct business as of the Closing. To the extent it is legally unenforceable in any state, country, or other geographic area; this covenant shall not thereby be affected with respect to any other state, country or geographic area

6.9   **Third Party Consents**. To the extent that consummation of this Agreement would diminish the Companies' rights under any contract or other instrument without the consent of another person, which consent has not been obtained, Owners shall use their reasonable efforts and Purchaser shall cooperate to obtain any such required consent(s) if deemed necessary and/or advisable as promptly as practicable. If any such consent shall not be obtained or if consummation of this Agreement would impair the Companies' rights under the instrument in question, Owners, to the maximum extent permitted by law and the instrument, shall act as the Company's agent in order to obtain for the Company the benefits thereunder and shall cooperate, to the maximum extent permitted by law and the instrument, with Purchaser and the Company in any other reasonable arrangement designed to provide such benefits to the Company and Purchaser.

6.10   **Distribution of Certain Assets**. Prior to Closing the Owners shall cause the Partnership to distribute the following assets not used in conducting the business of the Partnership of an estimated aggregate value of less than $125,000: several pieces of art

currently located at the Partnership's headquarters; Mr. Russell's personal office furniture; and an automobile, currently located in Phoenix, Arizona, that is used by Mr. Richard Russell; provided that all such matters are properly reflected in the Closing Balance Sheet and disclosed on the appropriate schedule to this Agreement.

6.11   **Life Insurance.** Prior to Closing, the Owners shall cause the Partnership to transfer to Mr. Richard Russell a life insurance policy from Prudential Insurance having a death benefit of $150,000 and a cash value of approximately $67,000 and bearing a quarterly premium of $1,606. Mr. Russell shall acquire the benefits and assume the obligations of the policy.

6.12   **COBRA.** Mr. Richard Russell and his wife, Ms. Rita Russell, will receive COBRA benefits for 18 months after Closing, at an anticipated cost of $546 per month, to be paid for by Mr. Russell.

6.13   **ITW Employee Benefit Plan.** The Partnership's employees will become participants in ITW's employee benefit plans within two (2) years after Closing.

6.14   **Employment.** Mr. Grant Russell, Mr. James Witcher and Mr. Sam Spradlin will each be offered an employment agreement by the Purchaser. Said employment agreements shall provide for a term of at least two (2) years (to begin upon Closing) and shall provide that each employee shall receive his current base salary, subject to satisfactory performance consistent with ITW's principles of conduct. During the same two (2) year period each of said employees will also participate in ITW's bonus program available to ITW employees in similar positions. Mr. Bo Maurer will be offered an employment agreement by the Purchaser. Mr. Maurer's employment agreement shall provide for a term of at least one (1) year (to begin upon Closing) and shall provide that Mr. Maurer' shall receive his current base salary. During such time, Mr. Maurer shall participate in ITW's bonus program available to ITW employees in a similar position. The terms and conditions of employment are set forth in Exhibit 6.17 hereof.

6.15   Purchaser has completed Phase 2 Environmental Assessments during its due diligence, and Purchaser hereby agrees to provide Owners and Owners' counsel, Sprouse Shrader Smith P.C., with a complete copy of the sampling plan and sample data in connection with said Phase 2 Environmental Assessments as soon as practicably possible after Closing.

6.16   **No Additional Representations by Owners.** Purchaser acknowledges that neither the Owners nor any of the Companies nor any other person or entity has made any representation or warranty, expressed or implied, at common law, by statute or otherwise, as to the accuracy or completeness of any information regarding Owners, the Partnership, the Subsidiaries, or the assets of any of the Companies furnished or made available to Purchaser and its representatives, except as expressly set forth in this Agreement or in the Schedules attached hereto.

7.   **CONDITIONS.**



7.1  **Conditions to Purchaser's Obligations.** Notwithstanding any other provisions of this Agreement, the obligation of Purchaser to effect the Transaction shall be subject to the fulfillment or written waiver of the following conditions:

    7.1.1  All material permits, approvals and consents of any federal, state or other government or governmental authority necessary or appropriate for consummation of the Transaction shall have been obtained;

    7.1.2  There shall not be any action taken, or any statute, rule, regulation or order enacted, entered, enforced or deemed applicable to the Transaction by any federal or state government or governmental authority and there shall not be in effect an order entered by any federal or state court which, in the sole reasonable judgment of Purchaser, (*i*) makes the consummation of the Transaction illegal; (*ii*) results in a material delay in the ability of Purchaser to consummate the Transaction; or (*iii*) imposes material limitations on the ability of Purchaser to exercise full rights of Partnership Interest or of a material portion of the assets or business of the Companies;

    7.1.3  The applicable waiting period under any governmentally-imposed waiting period shall have expired or been terminated;

    7.1.4  Any required consent to the Transaction under any agreement, contract or license (including such as may be required from any government or governmental authority), the withholding of which might have an adverse effect on the condition (financial or otherwise), properties, assets, business or operations of the Companies shall have been obtained;

    7.1.5  The Owners shall have complied with the provisions of Section 3.16 hereof and shall have obtained and delivered to Purchaser the determination letter referred to therein;

    7.1.6  The representations and warranties of the Owners contained in Sections 2 and 3 hereof shall be true and correct on and as of the Closing Date as though made on the Closing Date, and the Owners shall have complied with the covenants set forth in Section 5 hereof.

7.2  **Conditions to the Owners' Obligations.** Notwithstanding any other provisions of this Agreement, the obligations of the Owners to effect the Transaction shall be subject to the fulfillment or written waiver of the following conditions:

    7.2.1  All material permits, approvals and consents of any federal, state or other government or governmental authority necessary or appropriate for consummation of the Transaction shall have been obtained;

    7.2.2  There shall not be any action taken, or any statute, rule, regulation or




order enacted, entered, enforced or deemed applicable to the Transaction by any federal or state government or governmental authority and there shall not be in effect an order entered by any federal or state court which, in the sole reasonable judgment of the Partnership and the Owners, (*i*) makes the consummation of the Transaction illegal; or (*ii*) results in a material delay in the ability of the Partnership or the Owners to consummate the Transaction;

7.2.3   The applicable waiting period under any governmentally-imposed waiting period, shall have expired or been terminated;

7.2.4   Any required consent to the Transaction under any agreement, contract or license (including such as may be required from any government or governmental authority), the withholding of which might have an adverse effect on the condition (financial or otherwise), properties, assets, business or operations of Purchaser shall have been obtained; and

7.2.5   The representations and warranties of the Purchaser contained in Section 4 hereof shall be true and correct on and as of the Closing Date as though made on the Closing Date, and the Purchaser shall have complied with all covenants set forth in this Agreement.

8.   **CLOSING.**

8.1   <u>Closing Date</u>. The closing of the Transaction hereunder (the "Closing"), shall take place at the offices of Sprouse Shrader Smith P.C., 701 S. Taylor, Suite 500, Amarillo, Texas at 10:00 a.m. on the morning of January 13, 2006, or at such other time, place and manner as Purchaser and the Owners may mutually agree upon. The time and date on which the Closing is actually held is referred to herein as the "Closing Date."

8.2   <u>Certain Closing Deliveries</u>.

8.2.1   <u>Owners Deliveries</u>. At the Closing, the Owners shall deliver to Purchaser a) a general instrument of sale, conveyance, assignment, transfer and delivery of the Partnership Interest; b) the minute books and ledgers of the Partnership and its subsidiaries; d) payoff letters from all debt-holders, including, but not limited to, Merrill Lynch Business Financial Services, Inc., Southwest Mezzanine Investments; and Scotiabank de Costa Rica, S.A. c) the Escrow Agreement; d) resignations of the officers and directors of the Companies; e) the lease for the Partnership's existing manufacturing facility in Amarillo, Texas ("Lease"), as set forth in Exhibit 8.2.1(e) hereof; f) the five year non-compete agreement executed by Mr. Richard Russell as set forth in <u>Exhibit</u> 8.2.1(f) hereof; and g) the employment agreements set forth in Exhibit 6.14 hereof ("Employment Agreements").

8.2.2   <u>Purchaser Deliveries</u>. At the Closing, Purchaser shall deliver to the Owners a) immediately available wire transferred funds in the amount of the

 

Purchase Price, less the Assumed Debt and the Escrow Funds, as provided in Section 1.2; b) the Lease; c) the Escrow Agreement; d) the Employment Agreements; and e) the five year non-compete agreement executed by Mr. Richard Russell as set forth in Exhibit 8.2.1(f) hereof. The Purchase Price shall be disbursed as set forth in Exhibit 8.2.2.

9. **INDEMNIFICATION.**

   9.1 **Owners.** Subject to consummation of the Transaction, and further subject to the provisions of Section 10 of this Agreement, the Owners, individually and jointly agree that, notwithstanding the Closing and regardless of any investigation made by or on behalf of Purchaser or of any information Purchaser may have in respect thereof, the Owners will indemnify and save and hold Purchaser harmless from and against any cost, expense, damage, liability, loss or deficiency suffered or incurred (including, but not limited to all reasonable costs and expenses, including reasonable attorney's fees, incurred by Purchaser in connection with any action, suit, proceeding, demand, assessment or judgment incident to any of the matters indemnified against in this Section 9.1) by Purchaser arising out of or resulting from, and will pay Purchaser on demand the full amount (except as set forth below) of any sum which Purchaser may be obligated to pay and shall reasonably have paid in respect of:

   9.1.1 Any inaccuracy in any representation or the breach of any warranty by the Owners in or pursuant to this Agreement;

   9.1.2 Any failure of the Owners, the Partnership or the Subsidiaries duly to perform or observe any term, provision, covenant, agreement or condition in this Agreement required on the part of the Owners, the Partnership, the Subsidiaries or any of them, to be performed or observed prior to or at the Closing;

   9.1.3 Any and all debts, liabilities or obligations of the Companies, direct or indirect, fixed, contingent or otherwise, which exist at or as of the date of the Closing or which arise after the Closing from any act, omission, transaction, circumstance, production or sale of goods or services, state of facts, environmental or other condition or event which occurred or existed on or before the date of the Closing, whether or not then known, due or payable, except to the extent accrued or reserved for in the Closing Balance Sheet and except as otherwise qualified, referred to or contemplated under this Agreement, including but not limited to the matters provided for or disclosed in Article III hereof and in the Schedules hereto;

   9.1.4 Any tax liability (including penalties and interest) that may be assessed against any of the Companies, Purchaser or any other transferee, with respect to the operations of the Companies for all periods ending on or prior to the Closing Date and not accrued or reserved for in the Closing Balance Sheet;

   9.1.5 The amount of any and all receivables of the Companies or any of them

Page 29

which are not collected in accordance with the provisions of Section 3.24; and

    9.1.6    Any environmental claim or liability involving the compounds listed on Schedule 9.1.6 or any pollutant, contaminant, chemical, substance or condition that is discovered to have been present on the Property as of the Closing Date as a result of any investigation of the Property conducted by a third party (e.g., not by Purchaser or any affiliate thereof), and in each case which is in violation of, or in a manner which creates, a material liability under applicable Environmental Laws; and further provided, however that Owners shall have no obligation to indemnify Purchaser to the extent that any such Claim arises or results from the acts or omissions of the Purchaser, its successors or assigns, and the employees, agents, contractors, tenants and invitees of any of them. Owners further agree to accept tender from the Purchaser of any claim indemnified by Owners pursuant to this Section 9.1.6.

9.2    <u>Purchaser</u>. Subject to consummation of the Transaction, and further subject to the provisions of Section 10 of this Agreement, Purchaser agrees that, notwithstanding the Closing, and regardless of any investigation made by or on behalf of the Owners or of any information the Owners may have in respect thereof, Purchaser will indemnify and save and hold the Owners harmless from and against any cost, expense, damage, liability, loss or deficiency suffered or incurred (including, but not limited to all reasonable costs and expenses, including reasonable attorney's fees), incurred by the Owners in connection with any action, suit, proceeding, demand, assessment or judgment incident to arising out of or resulting from any of the matters indemnified against in this Section 9.2) and will pay the Owners on demand the full amount (except as set forth below) of any sum which the Owners may be obligated to pay and shall reasonably have paid in respect of:

    9.2.1    Any inaccuracy in any representation or the breach of any warranty made by Purchaser, in or pursuant to this Agreement; and

    9.2.2    Any failure of Purchaser duly to perform or observe any term, provision, covenant, agreement or condition in this Agreement required on the part of Purchaser, to be performed or observed prior to or at the Closing.

9.3    <u>Mutual Provisions</u>.

    9.3.1    In the event of a dispute between the parties, each party shall bear its own cost and expenses incident to any suit, action or proceeding undertaken to resolve the dispute. Subject to Section 10 of this Agreement, all representations and warranties made by any party pursuant to this Agreement shall survive the Closing.

    9.3.2    Where any representation or warranty contained in this Agreement is expressly qualified by reference to the Owner's Knowledge, information or belief, Owners confirm that they have no knowledge that such representation or warranty