David M. Monachino (DM 1527)
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

Michael D. Wexler, Esq. (admitted *pro hac vice*)
Jason P. Stiehl, Esq. (admitted *pro hac vice*)
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000

Attorneys for Plaintiff ITW Tech Spray, L.L.C.

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
ITW Tech Spray, L.L.C.,                                     :    **ECF Case**
                                                            :
                              Plaintiff,                    :    07 Civ. 6676 (Judge Crotty)
                                                            :
              v.                                            :    **FIRST AMENDED COMPLAINT**
                                                            :
Tech Spray Management Company, L.L.C.,                      :
Richard Russell and Rita Russell,                           :
                                                            :
                              Defendants.                   :
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff ITW Tech Spray L.L.C. ("Plaintiff" or "ITW Techspray"), through its attorneys,

Seyfarth Shaw LLP, as and for its First Amended Complaint against Defendants Tech Spray

Management Company, L.L.C., Richard Russell and Rita Russell (collectively, "Defendants" or

"the Owners"), allege as follows:

## INTRODUCTION

1.      Illinois Tool Works Inc., through a subsidiary, ITW Tech Spray, L.L.C.

(collectively "ITW" or "ITW Techspray"), paid millions of dollars to the Defendants to purchase

Tech Spray L.P., a manufacturer of chemicals and products for the electronics industry. ITW did

so based upon the Defendants making certain representations and warranties and allegedly

fulfilling certain obligations to disclose information and documents critical to evaluating Tech

Spray L.P. and a purchase price. Ultimately, it was discovered that the Defendants failed to

deliver to ITW correspondences and a contract entered into one month prior to the sale of Tech

Spray L.P. obligating Tech Spray L.P. to a 46% price increase in a raw material, failed to provide

ITW with notice of a significant increase in the price of raw materials, failed to disclose prior to

the sale that key leaders were leaving Tech Spray L.P. and failed to disclose that the Defendants'

son ran a personal business in competition with Tech Spray L.P. out of Tech Spray L.P. As a

result of the Defendants chicanery and failure to fulfill their obligations, ITW Tech Spray, L.L.C.

was damaged.  Additionally, Defendants failed to pay ITW Techspray certain monies from an

escrow account established to compensate ITW Techspray for specific expenses and liabilities

identified by ITW Techspray during the months following the closing.

## NATURE OF ACTION

2.      This action seeks substantial compensatory and punitive damages, as well as legal

fees and special damages, against the Owners arising out of, among other things, the Owners'

fraudulent misrepresentations made in connection with the "Acquisition and Sale Agreement"

(the "ASA") dated January 13, 2006, between ITW Tech Spray L.L.C, as purchaser, and the

Owners, as sellers, of all the Owners' interests in Tech Spray, L.P. ("Techspray[1]"), as well as

breaches of multiple obligations and warranties contained in the ASA.

3.      As a result of the Owners' acts of wrongdoing and breaches in connection to the

ASA, Plaintiff has been damaged in excess of $10.5 million dollars, and, the Owners' improper

---

[1] "Techspray" will be used throughout to refer generally to the business of Tech Spray L.P. pre and post
sale.

2

conduct prior to and subsequent to the acquisition caused Plaintiff to incur significant additional costs and expenses.

## PARTIES

4.    Plaintiff ITW Tech Spray L.L.C. is a Delaware Corporation and has its principal business office in Glenview, Illinois.  ITW Tech Spray L.L.C.'s sole member, Illinois Tool Works Inc. ("ITW"), is a Delaware Corporation with its principal place of business in Glenview, Illinois.

5.    Upon information and belief, Defendant Tech Spray Management Company L.L.C. is a limited liability company with its principal place of business in Amarillo, Texas. Its members are Defendants Richard Russell and Rita Russell.

6.    Upon information and belief, Defendants Richard Russell and Rita Russell are citizens of Arizona.

## JURISDICTION AND VENUE

7.    This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states and the matter in controversy exceeds $75,000.00, excluding interest and costs. This Court has supplementary jurisdiction pursuant to 28 U.S.C. § 1367.

8.    This Court has personal jurisdiction over Defendants and venue is proper in this District under 28 U.S.C. § 1391, because the parties contractually agreed to litigate this dispute in the Southern District of New York, and the parties subjected themselves to jurisdiction in this District through implementation of the terms of the ASA in New York City, New York. Moreover, upon information and belief, the Owners transacted business within the State and County of New York.

3

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

A.     **Techspray's Business**

9.     Techspray specializes in the design and manufacture of electronic cleaners, desoldering braid, temporary solder masks and other consumables for electronic manufacture, rework and repair.

10.     For many years, Techspray performed extensive research in formulating, blending and packaging a wide variety of chemicals and assorted support products for the electronics industry.

11.     One of Techspray's leading products is aerosol based solutions which are used to clean lenses, keyboards and circuit boards. For example, Techspray manufactures an aerosol canned product that blows propellant onto a camera lens to clean the lens without smudging or scratching the lens.

12.     Techspray manufactures aerosol spray cleaners by combining a specific ratio of specified chemicals with a propellant, placing the cleaner solution in an aerosol can, labeling the can and shipping the can to its distributors or direct customers in boxes containing multiple cans. One of the propellants commonly used by Techspray is called 134a.

13.     Techspray sells its cleaners and other products under its own name and private labels.

14.     Private labeling is the name given to the process by which manufacturers produce their product, but place the label of another company on the finished product so that the other company can call the product its own.

15.     For example, a person might check into a hotel or fly on an airplane in which he or she may be given a bottle of water displaying the airline's or hotel's logo on it. That bottle of

4

water was likely produced by a well known bottler of water, but the airline or hotel ordered the water with its own label on it instead.

16.     In private labeling situation, the company ordering the private label product many times will actually insist on very specific modifications to the standard product produced by the manufacturer.

17.     Some companies require the specific modifications for quality reasons, others for cost reasons and still others for marketing reasons.

18.     The specific requirements of private label customers are called the customers specifications and this information is recorded on the bill of materials.

19.     The bill of materials outlines in great detail the specific requirements of Techspray's customer for private label chemical cleaners.

20.     In turn, Techspray develops a formula and a method by which it can produce its chemicals to meet the specifications in the bill of materials.

21.     Techspray captures its formula and method to fulfill the bill of materials in a standard operating procedure specific to each private label customer.

22.     Techspray spent years developing its chemicals and spent hundreds of thousands of dollars, if not millions, developing the composition of its chemicals.

23.     Likewise, Techspray devotes considerable time and resources to developing chemicals that meet the specific requirement of its private label customers and the standard operating procedures to fulfill the bills of materials.

24.     Many times, multiple attempts of trial and error are needed to find the right combination of chemicals to meet a customer's specific requirements.

25.    The price at which Techspray sells its products to its customers is another key factor in the success of Techspray. Its pricing is affected by supply costs and margins.

26.    Techspray's formulas, methods, margins, pricing, bills of material, standard operating procedures and supply costs are proprietary to Techspray and are only available to Techspray employees.

27.    The private label business of Techspray accounts for a substantial portion of Techspray's business.

28.    Techspray is a leader in customer support and service through the use of a well trained sales and support staff.

**B.    The Owners Hid a Significant Price Increases and Subsequent
Amendments to Key Contracts Just Prior to the Sale of Techspray to ITW**

29.    In 2005, the Owners decided to sell Techspray with the assistance of John Grimes and his firm Growth Capital Partners ("GCP").

30.    During the summer of 2005, ITW began negotiations with the Owners to purchase Techspray through an entity ITW created called ITW Tech Spray, L.L.C.

31.    During late 2005, GCP, on behalf of the Owners, opened a virtual data room ("VDR") containing significant information about Techspray including: contracts, financial documents, employment agreements, sales projections and other documents.

32.    The VDR was opened to facilitate ITW's due diligence of Techspray.

33.    In addition to other documents, the VDR contained "Significant Supplier Contracts."

34.    Identified amongst the Significant Supplier Contracts were contracts significant to Techspray's business between Arkema (formerly known as ATOFINA Chemicals, Inc.) and Techspray for the supply of the aerosol propellant known as 134a.

6

35.    134a is the propellant used in aerosol solvents and dusters, a significant component of Techspray's business.

36.    The price of 134a can affect the cost of Techspray's finished products and consequently the profitability of Techspray's products.

37.    ITW was provided access to the VDR to review Techspray's Significant Supplier Contracts.

38.    The VDR contained the original supply contract with Arkema, effective from July 1, 2002 through June 30, 2003, setting the price of 134a at $1.62 per pound, and requiring Techspray to purchase a minimum of 3,400,000 pounds.

39.    The VDR contained the first amendment to the supply contract with Arkema, effective July 1, 2003, and setting the price of 134a at $1.55 per pound.

40.    The VDR contained the second amendment to the supply contract, effective July 1, 2004 through December 31, 2004, setting the price of 134a at $1.49 per pound.

41.    The VDR contained the third amendment to the supply contract, effective December 31, 2004 through December 31, 2005, setting the price of 134a at $1.815 per pound.

42.    Notably, many of the contracts between Arkema and Techspray were executed after the expiration of the previous contract.

43.    Subsequent to the execution of the third amendment beginning in approximately October – November 2005, Grant Russell, the Owners' son and President of the private-label division of Techspray, and Arkema negotiated a fourth amendment to the supply contract.

44.    ITW was never informed that these negotiations were finalized, never supplied with any documents indicating a new price was being negotiated and was never informed by Owners of a significant price increase in the cost of the raw material-134a.

7

45.     On December 12, 2005, one month prior to the closing of the purchase of Techspray by ITW, Sam Spradlin, the CFO of Techspray, executed a fourth amendment to the supply contract obligating Techspray (and, because of the purchase of Techspray one month later, ITW) to pay $2.65 a pound for 134a.

46.     This was a 46% increase in the price per pound from one year earlier.

47.     In addition, the minimum quantities increased for the first time from 3.2 million pounds to 4.3 million pounds, representing a 26% increase.

48.     On December 2, 2005, well prior to the sale of Techspray, Arkema sent a letter to Sam Spradlin forwarding the finalized fourth amendment to the Arkema contract with Techspray for execution by Techspray.

49.     On December 12, 2005, Sam Spradlin executed the fourth amendment to the Arkema contract with Techspray. On December 12, 2005, the executed fourth amendment was forwarded to Arkema with a letter from Techspray's Bill Koskie to Kirsten Makel of Arkema.

50.     The correspondence between Techspray and Arkema regarding the negotiations and execution of the fourth amendment to the Arkema contract with Techspray and the actual fourth amendment were never placed in the VDR.

51.     Neither the correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray nor the actual fourth amendment contract were provided to ITW or the Plaintiff prior to the sale of Techspray to ITW.

52.     Richard Russell did not provide the physical correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

8

53.     Richard Russell did not provide the fourth amendment document to the contract between Arkema and Techspray to ITW or the Plaintiff prior to the sale of Techspray to ITW.

54.     Rita Russell did not provide the physical correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

55.     Rita Russell did not provide the fourth amendment document to the contract between Arkema and Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

56.     Grant Russell did not provide the physical correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

57.     Grant Russell did not provide the fourth amendment document to the contract between Arkema and Techspray to ITW or the Plaintiff prior to the sale of Techspray to ITW.

58.     Sam Spradlin did not provide the physical correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

59.     Sam Spradlin did not provide the fourth amendment document to the contract between Arkema and Techspray to ITW or the Plaintiff prior to the sale of Techspray to ITW.

60.     James Witcher did not provide the physical correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

61.     James Witcher did not provide the fourth amendment document to the contract between Arkema and Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

9

62.    Bo Maurer did not provide the physical correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

63.    Bo Maurer did not provide the fourth amendment document to the contract between Arkema and Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

64.    Bill Koskie did not provide the physical correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

65.    Bill Koskie did not provide the fourth amendment document to the contract between Arkema and Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

66.    No employee of Techspray provided the physical correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

67.    No employee of Techspray provided the fourth amendment document to the contract between Arkema and Techspray to ITW or the Plaintiff prior to the sale of Techspray to ITW.

68.    No representative of the Owners provided the physical correspondence between Techspray and Arkema regarding the negotiations of and execution of the fourth amendment to the Arkema contract with Techspray to ITW or Plaintiff prior to the sale of Techspray to ITW.

69.    No representative of the Owners provided the fourth amendment document to the contract between Arkema and Techspray to ITW or the Plaintiff prior to the sale of Techspray to ITW.

10

70.    Richard Russell did not orally inform ITW or Plaintiff that Techspray was negotiating or had entered into a fourth amendment to the supply contract between Arkema and Techspray prior to the sale of Techspray to ITW.

71.    Rita Russell did not orally inform ITW or Plaintiff that Techspray was negotiating or had entered into a fourth amendment to the supply contract between Arkema and Techspray prior to the sale of Techspray to ITW.

72.    Grant Russell did not orally inform ITW or Plaintiff that Techspray was negotiating or had entered into a fourth amendment to the supply contract between Arkema and Techspray prior to the sale of Techspray to ITW.

73.    Sam Spradlin did not orally inform ITW or Plaintiff that Techspray was negotiating or had entered into a fourth amendment to the supply contract between Arkema and Techspray prior to the sale of Techspray to ITW.

74.    James Witcher did not orally inform ITW or Plaintiff that Techspray was finalizing negotiations or had entered into a fourth amendment to the supply contract between Arkema and Techspray prior to the sale of Techspray to ITW.

75.    Bo Maurer did not orally inform ITW or Plaintiff that Techspray was negotiating or had entered into a fourth amendment to the supply contract between Arkema and Techspray prior to the sale of Techspray to ITW.

76.    Bill Koskie did not orally inform ITW or Plaintiff that Techspray was negotiating or had entered into a fourth amendment to the supply contract between Arkema and Techspray prior to the sale of Techspray to ITW.

77.    Prior to the sale of Tech Spray L.P. to ITW, but after the execution of the fourth amendment, Spradlin was specifically asked by ITW's auditors whether any changes had

11

occurred regarding the pricing, contracts, or supplier relationships, to which he responded that none had occurred.

78.     Prior to the sale of Tech Spray L.P., to ITW, but after the execution of the fourth amendment, management of Techspray was asked whether any changes had occurred regarding the pricing, contracts, or supplier relationships, to which it responded that none had occurred.

79.     Prior to the sale of Tech Spray L.P. to ITW, but after a significant increase in the price of the 134a, the Owners, Grant Russell, Sam Spradlin, James Witcher, Bo Maurer and Bill Koskie did not inform ITW orally or in writing of a significant increase in the price of 134a or that a fourth amendment to the supply contract between Arkema and Techspray had been negotiated or signed.

C.     **The Owners Hid the Imminent Departure of Two Key Employees**

80.     Prior to closing, Richard Russell, required that ITW offer employment contracts to four key employees: Grant Russell, Jimmy Witcher, Sam Spradlin, and Bo Maurer.

81.     Of those four, three were given substantial closing bonuses by the Owners if the deal between ITW and the Owners closed.

82.     Specifically, the Owners required that ITW give Spradlin an employment contract.

83.     Spradlin, however, also received a closing bonus from the Owners of $135,000.

84.     Likewise, the Owners required that ITW give Jimmy Witcher, the President of Techspray, an employment contract.

85.     Witcher, however, also received a closing bonus from the Owners of $625,000.

86.     Both Spradlin and Witcher signed employment agreements prior to closing.

87.     On information and belief, the Owners' insistence that ITW provide employment contracts to Spradlin and Witcher was a ruse to create the appearance that these individuals were

12

going to continue to be employed at Techspray since ITW would not have purchased Techspray if its leadership left.

88.    Witcher tendered his resignation on Monday, January 16, 2006, one business day following the sale of Techspray to ITW and after he received the $625,000 closing bonus promised to him by the Owners if the sale transaction closed.

89.    Spradlin tendered his resignation the following day, on Tuesday, January 17, 2006, once again after the sale closed and he received the $135,000 closing bonus promised to him by the Owners if the transaction closed.

90.    Both Witcher and Spradlin received their very large closing bonuses upon closing and the Owners received thirty-six (36) million dollars.

**D.    Grant Russell, the Owners' Son, Refuses to
Divest Himself of His Interest in a Competing Business
and Refuses to Sign His Agreed Upon Employment Agreement**

91.    One day prior to closing, ITW discovered that Grant Russell was running a competing business within Techspray, using Techspray resources.

92.    Immediately after discovering this fact, ITW requested that Grant Russell divest himself of his interest in that company and sign an employment agreement to that effect.

93.    Prior to closing, Grant Russell agreed to divest himself of the company and enter into an employment agreement as negotiated by his attorneys.

94.    However, two business days after closing, Grant Russell refused to sign the employment agreement.

95.    Grant Russell also refused to divest himself of the competing company.

96.    Immediately after the closing, Grant Russell collected Techspray's: (1) vendor lists, which identified the supplies and suppliers of the components for various products, (2) bills of materials detailing the specific proprietary components of the private-labeled products, (3)

13

pricing information for raw materials, and (4) the standard operating procedures for private label customers detailing customers' specific requirements.

97.    Grant Russell also requested employees to provide him with formula specifications and lab samples for products produced for private-label customers, as well as information regarding finished goods assembly of various cleaning kits and billing procedures.

98.    Grant Russell collected information that he previously had not asked for and told ITW Techspray employees that he was doing so to take ITW Techspray's private label business from ITW Techspray for his own competing business.

99.    In return for information, Grant Russell promised to reward employees with new employment and salary if they helped him in any way possible.

100.    ITW Techspray discovered Grant Russell's improper actions and terminated him on or about February 2, 2006.

101.    Grant Russell also received from the Owners a $625,000 bonus upon the closing of the sale of Techspray.

102.    Subsequently, ITW Techspray has been forced to file litigation against Grant Russell in Arizona for improper removal of confidential information, his use of the information to improperly compete against ITW Techspray, and his improper attempt to solicit ITW Techspray employees.

E.    **The Owners Breach Numerous Obligations
and Make Untrue Representations and Warranties**

103.    On January 13, 2006, ITW acquired all of the equity and ownership in Techspray for $36 million dollars, pursuant to the Acquisition and Sale Agreement ("ASA"), attached hereto and incorporated herein as Exhibit A.

14

104.    Through the ASA, the Owners of Techspray were obligated to perform certain

tasks and the Owners were required to make, and in fact made, numerous warranties,

representations and covenants pertinent to this matter.

105.    Specifically, the Owners warranted and represented that since September 30,

2005, Techspray had not:

> Section 3.11.6 ... had any change in its relations with its employees, agents,
> customers or suppliers or with any governmental authorities or self-regulatory
> organizations, which would in each case have a material adverse effect on the
> Companies individually or in the aggregate;
>
> Section 3.11.12 ...made any purchase commitment in excess of the normal,
> ordinary and usual requirements or at any price in excess of the then current
> market price, or made any change in selling, pricing, advertising or personnel
> practices of the Partnership or Subsidiaries inconsistent with its prior practice;
>
> Section 3.11.13 Suffered any change, event or condition which, in any case or in
> the aggregate, has had or reasonably may be expected to have a material adverse
> effect on the Partnership's or any of the Subsidiaries' condition, properties, assets,
> liabilities, or operations, including, without limitation, any change in the
> Partnership's or such Subsidiary's revenues, costs, backlog or relations with its
> employees, agents, customers, or suppliers ....;

(ASA, Ex. A.)

106.    The Owners were obligated to and/or represented that they had provided:

> Section 3.14.1. Each contract, agreement or commitment... for the purchase of
> inventories, equipment, raw materials, supplies, services or utilities which
> involves payments or receipts by the Companies of $25,0000 or more per annum
> and... iii) is otherwise material to the assets, business, results of operations or the
> financial condition of the Companies individually or in the aggregate; ....

(ASA, Ex. A.)

107.    The Owners were obligated to and/or represented that the documents referenced

in 3.14.1:

> have been delivered by the Owners to Purchaser and are true and complete and
> include all amendments, supplements or modifications thereto.

(ASA, Ex. A.)

15

108.    Through Section 3.35, the Owners assured that no "representation or warranty...

will contain any untrue statement of material fact or omits or will omit to state a material fact

necessary to make statements contained therein not misleading." (ASA, Ex. A.)

109.    The Owners also had an affirmative duty to make an inquiry regarding the terms,

obligations, representations and warranties expressed in the ASA with their key managers,

including: (1) Grant Russell, (2) Sam Spradlin, (3) James Witcher, (4) Bo Maurer, and (5)

Techspray's plant mangers.

110.    Specifically, Section 9.32 provides (emphasis added):

> Where any representation or warranty contained in this Agreement is expressly
> qualified by reference to the Owners' Knowledge, information or belief, Owners
> confirm that they have no knowledge that such representation or warranty is not
> true and correct to the same extent provided in such representation or warranty
> and that have made due and diligent inquiry as to the matters that are the subject
> of such representations and warranties, including due inquiry of appropriate
> members of management of the Companies including **Grant Russell, James
> Witcher, Sam Spradlin,** Bo Maurer and the plant managers at each of the
> Companies facilities, and nothing has come to their attention during the course of
> such inquiry or otherwise which cause such party in the exercise of due diligence,
> to believe that such representation and warranty is not true and correct in all
> material respects.

(ASA, Ex. A.)

111.    Through the ASA, the Owners represented and warranted that the Owners in fact

fulfilled their obligations under the ASA and made due inquiry.

112.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita

Russell made due inquiry of Sam Spradlin to ascertain whether Techspray had entered into any

contracts and/or incurred any changes that would have or may be expected to have a material

adverse effect on Techspray's assets, liabilities, operations, revenue, costs or relations with its

suppliers.

16

113.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Sam Spradlin to ascertain whether all physical contracts or agreements for the purchase of raw materials or supplies exceeding $25,000 or more per annum and all supplier contracts including all amendments thereto were supplied to ITW.

114.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Grant Russell to ascertain whether Techspray had entered into any contracts and/or incurred any changes that would have or may be expected to have a material adverse effect on Techspray's assets, liabilities, operations, revenue, costs or relations with its suppliers.

115.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Grant Russell to ascertain whether all physical contracts or agreements for the purchase of raw materials or supplies exceeding $25,000 or more per annum and all supplier contracts including all amendments thereto were supplied to ITW.

116.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of James Witcher to ascertain whether Techspray had entered into any contracts and/or incurred any changes that would have or may be expected to have a material adverse effect on Techspray's assets, liabilities, operations, revenue, costs or relations with its suppliers.

117.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of James Witcher to ascertain whether all physical contracts or agreements for the purchase of raw materials or supplies exceeding $25,000 or more per annum and all supplier contracts including all amendments thereto were supplied to ITW.

17

118.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Bo Maurer to ascertain whether Techspray had entered into any contracts and/or incurred any changes that would have or may be expected to have a material adverse effect on Techspray's assets, liabilities, operations, revenue, costs or relations with its suppliers.

119.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Bo Maurer to ascertain whether all physical contracts or agreements for the purchase of raw materials or supplies exceeding $25,000 or more per annum and all supplier contracts including all amendments thereto were supplied to ITW.

120.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Bill Koskie to ascertain whether Techspray had entered into any contracts and/or incurred any changes that would have or may be expected to have a material adverse effect on Techspray's assets, liabilities, operations, revenue, costs or relations with its suppliers.

121.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Bill Koskie to ascertain whether all physical contracts or agreements for the purchase of raw materials or supplies exceeding $25,000 or more per annum and all supplier contracts including all amendments thereto were supplied to ITW.

122.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Techspray's plant managers to ascertain whether Techspray had entered into any contracts and/or incurred any changes that would have or may be expected to have a material adverse effect on Techspray's assets, liabilities, operations, revenue, costs or relations with its suppliers.

18

123.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Techspray's plant managers to ascertain whether all physical contracts or agreements for the purchase of raw materials or supplies exceeding $25,000 or more per annum and all supplier contracts including all amendments thereto were supplied to ITW.

124.    Sam Spradlin informed Richard Russell and/or Rita Russell prior to the closing of the sale of Techspray to ITW that Techspray entered into a fourth amendment to the supply contract between Arkema and Techspray for 134a calling for a price increase in 134a.

125.    Sam Spradlin provided Richard Russell and/or Rita Russell with copies of the fourth amendment to the supply contract between Arkema and Techspray prior to the closing of the sale of Techspray to ITW.

126.    Grant Russell informed Richard Russell and/or Rita Russell prior to the closing of the sale of Techspray to ITW that Techspray entered into a fourth amendment to the supply contract between Arkema and Techspray for 134a calling for a price increase in 134a.

127.    Grant Russell provided Richard Russell and/or Rita Russell with copies of the fourth amendment to the supply contract between Arkema and Techspray prior to the closing of the sale of Techspray to ITW.

128.    James Witcher informed Richard Russell and/or Rita Russell prior to the closing of the sale of Techspray to ITW that Techspray entered into a fourth amendment to the supply contract between Arkema and Techspray for 134a calling for a price increase in 134a.

129.    James Witcher provided Richard Russell and/or Rita Russell with copies of the fourth amendment to the supply contract between Arkema and Techspray prior to the closing of the sale of Techspray to ITW.

19

130.    Bo Maurer informed Richard Russell and/or Rita Russell prior to the closing of the sale of Techspray to ITW that Techspray entered into a fourth amendment to the supply contract between Arkema and Techspray for 134a calling for a price increase in 134a.

131.    Bo Maurer provided Richard Russell and/or Rita Russell with copies of the fourth amendment to the supply contract between Arkema and Techspray prior to the closing of the sale of Techspray to ITW.

132.    Bill Koskie informed Richard Russell and/or Rita Russell prior to the closing of the sale of Techspray to ITW that Techspray entered into a fourth amendment to the supply contract between Arkema and Techspray for 134a calling for a price increase in 134a.

133.    Bill Koskie provided Richard Russell and/or Rita Russell with copies of the fourth amendment to the supply contract between Arkema and Techspray prior to the closing of the sale of Techspray to ITW.

134.    Employees of Techspray informed Richard Russell and/or Rita Russell prior to the closing of the sale of Techspray to ITW that Techspray entered into a fourth amendment to the supply contract between Arkema and Techspray for 134a calling for a price increase in 134a.

135.    Employees of Techspray provided Richard Russell and/or Rita Russell with copies of the fourth amendment to the supply contract between Arkema and Techspray prior to the closing of the sale of Techspray to ITW.

136.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of Sam Spradlin to ascertain whether he would remain as an employee of Techspray after the sale.

20

137.    Prior to the closing of the sale of Techspray to ITW, Richard Russell and/or Rita Russell made due inquiry of James Witcher to ascertain whether he would remain as an employee of Techspray after the sale.

138.    On information and belief, prior to the closing of the sale of Techspray to ITW, Sam Spradlin informed Richard Russell and/or Rita Russell that he would not remain as an employee of Techspray after the sale.

139.    On information and belief, prior to the closing of the sale of Techspray to ITW, James Witcher informed Richard Russell and/or Rita Russell that he would not remain as an employee of Techspray after the sale.

140.    Prior to the closing of the sale of Techspray, the Owners did not disclose to Plaintiff that Sam Spradlin and/or James Witcher were going to leave the employ of Techspray after the sale closed.

141.    Plaintiff, in reliance upon the Owners' fulfilling their obligations under the ASA as well as the representations and warranties made by the Owners and their counsel, purchased Techspray from the Owners.

F.      **Nearly Six Months after Closing the Transaction,
        ITW Learns about the New Contract with Arkema**

142.    In June 2006, after noticing a significant decrease in operating income, ITW Techspray conducted an investigation as to the cause of this decrease.

143.    Through this investigation, ITW discovered for the first time the price increase in 134a that Grant Russell negotiated, Sam Spradlin executed and the Owners did not reveal to ITW.

21

144.    ITW also discovered written correspondence and a written contract (the fourth amendment) increasing the price of 134(a) which had never been provided to ITW by the Owner's or any Techspray employee.

## COUNT I
### (Breach Of Contract)

145.    Plaintiff incorporates by reference the allegations made in paragraphs 1 through 144, as fully set forth herein.

146.    On January 13, 2006, ITW and the Owners entered into a binding contract known as the ASA.

147.    Plaintiff paid the Owners $36,000,000 per the terms of that contract based upon the Owners allegedly fulfilling their obligations, as well as the Owner's representations and warranties.

148.    Plaintiff fully and satisfactorily performed all conditions, covenants and acts required under the ASA.

149.    Per the terms of the contract, the Owners were to provide Plaintiff with all information regarding any changes in the manner in which Techspray conducted its business, including, but not limited to, copies of all contracts, including all amendments, between Techspray and its suppliers, material changes in the business including leadership departures, notice of significant price increases in raw materials and/or information regarding business dealings affecting the revenues, assets, liabilities and costs of Techspray such as the sweetheart terms Grant Russell was receiving for his carefully hidden personal business entity.

150.    The Owners failed to notify ITW of significant changes, failed to make information and documents available to ITW and/or hid the information.

22

151.    As a result of the Owners' failure to provide notice of a significant increase in the cost of a raw material and failure to provide all information and documents required under the contract, including, but not limited to, the fourth amendment to the Arkema supply contract, leadership changes and/or Grant Russell's personal competing business, the Owners breached the ASA and as a result of said breaches, Plaintiff was damaged in that the purchase price for Techspray was overvalued by at least $10,500,000. Had all of the information and notice identified herein been provided to Plaintiff, the purchase price for Techspray would have been far less because Techspray's on-going expenses would have been substantially greater and its profitability substantially less than in previous years and in projected revenues.

152.    ITW Techspray is entitled to the benefit of its bargain, in that it is entitled to the value of the Owners' business had their representation and warranties been true.

153.    Additionally, as a result of the increased supply costs and departure of key employees, Plaintiff also incurred additional expenses, including but not limited to, replacing employees, relocating employees, placing additional managers on site at ITW Techspray and losing customers.

154.    By reason of the foregoing, Plaintiff is entitled to in excess of $10,500,000, together with interest thereon.

## COUNT II
### (Fraudulent Inducement)

155.    Plaintiff incorporates by reference the allegations made in paragraphs 1 through 144, and paragraphs 146 through 154, as fully set forth herein.

156.    The Owners' representation regarding the completeness of the contracts provided to Plaintiff were false when made. Additionally, the Owners' misrepresented its finances and

failed to disclose the circumstances surrounding the negotiation (and eventual execution) of the a fourth amendment to the supply contract for the propellant known as 134a.

157.    The Owners' representation that there had been no change in the relationship with suppliers (Arkema) was false when made.

158.    The Owners' representation that it had not made any change in pricing inconsistent with their prior practice was false when made.

159.    The Owners' representation that they had not made any change in purchasing commitment in excess of the normal requirement was false when made.

160.    The Owners' representation that they had not suffered any changes in costs was false when made.

161.    The Owners' representation that there were no significant price increases in supply costs was false when made.

162.    The Owners' representation that they had provided every contract and amendments was false when made.

163.    The Owners' representation that they had delivered a true and correct copy of all contracts and amendments was false when made.

164.    The Owners' statement that no "representation or warranty... will contain any untrue statement of material fact or omits or will omit to state a material fact necessary to make statements contained therein not misleading" was false when made.

165.    The Owners' representation that they made due inquiry of Grant Russell was false when made.

166.    The Owners' representation that they made due inquiry of Sam Spradlin was false when made.

167.    The Owners' representation that they made due inquiry of Jimmy Witcher was false when made.

168.    The Owners' representation that they made due inquiry of Bo Maurer was false when made.

169.    The Owners were specifically asked whether any material changes had occurred in the operation of the business of Techspray, to which they responded that no changes had occurred.

170.    The Owners' request that ITW provide an employment agreement for Jimmy Witcher as a requirement of closing, knowing that Witcher would depart days after the closing in any event, was misleading.

171.    The Owners' request that ITW provide an employment agreement for Sam Spradlin as a requirement of closing, knowing that Spradlin would depart days after the closing in any event, was misleading.

172.    The Owners failed to disclose that Grant Russell, one of the key members of management, had been operating an independent business utilizing Techspray resources, confidential and proprietary information.

173.    The Owners' requirement that an employment agreement for Grant Russell was a necessity for closing, with knowledge that Grant Russell would refuse to divest himself of this independent business and immediately enter into competition with Techspray, was misleading.

174.    The Owners' knew their representations and warranties to ITW Techspray were false when made or were made with reckless indifference for the truth so that ITW Techspray would be induced to complete the purchase of Tech Spray, L.P. The Owner's had a duty to disclose the concealed facts regarding, among other things, the fourth amendment to the supply

25

contract for the propellant known as 134a known to it prior to the execution of the ASA. The Owner's misstatements and omissions of present facts were collateral to the contract (and induced ITW to sign the contract) and therefore involves a separate breach of duty outside the ASA.

175.    The Owners knew or should have reasonably known that their intentional misstatements and improper actions would require Plaintiff to incur significant special damages outside of the parameters of the ASA, including, but not limited to, professional, attorney and other fees and costs, as a direct result of their fraud, especially in regard to Grant Russell operating a competing business utilizing ITW Techspray's confidential and proprietary information and Jimmy Witcher's and Sam Spradlin's immediate departure from the company.

176.    Additionally, as a result of the Defendants fraud, Plaintiff also incurred additional special damages, expenses and/or losses, including but not limited to, replacing employees, relocating employees, placing additional managers on site at ITW Techspray and loss of customers and goodwill.

177.    All of the above representations, warranties and statements by Owners, were knowingly false when made or made with reckless indifference for the truth so that ITW Techspray would rely upon the representations, warranties and statements.

178.    Plaintiff justifiably acted in due and reasonable reliance on the above representation and warranties by expending time and effort to enter into the ASA, by basing their valuation of the company upon these warranties and representations, and/or by foregoing other business opportunities based upon these warranties and representations.  Additionally, Plaintiff relied upon the ASA, the January 13, 2006 Escrow Agreement, and the numerous indemnification terms therein, which it purchased, as further guarantee and insurance that the

26

representations and warranties in the ASA were truthful and accurate and to guard against future claims. At the time the aforesaid warranties and representations were made by the Defendants, Plaintiff were not aware of the falsity of these statements, and believed them to be true.

179.    The Owners derived substantial economic benefit as a result of their fraud, and the Owners' conduct was undertaken with malice and intent, oppression and fraud, for their own personal gain, thereby justifying an award of exemplary and punitive damages against them.

180.    In agreeing on the Owner's purchase price, ITW placed substantial value on Techspray's intrinsic qualities, including its key personnel (including their quality of service and representations of continued employment), the Techspray's contracts with outside vendors, and its financial performance based on historical pricing, supply costs and/or quantity of purchases. The Owners fraudulently misrepresented those qualities, and, therefore upon the closing of the transaction, ITW acquired Techspray at a price that exceeded its true value. On information and belief, the Owners' egregious conduct and malfeasance caused ITW Techspray damages in excess and/or outside of any contractual limitation contained in the ASA.

181.    As a proximate result of the Owners' fraudulent conduct as aforesaid, ITW Techspray has been damaged in an amount in excess of $10,500,000 in compensatory and/or general damages, plus punitive damages in the amount of $20,000,000, as well as special damages to be proven at trial. ITW Techspray will seek leave of Court to amend the Complaint to insert this amount when it becomes known, or upon further proof thereof.

## COUNT III
### (Reimbursement Of Attorneys' Fees)

182.    Plaintiff incorporates by reference the allegations made in paragraphs 1 through 144, paragraphs 146 through 154 and paragraphs 156 through 181 as fully set forth herein.

183.    Paragraph 9.1 of the ASA provides, in relevant part:

27

[T]he Owners, individually and jointly agree that, notwithstanding the Closing and regardless of any investigation made by or on behalf of Purchaser or of any information Purchaser may have in respect thereof, the Owners will indemnify and save and hold harmless from and against any cost, expense, damage, liability, loss or deficiency suffered or incurred (including but not limited to all reasonable costs and expenses, including reasonable attorney's fees, incurred by Purchaser in connection with any action, suit, proceeding, demand, assessment or judgment incident to any of the matters indemnified against in this Section 9.1) by Purchaser or arising out of or resulting from, and will pay purchaser on demand the full amount (except as set forth below) of any sum which Purchaser may be obligated to pay and shall reasonably have paid in respect of:

9.1.1 Any inaccuracy in any representation or the breach of any warranty by the Owners in or pursuant to this Agreement;

184.    ITW Techspray incurred, and, upon information and belief, will continue to incur attorneys' fees and costs associated therewith in an amount not presently ascertainable, as a result of the Owners' breaches of the ASA and fraud.

185.    As a result of the Owners' breaches of the ASA and fraud, ITW Techspray made a claim and request for indemnification upon the Owners for which the Owners are refusing to satisfy.

186.    Pursuant to the terms of the ASA, the Owners are obligated to reimburse ITW Techspray's attorneys' fees, costs and expenses incurred in pursuing its claims, in an amount to be determined at trial.

**COUNT IV**
**(Release of Escrow Funds)**

187.    Plaintiff incorporates by reference the allegations made in paragraphs 1 through 144, paragraphs 146 through 154, paragraphs 156 through 181 and paragraphs 183 through 186 as fully set forth herein.

188.    Pursuant to the ASA, at closing, an Escrow Fund was established in the amount of $3,000,000.00 against which ITW Techspray was authorized to make claims for amounts due and owing it as a result of certain enumerated breaches of the obligations, representations and

28

warranties contained within the ASA. Plaintiff justifiably relied upon the ASA and the January

13, 2006 Escrow Agreement, and the indemnification terms therein as further guarantee and

insurance that the representations and warranties in the ASA were truthful and accurate.

189.   Pursuant to ASA and the January 13, 2006 Escrow Agreement, the Owners

represented and warranted to ITW and ITW Techspray, among other things, that:

"Section 1.5.1. Within thirty (30) days following the Closing Date, the Owners shall cause the preparation and delivery to Purchaser of a consolidated balance sheet for the Partnership as of the close of business on the Closing Date, which shall be prepared on a basis consistent with the preparation of the Financial Statements (as defined in Section 3.8) and the Partnership's past practices as if the fiscal year ended on the Closing Date, excluding the preparation of year-end statement of cash flows and footnotes (the "Closing Balance Sheet").

"Section 3.4… True and correct copies of the Articles of Incorporation, including all amendments thereto, and by-laws for the Companies organized outside the United States will be delivered to Purchaser within forty-five (45) days after the Closing Date."

"Section 3.9…. The Companies have filed or will file all federal, state, county, local and foreign… property… tax returns which are required to be filed that relate to periods ending on or before the Closing and have paid or will pay all taxes, including, but not limited to, … property … tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or penalty, which have become due, whether pursuant to such returns or otherwise, or become payable with respect to tax periods ending on or prior to the Closing or pursuant to any assessment which has or becomes payable."

"Section 3.10…. The Companies have no material liability or obligation… of any nature whether known or unknown, absolute, accrued, contingent, or otherwise… Except as disclosed on Schedule 3.10, none of the employees of the Companies is now, or will by the passage of time hereinafter become entitled to receive any, retirement benefits (including pension, health and life insurance)… the liability for which has not been accurately recorded in Financial Statements without regard to materiality or prior practice."

Section 3.11.6 . . . The Companies… have not…had any change in its relations with its employees, agents, customers or suppliers or with any governmental authorities or self-regulatory organizations, which would in each case have a material adverse effect on the Companies individually or in the aggregate;"

"Section 3.11.13 The Companies… have not…Suffered any change, event or condition which, in any case or in the aggregate, has had or reasonably may be expected

29

to have a material adverse effect on the Partnership's or any of the Subsidiaries' condition, properties, assets, liabilities, or operations, including, without limitation, any change in the Partnership's or such Subsidiary's revenues, costs, backlog or relations with its employees, agents, customers, or suppliers ...."

"Section 3.29.4... The Companies (a) hold all required registrations, permits, licenses, variances, exemptions, approvals and other authorizations which are required for each of them under federal, state and local laws and regulations relating to pollution or protection of the environment, ...."

190.    The Owners also represented and warranted pursuant to Section 3.35 of the ASA that no "representation or warranty... will contain any untrue statement of material fact or omits or will omit to state a material fact necessary to make statements contained therein not misleading." Moreover, the Owners were required under Section 5.2 of the ASA to advise ITW Techspray of any change in the operations or business of the Techspray which may be reasonably be expected to be materially adverse to any aspect of any of Techspray's business.

191.    Despite the Owners contractual obligations, representations and warranties it was discovered that the Owners failed to reflect numerous matters on the Closing Balance Sheet, as required by the ASA, including, but not limited to: (1) amounts in excess of the reserve for uncollectible receivables from Greentree Spray Technologies; (2) amounts in excess of the reserve for customer rebates and co-ops which were unpaid upon the closing of the sale of Techspray;  (3) an unpaid property tax bill of Techspray for 2005; and (4) unpaid legal bills of Techspray incurred in 2005. Consequently, ITW Techspray paid these previously undisclosed expenses and now seeks reimbursement.

192.    The Owners also did not properly fund certain retirement obligations of Techspray prior to the sale of Techspray, despite representations to the contrary by the Owners, requiring ITW Techspray to pay such funds and incur legal expenses to correct the situation.

30

193.   It was also discovered, despite representations and warranties to the contrary by the Owners, that prior to the sale of Techspray, the Owners did not obtain proper air permitting and/or properly file Tier II documentation with the Texas Commission on Environmental Quality ("TCEQ"). Hence, ITW Techspray was required to apply for permitting from TCEQ, post sale, thereby incurring environmental consulting fees, application fees and other costs that may be imposed by TCEQ.

194.   The Owners also failed to disclose the imminent departure of Sam Spradlin and Jimmy Wicher resulting in the need for ITW to undertake significant costs and expenses to fill the positions of these two individuals, including relocation costs and travel expenses.

195.   By certified letter dated October 19, 2006, as well as previous claim notices, due demand and notice was given pursuant to the ASA and the January 13, 2006 Escrow Agreement sections 9.4.3 and 3.2(a), respectively, of a claim for at least $500,000 against the Escrowed Funds and the Owners.

196.   Despite Techspray's demand for payment of the above referenced items, the Owners have not satisfied Plaintiff's demand.

197.   By reason of Owners numerous failures and breaches, Techspray is entitled to an amount be determined by the Court but believed to be at least $500,000, and for all additional sums, damages, attorney fees and losses incurred by Techspray in connection with the above-described actions of the Owners from the escrowed funds pursuant to the express terms of the ASA.

## RELIEF REQUESTED

**WHEREFORE,** ITW Tech Spray, L.L.C. respectfully demands Judgment against

Defendants as follows:

(a)    On Count I, in the amount of at least $10,500,000, together with interest thereon;

(b)    On Count II, in an amount to be determined by the Court, but believed to exceed $10,500,000 in compensatory damages, and punitive damages in the amount of $20,000,000, as well as special damages in an to be determined at trial;

(c)    On Count III, awarding Plaintiff attorneys' fees and costs incurred in an amount to be determined at trial;

(d)    On Count IV, in an amount to be determined by the Court, but believed to be at least $500,000, plus attorney fees;

(e)    For the costs and disbursements of this action; and

(f)    For such other and further relief as this Court may deem just and proper.

Dated:    New York, New York
December 21, 2007

SEYFARTH SHAW LLP

By: _____

David Monachino (DM-1527)
Michael D. Wexler, Esq.
(admitted *pro hac vice*)
Jason P. Stiehl, Esq.
(admitted *pro hac vice*)
620 Eighth Avenue
New York, New York 10018-1405
Telephone: (212) 218-5500
Facsimile: (212) 218-5526

Attorneys for Plaintiff ITW Tech Spray, L.L.C.

32

USDC SDNY

ITW Tech Spray, L.L.C. v. Tech Spray Management Company, L.L.C. et al

07 Civ 6676 (PAC)

# FIRST AMENDED COMPLAINT

# EXHIBIT A

## ACQUISITION AND SALE AGREEMENT

This Acquisition and Sale Agreement ("Agreement") is made this 13th day of January, 2006 by and among ITW Tech Spray L.L.C., a Delaware limited liability company, or its wholly-owned nominee (the "Purchaser"), having its principal office at 3600 West Lake Avenue, Glenview, Illinois 60026-1215 and Tech Spray Management Company, L.L.C., a Texas limited liability company ("TS") and Richard G. Russell and Rita Russell, individuals (collectively, the "Russells"), TS and the Russells being the owners ("Owners") of all of the equity and ownership interest in Tech Spray, L.P., a Texas limited partnership, having its principal office at 1001 NW. 1st Avenue, Amarillo, Texas (the "Partnership").

### WITNESSETH:

WHEREAS, the Partnership is engaged, directly and through one or more of its Subsidiaries (as defined herein), in the business of marketing and manufacturing specialty repair, maintenance and production support products for industrial, electronic and consumer markets worldwide, including but not limited to solvents, dusters, swabs and brushes, solder tips, shears, desoldering braid, solder pots, maintenance, repair and operation supplies and production supplies ("Business");

WHEREAS, the Owners own, in the aggregate, all of the equity and ownership interest in the Partnership;

WHEREAS, the Partnership, directly or indirectly, owns, except as noted on Schedule 3.2, one hundred percent (100%) of the issued and outstanding capital stock of the Subsidiaries;

WHEREAS, the parties hereto wish to provide for the acquisition of the equity and ownership interest in the Partnership by the Purchaser in accordance with the terms and conditions hereinafter set forth; and

WHEREAS, the Owners and Purchaser desire to make certain representations, warranties and agreements in connection with the acquisition and sale contemplated herein (the "Transaction") and also wish to set forth various conditions precedent to the consummation of the Transaction.

NOW, THEREFORE, in consideration of the mutual covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby, the parties hereto agree as follows:

### I.   TRANSACTION.

1.1   Partnership Interest.   At the Closing, as that term is defined in Section 8.1 hereof, Purchaser shall acquire from the Owners and the Owners shall sell to Purchaser all of the ownership and equity interest in the Partnership (collectively, the "Partnership Interest") for the consideration and upon the terms and conditions hereinafter set forth.



**1.2   Price.** In consideration of the sale and transfer of the Partnership Interest to Purchaser, and subject to the adjustment mechanism as set forth in Section 1.5 hereof, Purchaser shall pay the Owners at the Closing the sum of Thirty Six Million Dollars ($36,000,000) (the "Purchase Price"), less the Assumed Debt, as defined in Section 1.4, and less the Escrowed Funds, as defined in Section 6.8. The parties acknowledge that the Purchase Price may be increased or decreased after Closing, based on the Closing Balance Sheet (as defined in Section 1.5.1) in accordance with the provisions set forth in Section 1.5.

**1.3   Disbursements.** On the Closing Date the Purchaser shall disburse the Purchase Price, less Escrowed Funds and Assumed Debt by wire transfer in immediately available funds in accordance with Exhibit 8.2.2. All disbursements shown on Exhibit 8.2.2 by the Partnership, if any, shall be reflected in the Closing Balance Sheet.

**1.4   Assumed Debt.** The term Assumed Debt shall mean all debt of the Companies and all debt encumbering the assets of the Companies at Closing, as more specifically described on Schedule 1.4 attached hereto.

**1.5   Purchase Price Adjustment.**

1.5.1  Within thirty (30) days following the Closing Date, the Owners shall cause the preparation and delivery to Purchaser of a consolidated balance sheet for the Partnership as of the close of business on the Closing Date, which shall be prepared on a basis consistent with the preparation of the Financial Statements (as defined in Section 3.8) and the Partnership's past practices as if its fiscal year ended on the Closing Date, excluding the preparation of year-end statement of cash flows and footnotes (the "Closing Balance Sheet").

1.5.2  The inventory valuation of the Closing Balance Sheet shall be based on a physical inventory count conducted by the parties on or before the Closing, the results of which shall be included in the Closing Balance Sheet (the "Inventory"). The Inventory shall be counted and valued in accordance with generally accepted accounting principles ("GAAP") as consistently and historically applied by the Partnership and net of applicable inventory reserves (the "Reserves"). There shall be three (3) separate classes of Reserves, which shall be hereinafter referred to as the "Reserve Classes."

Reserve Classes shall be calculated as follows: If any inventory on hand, excluding work in progress and any and all tooling and spare parts, of any stock keeping unit (a "SKU") exceeds the amount of inventory of that SKU used within the 12 month period prior to the Closing, and if there has been some usage within the 12 month period prior to the Closing, then a Reserve Class of 50% shall be assigned to that SKU. If there has been no usage of any inventory on hand of any SKU within the 12 month period prior to the Closing, a Reserve Class of 100% shall be assigned to that SKU. All other SKUs shall be assigned a Reserve Class of 0%.

The Reserve is the sum of the product of the applicable Reserve Class percentage and the Inventory value on-hand for each SKU. For purposes of calculating the Reserves for



the Inventory of Plato GMBH, each SKU shall be assigned the same Reserve Class as was assigned to that SKU in valuing the inventory located at Amarillo. A detailed listing of SKU's and their resulting Reserves shall be delivered as a schedule to the Closing Balance Sheet.

1.5.3  During the thirty (30) day period following Closing, the Purchaser shall cooperate with the Owners and shall allow the Owners reasonable access to the books and records of the Partnership for the purpose of preparing the Closing Balance Sheet. Additionally, the Purchaser shall allow the Owners reasonable access to certain employees of the Partnership, including, but not limited to Mr. Sam Spradlin, for the purpose of preparing the Closing Balance Sheet. In the event the Owners fail to deliver the Closing Balance Sheet as required above, the Purchaser shall have the right to prepare or have prepared such Closing Balance Sheet.

1.5.4  Unless Purchaser gives written notice of a good faith objection to the Closing Balance Sheet before the close of business on the 20th business day after the Purchaser's receipt thereof, the Closing Balance Sheet shall become final and binding upon Purchaser and the Owners as of that 20th business day ("Final Report Date"). If Purchaser (by written notice before the close of business on such 20th day) objects in good faith to the Closing Balance Sheet and if Purchaser and the Owners do not reach agreement on the Closing Balance Sheet within twenty (20) days after notice of objection, then the matter objected to (and only such matter) shall be submitted to BDO Seidman, independent certified public accountants ("Accountants"), who shall act as an arbitrator and shall resolve the dispute and submit a written statement of such resolution within twenty (20) days, which statement shall be binding on all parties and the date of such statement shall be the Final Report Date. Each of the parties hereto shall bear all costs and expenses incurred by it in connection with such arbitration, except that the fees and expenses of the Accountants hereunder shall be borne equally by the Owners and Purchaser.

1.5.5  If the Net Worth (as hereinafter defined) of the Partnership shown on the Closing Balance Sheet is less than the Net Worth of $16,739,173 set forth on the Partnership's balance sheet dated September 30, 2005 attached as Schedule 1.5.5, then the amount of the deficiency shall be paid to Purchaser by the Owners by wire transfer of immediately available funds within five (5) business days following the Final Report Date. There shall be no upward adjustment.

1.5.6  For purposes of this Section 1.5, "Net Worth" shall mean total assets less total liabilities (excluding debt), as set forth on Schedule 1.5.5 and as computed in accordance with GAAP as consistently and historically applied by the Partnership., except for the valuation of Inventory as provided in Section 1.5.2.

2.  PERSONAL REPRESENTATIONS AND WARRANTIES.  Each of the Owners, jointly and severally, represents and warrants that at the Closing:

2.1  Such Owner is the sole beneficial owner, free and clear of any lien, claim or

Page 3

encumbrance, except as set forth in Schedule 2.1 of all of the Partnership Interest listed after such Owner's name on Schedule 2.1 attached hereto, and has full capacity and authority to enter into and perform this Agreement and to transfer good and valid title of the Partnership Interest free and clear as aforesaid.

2.2    No options, warrants, rights, contracts, subscriptions, commitments or undertakings of any kind have been or will be granted by such Owner which relate to the purchase or sale of any of the present or additional interest in the Partnership as of the time of Closing. Notwithstanding the foregoing, on the 3rd day of September 2003, the Partnership issued two (2) warrants, one to Jefferson Capital Partners I, L.P. and the other to Texas Growth Capital Fund, L.P. (the "Warrants"). Before Closing, the Warrants shall be terminated.

2.3    This Agreement constitutes the valid and binding agreement of such Owner enforceable in accordance with its terms.

2.4    No authorization, consent or approval of or filing with any public body or authority is necessary on the part of the Owners in connection with the consummation by the Owners of the Transaction contemplated by this Agreement.

3.    REPRESENTATIONS AND WARRANTIES OF OWNERS RELATING TO THE PARTNERSHIP AND THE SUBSIDIARIES. The Owners, jointly and severally, represent and warrant to Purchaser that:

3.1    Organization. The Partnership is a limited partnership duly formed, validly existing and in good standing under the laws of the State of Texas. The Partnership has all requisite limited partnership power and authority to execute, deliver and perform this Agreement and to consummate the Transaction contemplated hereby. The Partnership is duly qualified as a foreign limited partnership to do business, and is in good standing, in each jurisdiction where the failure to be so qualified would have a material adverse effect on the Partnership's business, assets, results of operations or financial condition. A list of each such jurisdiction is attached hereto as Schedule 3.1.

3.2    Affiliates. Schedule 3.2 contains a complete and accurate list of all entities including corporations, partnerships, limited liability companies, associations, joint stock companies, trusts, joint ventures or unincorporated organizations in which the Partnership has a direct or indirect ownership interest (the "Subsidiaries"; collectively the Partnership and the Subsidiaries shall be referred to as the "Companies"). Each of the Subsidiaries is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation as set forth in such Schedule and has the corporate or other power to carry on its business as now being conducted. The Partnership is or will be immediately prior to Closing directly or indirectly the record and beneficial owner of and has or will have immediately prior to Closing good and valid title to all of the issued and outstanding capital stock of each of the Subsidiaries. All of the issued and outstanding capital stock of the Subsidiaries is validly issued, fully paid and non-assessable, and as of Closing will be free and clear of all liens, claims,

Page 4

encumbrances, security agreements, equities, charges and restrictions. There are no outstanding options, commitments or other rights of any nature that relate to the issuance, sale, purchase or redemption of any shares of capital stock of any of the Subsidiaries. All of issued and outstanding shares of capital stock have been issued in compliance with all applicable laws of their respective States or Countries of incorporation and, to the extent applicable, regulations of the Securities and Exchange Commission. The Partnership does not have a direct or indirect ownership interest in any other entity. Subject to applicable law the Partnership shall deliver to the Purchaser the organizational documents and records of the Subsidiaries at Closing. Each Subsidiary is duly qualified as a foreign corporation to do business, and is in good standing, in each jurisdiction where the failure to be so qualified would have a material adverse effect on such Subsidiary's business, assets, results of operations or financial condition. Schedule 3.2 also contains a list of each such jurisdiction.

3.3    Officers and Directors. Schedule 3.3 sets forth the name and title of each officer and director of each of the corporate Subsidiaries and the directors of the foreign Subsidiaries immediately prior to Closing. The directors of the Companies shall tender their resignations effective as of the Closing.

3.4    Organizational Documents. True and correct copies of all of the Organizational Documents, as that term is hereinafter defined, in effect on the date hereof and as of the Closing of each of the Companies organized in the United States have been delivered to Purchaser. True and correct copies of the Articles of Incorporation, including all amendments thereto, and by-laws for the Companies organized outside the United States will be delivered to Purchaser within forty-five (45) days after the Closing Date, and to the extent necessary, the Owners shall have access to the Companies' records to satisfy this requirement. For purposes of this Agreement, "Organizational Documents" means (i) the articles or certificate of incorporation and the bylaws of a corporation; (ii) the partnership agreement and any statement of partnership of a general partnership; (iii) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (iv) the articles of organization and regulations of a limited liability company; and (v) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a partnership (limited or general), corporation, association, joint stock company, trust, joint venture or limited liability company; and (vi) any amendment to the foregoing.

3.5    Capitalization of the Partnership Interest. The authorized Partnership Interest is as set forth in Schedule 2.1. The Owners are the registered and beneficial owners of the Partnership Interest. The Partnership Interest is free and clear of all encumbrances. No authorization or consent of any person is required in order to consummate the transactions contemplated by this Agreement by virtue of any such person having an equitable or beneficial interest in the Partnership or the Partnership Interest. There are no outstanding options, warrants, calls, commitments or plans by the Owners to admit new partners to the Partnership; to make distributions to the Owners; or to purchase, redeem, or retire any outstanding Partnership Interest; nor are there outstanding any



securities or obligations that are convertible into or exchangeable for legal or beneficial interest in the Partnership.

**3.6    No Conflicts.** The execution, delivery and performance by the Owners of this Agreement, and the consummation of the Transaction contemplated hereby, do not and will not conflict with or result in a violation of or a default under (with or without the giving of notice or the lapse of time or both) (*i*) any law applicable to the Companies; (*ii*) the Agreement of Limited Partnership of the Partnership or any of the Organizational Documents of any of the Subsidiaries; (*iii*) any provision of, or any grant to any third party the right to terminate or result in the acceleration of any obligation under, any governmental license or other authorization, loan document, agreement, contract, mortgage, lien, lease, instrument, order, arbitration, award, judgment, decree or other instrument to which the Companies or any of them is a party or by which any of them may be bound or affected, or (*iv*) affect the Companies' qualifications to carry on their respective businesses, except in the case of clauses (*i*) and (*iii*), for such violations or defaults which would not have a material adverse effect on the business, properties, financial condition or operations of the Companies.

**3.7    Authorization.** The execution and delivery of this Agreement, and the consummation of the Transaction contemplated hereby have been duly authorized by the Owners, and no other proceedings on the part of Owners are necessary to authorize this Agreement and the consummation of the Transaction contemplated hereby. This Agreement constitutes a valid and binding agreement of Owners enforceable in accordance with its terms. No authorization, consent or approval of, or filing with, any public body or authority is necessary or required to be obtained or made in connection with the execution and delivery of this Agreement or for the consummation of the Transaction contemplated hereby

**3.8    Financial Statements.** Attached hereto as _Schedule_ 3.8 are true and complete copies of the Partnership's audited consolidated financial statements as of June 30, 2005, consisting of the balance sheet and related statements of income, retained earnings and cash flows for the year then ended (the "Audited Statement"). Also, attached hereto as a part of _Schedule_ 3.8 are interim financial statements for the period ending November 30, 2005 (the "Interim Statement") (collectively the Interim Statement and the Audited Statements are hereinafter referred to as the "Financial Statements"). The Audited Statements have been certified by the independent certified public accounting firm of Clifton Gunderson LLP and have been prepared in accordance with United States GAAP consistently applied throughout the periods indicated. The Interim Statements have been prepared in accordance with United States GAAP and consistently applied throughout the periods indicated. To the Knowledge (as hereinafter defined) of the Owners, the Financial Statements (including any related notes) present fairly the financial position of the Companies as of the respective dates and the consolidated results of operations (and on an annual basis the related cashflows) as of such dates for the periods therein set forth.

**3.9    Tax Liabilities.** The Companies have filed or will file all federal, state, county,

local and foreign income, excise, property, sales and other tax returns which are required to be filed that relate to periods ending on or before the Closing and have paid or will pay all taxes, including, but not limited to, income, unitary, sales, use, ad valorem, franchise, withholding, payroll, excise, property, custom, duty or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or penalty, which have become due, whether pursuant to such returns or otherwise, or become payable with respect to tax periods ending on or prior to the Closing or pursuant to any assessment which has or becomes payable. Except as disclosed on <u>Schedule</u> 3.9 no agreements, waivers or other arrangements with any governmental agency providing for an extension of the time for filing any returns or the assessment of any tax or deficiency are presently in effect or contemplated, and no power of attorney with respect to any taxes is currently on file with the Internal Revenue Service or any other governmental agency. There are no actions, suits, proceedings or investigations or claims now pending or, to the Knowledge of the Owners, threatened against the Companies or any of them in respect of any tax or assessment and there is no reasonable basis for any such assertion of which the Partnership is or reasonably should be aware, nor are there any matters under discussion between the Companies or any of them and any federal, state or local authority relating to any taxes or assessments asserted by any such authority against any of the Companies. The federal and state tax returns for the fiscal years ended June 30, 2003, June 30, 2004 and June 30, 2005 are included in <u>Schedule</u> 3.9 and represent true, correct and complete copies of the original returns as filed by the Companies with the appropriate governmental authority. The applicable statutes of limitation related to United States income and information tax returns for the Partnership have expired for all past years and periods through the fiscal year ended June 30, 2002. Adequate reserves, as computed in accordance with GAAP as consistently and historically provided by the Partnership, have been provided in the Financial Statements with respect to the taxes of the Companies.

3.10   <u>No Undisclosed Liabilities</u>. The Companies have no material liability or obligation (and, to the Knowledge of the Owners, there is no reasonable basis for the assertion of liability) of any nature whether known or unknown, absolute, accrued, contingent, or otherwise and whether due or to become due, which is not shown or which is in excess of the amount shown or reserved for on the latest audited balance sheet (including footnotes) included in the Financial Statements (the "Balance Sheet") (and which should have been, if known at the time, shown on the Balance Sheet in accordance with GAAP historically and consistently applied by the Partnership), other than liabilities referred to in this Agreement, including the <u>Schedules</u> attached hereto, or reasonably incurred in the ordinary course of its business consistent with prior practice after the date of the Balance Sheet, that individually or in the aggregate will have a material adverse effect on the assets, properties, results of operations or financial condition of the Companies or any of them. Except as disclosed on Schedule 3.10, none of the employees of the Companies is now, or will by the passage of time hereinafter become entitled to receive any, retirement benefits (including pension, health, and life insurance) or severance or seniority pay, attributable to services rendered prior to the date of the Balance Sheet, the liability for which has not been accurately recorded in the Financial Statements without regard to materiality or prior practice.

Page 7



**3.11  Changes in Condition.**  The Companies have conducted their respective businesses only in the ordinary course consistent with their prior practice and have not since September 30, 2005, or such other date as specifically noted:

**3.11.1** Incurred any obligation or liability, absolute, accrued, contingent or otherwise, whether due or to become due, except current liabilities incurred in the ordinary course of business and consistent with its prior practice, none of which liabilities in any case or in the aggregate, adversely affects in any material respect the assets, properties, liabilities or financial condition of the Companies or any of them;

**3.11.2** Discharged or satisfied any lien, charge or encumbrance other than those then required to be discharged or satisfied, or paid any obligation or liability, absolute, accrued, contingent or otherwise, whether due or to become due other than current liabilities shown on the Financial Statements and current liabilities incurred since the Financial Statements in the ordinary course of business and consistent with its prior practice;

**3.11.3** Mortgaged, pledged or subjected to a lien, charge, security interest or other encumbrance or restriction on any of its property, business or assets, whether tangible or intangible;

**3.11.4** Sold, transferred, leased to others or otherwise disposed of any of its assets, canceled or compromised any debt or claim, or waived or released any right of substantial value, in each case except in the ordinary course of business;

**3.11.5** Received any notice of termination of any contract, lease or other agreement or suffered any damage, destruction or loss which, in any case or in the aggregate, has had or may reasonably be expected to have a material adverse effect on the assets, operations or prospects of the Companies individually or in the aggregate;

**3.11.6** Encountered any labor union organizing activity, had any actual or threatened employee strikes, work stoppages, slow-downs or lock-outs, or had any change in its relations with its employees, agents, customers or suppliers or with any governmental authorities or self-regulatory organizations, which would in each case have a material adverse effect on the Companies individually or in the aggregate;

**3.11.7** Transferred or granted any rights under, or entered into any settlement regarding the breach or infringement of, any United States or foreign license, patent, copyright, trademark, trade name, invention or similar rights, or modified any existing rights with respect thereto;

**3.11.8** Since September 30, 2005, made any change in the rate of compensation,

commission, bonus or other direct or indirect remuneration payable, or paid or agreed or orally promised to pay, conditionally or otherwise, any bonus, extra compensation, pension or severance or vacation pay to any shareholder, director, officer of any of the Companies or employee, salesman, distributor or agent of any of the Companies, except as disclosed on Schedule 3.11 or in the ordinary course of business (and in no case has an increase exceeded 10%) and consistent with prior practice;

3.11.9 Issued or sold any ownership interest or other securities, or issued, granted or sold any options, rights or warrants with respect thereto, or acquired any capital stock or other securities of any corporation or any interest in any business enterprise or otherwise made any loan or advance to or investment in, any person, firm or corporation;

3.11.10 Except as disclosed on Schedule 3.11.10, made any capital expenditures, commitments, additions or betterments which individually are in excess of $25,000 or in the aggregate are in excess of $100,000;

3.11.11 Instituted, settled or agreed to settle any litigation, action or proceeding before any court or governmental body;

3.11.12 Failed to replenish its inventories and supplies in a normal and customary manner consistent with its prior practice, or made any purchase commitment in excess of the normal, ordinary and usual requirements or at any price in excess of the then current market price, or made any change in selling, pricing, advertising or personnel practices of the Partnership or Subsidiaries inconsistent with its prior practice;

3.11.13 Suffered any change, event or condition which, in any case or in the aggregate, has had or reasonably may be expected to have a material adverse effect on the Partnership's or any of the Subsidiaries' condition, properties, assets, liabilities, or operations, including, without limitation, any change in the Partnership's or such Subsidiary's revenues, costs, backlog or relations with its employees, agents, customers, or suppliers; or

3.11.14 Entered into any transaction, contract or commitment other than in the ordinary course of business.

3.12 Insurance. The Partnership has disclosed in Schedule 3.12 a list of all insurance policies maintained by the domestic Companies on their respective properties, assets, business and personnel (specifying the insurer, the amount and duration of the coverage, the type of insurance including, but not limited to whether each such policy is based on claims made or occurrence, premium allocation, the policy number and any pending claims thereunder). True and complete copies of each such policy have been delivered to Purchaser. The Subsidiaries located outside of the United States shall provide true and complete copies of each such insurance policy within forty-five (45) days of the



Closing Date.  Schedule 3.12 also contains all claims for insurance losses in excess of $25,000 per occurrence, filed by the Partnership or any of the Subsidiaries during the two (2) year period immediately preceding the Closing, including, but not limited to Worker's Compensation, automobile, general and product liability.  The Companies, individually and in the aggregate, have not received written notice that they or any of them are in default with respect to any provision contained in any insurance policy, nor has any one of them failed to pay any premiums thereunder or to give any notice or present any claim thereunder in due and timely fashion and, the Companies are not in default with respect to any such policies.  To the Knowledge of the Owners, there is no occurrence that may result in a claim in excess of twenty five thousand dollars ($25,000) against or by the Companies or any of them with respect to which such claim has not been asserted.  Adequate reserves, as computed in accordance with GAAP as consistently and historically provided by the Partnership, have been provided in the Financial Statements with respect to any self insured claims pending and any such claims which may be reasonably expected based upon the Companies' prior experience.

### 3.13   Trademarks and Patents.

3.13.1  The Companies have disclosed in Schedule 3.13 a list of all United States and foreign registered patents, trademarks, copyrights and applications therefor and all state registered trade names and trademarks and applications therefor owned or used by one or more of the Companies.  The Companies own (or possess adequate and enforceable royalty-free licenses or other rights to use) all trademarks, trade names, patents, copyrights, service marks, service names, software, inventions, trade secrets, know-how, formulas and processes and other proprietary rights and corresponding foreign counterparts necessary to the conduct of their respective business and such use does not conflict with the rights of others.

3.13.2  Except as set forth on Schedule 3.13.2, no proceedings are pending, or, to the Owners' Knowledge, have been instituted or threatened which challenge the validity of the ownership by the Companies or any of them to such trademarks, trade names, patents, copyrights and applications.  None of the Companies has entered into any patent or trademark license, technology transfer, or non-competition agreement relating to their respective businesses except as set forth in Schedule 3.13.2.  Except as set forth on Schedule 3.13.2, the Owners have no Knowledge of infringement of any of the Companies' intellectual property rights.

3.13.3  To the Knowledge of the Owners, neither the Partnership nor any of the Subsidiaries is infringing upon or otherwise acting adversely to any copyrights, trademarks, trademark rights, service marks, service names, trade names, patents, patent rights, licenses, trade secrets, software or know-how of any third party to the extent such possible infringement would have a material adverse effect on the Partnership or the Subsidiaries.  There are no existing or, to the Owners' Knowledge, threatened patent, trademark, software, infringement, opposition, interference or other intellectual property related lawsuits by, or against, the

Page 10

Companies or any of them, nor are there any outstanding notices, to the Companies or by the Companies or any of them to another, regarding possible patent infringement of either a patent or trademark owned by one of the Companies or the licensed patent or trademark of a third party.

**3.13.4** The Companies have performed all the obligations required to be performed by them to date and, to the Knowledge of the Owners, are not in default under any license agreement. The Companies have complied and are in compliance in all material respects with all applicable registered user laws or regulations. To the Knowledge of the Owners, no employee of any of the Companies has disclosed or made available to any third party any trade secrets of the Companies under circumstances constituting a breach of confidentiality.

**3.14** **Contracts.** Schedule 3.14 lists specifically each of the following contracts, agreements, commitments and other documents (other than those of a type disclosed in some other schedule hereto) to which any of the Companies is a party or by which any of the Companies, or their respective properties or assets is in any way bound, including all amendments and supplements thereto and modifications thereof:

**3.14.1** Each contract, agreement or commitment in respect of the sale of products or the performance of services, or for the purchase of inventories, equipment, raw materials, supplies, services or utilities, which involves payments or receipts by the Companies of $25,000 or more per annum, and (*i*) is not terminable by the Companies at any time and without cause or penalty; or (*ii*) is otherwise material to the assets, business, results of operations or the financial condition of the Companies individually or in the aggregate;

**3.14.2** Each sales agency, dealer, representative, distributorship, brokerage or franchise agreement which is not terminable by the Companies within ninety days from the date hereof without cause, payment or penalty;

**3.14.3** Each employment, collective bargaining, union, non-competition or secrecy agreement (including any non-competition or secrecy agreements routinely obtained by the Partnership or the Subsidiaries from their respective employees);

**3.14.4** Each loan or credit agreement, security agreement, guaranty, indenture, mortgage, pledge, conditional sale or title retention agreement, equipment obligation, lease purchase agreement or other instrument evidencing indebtedness;

**3.14.5** Each partnership, joint venture, joint operating or similar agreement; and

**3.14.6** Each contract, agreement or commitment (other than those of the type covered by the aforementioned subsections of this section) which involves payment or receipts by the Partnership or any of the Subsidiaries of Twenty Five

Thousand Dollars ($25,000) or more and is not terminable by the Partnership or any of the Subsidiaries at any time upon thirty (30) days or less prior written notice without cause, payment or penalty.

All of said contracts, agreements, commitments and undertakings are valid, binding and in full force and effect. There exists no default by the Companies or, to the Knowledge of the Owners, by another party thereto. Additionally, to the Knowledge of the Owners, no event has occurred which with the passage of time or giving of notice would constitute a material default under any such contract, agreement, commitment or undertaking. No purchase commitment of any of the Companies is in excess of its ordinary business requirements or, to the Knowledge of Owners, at a price in excess of market price at the date of such commitment. Copies of all of the documents described in the aforesaid Schedule, and of each other schedule delivered pursuant to this Agreement, have been delivered by the Owners to Purchaser and are true and complete and include all amendments, supplements or modifications thereto.

3.15   Claims. Except as set forth on Schedule 3.15, (i) no suit, action or claim has been made, or to the Owner's Knowledge is threatened; (ii) no investigation or inquiry by any administrative agency or governmental body has been made, or to the Owners' Knowledge is threatened; and (iii) there is no legal, administrative or arbitration proceeding, pending or threatened in writing or, to the Owners' Knowledge, otherwise threatened, against the Companies or any of them or any of their respective properties, assets or business or to which the Companies or any of them is a party. Schedule 3.15 specifies each suit, action, claim, investigation, inquiry or proceeding of a type referred to in this Section involving a claim for more than $25,000 pending at any time during the past five (5) years. There is no outstanding order, writ, injunction or decree of any court, administrative agency or governmental body or arbitration tribunal, issued in a proceeding to which the Partnership or a Subsidiary was a party or of which the Owners otherwise have Knowledge, against the Companies or any of them or the Partnership Interest or any of the, capital stock, properties or assets of the Companies.

3.16   Employee Benefit Plans.

3.16.1   Set forth in Schedule 3.16.1 is a list of all pension profit sharing, bonus, disability, welfare or group insurance, deferred compensation, option, paid vacation and all other presently effective employee benefit plans, agreements or commitments, written or oral (if any), of the Companies ("Employee Benefit Plans").

3.16.2   A copy of each Employee Benefit Plan as amended to the date hereof has been delivered to the Purchaser, together with audited financial statements and actuarial reports, if any, Form 5500, if required, for the most recent three plan years of each such plan and the most recent IRS determination letter (or application therefore) for any such plan which is an Employee Pension Plan within the meaning of Section 3(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"). Except as set forth in Schedule 3.16.2, (i) each

Page 12

Employee Pension Plan has been amended for the GUST requirements (defined in IRS Revenue Procedure 2001-55) and submitted for an IRS determination that it continues to be qualified under Section 401(a) of the Internal Revenue Code, or (ii) the Companies have adopted a master or prototype plan which was submitted for an IRS determination under the circumstances specified under Section 19.03 of Revenue Procedure 2000-20. Each Employee Benefit Plan that is intended to be Qualified (i) has been amended to reflect the GUST requirements (defined in IRS Revenue Procedure 2001-55) and was timely submitted for an IRS determination that it continues to be Qualified under Section 401(a) of the IRC, or (ii) constitutes a master or prototype plan which was timely submitted for an IRS determination under the circumstances specified under Section 19.03 of Revenue Procedure 2000-20. All necessary amendments to each Employee Benefit Plan that is intended to be Qualified (reflecting the Economic Growth and Tax Reconciliation Reform Act of 2001 and all subsequent laws and agency-promulgated rules) have also been timely made. All necessary amendments for changes on how such Employee Pension Plans are administered under the Economic Growth and Tax Reconciliation Reform Act of 2001 and subsequent laws and agency promulgated rules have also been timely made.

3.16.3    Except as set forth as part of Schedule 3.16.3, all Employee Benefit Plans are in compliance with the terms of the applicable plan documents and the provisions of ERISA and have complied with the reporting and disclosure requirements of applicable federal and state laws and regulations.

3.16.4    Except as set forth as part of Schedule 3.16.4, (i) no Employee Benefit Plan or related trust has had a "reportable event" as such term is defined in ERISA nor has any such plan or any "fiduciary" or "party-in-interest" or "disqualified person" entered into any non-exempt "prohibited transaction" as such terms are defined in ERISA or the Internal Revenue Code; (ii) no partial or complete termination, or permanent discontinuance of contributions has occurred; (iii) no amendments have been made which were not the subject of a favorable IRS determination letter; (iv) all reports, together with all supporting statements, opinions, certifications and schedules, required pursuant to ERISA or the Code have been duly and timely filed with the appropriate governmental agencies; (v) all notices required to be provided to participants and beneficiaries by the Companies pursuant to ERISA or the Code have been duly and timely provided; and (vi) each Employee Benefit Plan has been administered and operated substantially in accordance with its terms and applicable laws.

3.16.5    Except set forth on Schedule 3.16.5 there are no third party contract, agreements or arrangements with respect to any Employee Benefit Plan which may not be canceled or liquidated with no more than sixty (60) days advance notice or which, upon liquidation assesses a surrender charge, penalty, back-end load or market value adjustment.

3.16.6    The Companies have no liability, jointly or otherwise, for any

withdrawal liability demanded or yet to be demanded under Title IV of ERISA by any multi-employer plan for a complete or partial withdrawal from such plan by any member of a control group of employers (within the meaning of Section 4001(b) of ERISA) of which the Companies are a member.

3.16.7    There are no actions, suits, or claims (other than routine claims for benefits) pending or threatened or, to the Knowledge of the Owners, any facts which could give rise to any such actions, suits or claims against any Employee Benefit Plan or the assets thereof.

3.16.8    Except as set forth on Schedule 3.16.8, no Benefit Plan of the Companies is a "defined benefit pension plan" as defined in Section 3(35) of ERISA subject to Title IV of ERISA, and no Benefit Plan of the Companies is subject to the minimum funding standards of Section 302 of ERISA.  For each plan listed in Schedule 3.16.8, the last three years' actuarial valuations have been furnished to Purchaser.  In addition, to the extent such plan is not reflected in the Financial Statements such plan(s) actuary shall be directed to prepare a FAS 87 valuation report as of the Closing Date using assumptions determined by Purchaser.

3.17    Foreign Employee Matters

3.17.1 Schedule 3.17 hereto lists each non-governmental retirement and welfare benefit plan for employees of the Companies located outside of the United States (the "Foreign Benefit Plans").  Except as set forth on Schedule 3.17.1, each Foreign Benefit Plan and each fund, if any, maintained thereunder has been established, operated, administered, maintained and invested, as the case may be, in material compliance with all laws applicable thereto and the respective requirements of each such Plan's governing documents, all other applicable pension benefits legislation, and all applicable regulations, rules and policies in relation thereto.

3.17.2    The Companies have heretofore delivered to Purchaser correct and complete copies of (i) each Foreign Benefit Plan; (ii) if applicable, the most recent actuarial valuation report available, whether or not filed, with respect to each such Plan; (iii) the most recent funding and investment management agreements with respect to each such Plan and all amendments thereto; (iv) the most recent summary description for employees with respect to each such Plan; and (v) the two most recent annual reports filed in respect of each such Plan.

3.17.3    Full payment has been or will be made of all premiums, contributions and other amounts required by the applicable documents governing any Foreign Benefit Plan, or any applicable laws, regulations, rules and policies in relation thereto to be paid by the  Companies or any of them under the terms of each such Plan as of the Closing Date.

3.17.4 There are no pending or, to the Owners' Knowledge, any written threat of claims against or in respect of any of the Foreign Benefit Plans, whether by any governmental agency, or employee, or beneficiary or otherwise (other than routine claims for benefits).

3.17.5 No Foreign Benefit Plan provides for benefits including, without limitation, death or medical benefits (whether or not insured), with respect to any past or present employees of the Companies or any of them beyond their retirement or termination of service.

3.17.6 Except as set forth on Schedule 3.17.6 or as otherwise specifically set forth in this Agreement or required by law, Purchaser shall not assume any liability to any employee, beneficiary or other person or entity in connection with any Foreign Benefit Plan or by reason of any action or inaction by the Companies or any of them or any administrator or fiduciary or other person or entity with respect to any Foreign Benefit Plan, whether before or after the Closing Date, as a result of the Transaction.

3.17.7 There are no third party contracts, agreements or arrangements with respect to any Foreign Benefit Plan which may not be canceled or liquidated with no more than sixty (60) days advance notice or which, upon liquidation assesses a surrender charge, penalty, back-end load or market value adjustment.

3.18 Minute Book and Ownership Ledger. The Minute Books of each corporate Subsidiary contain correct and complete minutes of all annual and special meetings of the officers and directors, including any consents in lieu thereof, and the signatures therein are the true signatures of the persons purporting to have signed them. The Ownership Ledgers of the Companies are complete.

3.19 Leases. There is set forth in Schedule 3.19 a description of every lease or agreement under which any of the Companies is a lessee of, or holds or operates any real property owned by any third party, including the Owners. Accurate and complete copies of each such lease have been delivered to Purchaser. Except as specifically set forth in Schedule 3.19, each such lease or agreement is in full force and effect and constitutes the legal, valid and binding obligation of the respective parties thereto.

3.20 Personal Property. The machinery and equipment and other personal property ("Personal Property") owned, leased or used by the Companies in their respective businesses are in good working order and repair (reasonable wear and tear excepted), adequate to operate the business of the Companies as presently conducted, and in material conformity with all applicable ordinances, regulations and other laws. Their operation within the previous one year period has not violated any applicable federal, state or local law, statute, ordinance or regulation relating to the protection of the environment or condition of employment, nor has any written notice of any claimed violation of any such laws, statutes, ordinances or regulations been served on any of the Companies. All Personal Property is located at facilities controlled by the Companies

Page 15

 

and no Personal Property is in the possession of others.

3.21  Title of Property.  The Companies have good and marketable title to all of their respective Personal Property, and the Personal Property constitutes all of the personal property required or necessary to conduct the business of the Companies.  None of the Personal Property is subject to any mortgage, pledge, lien, charge, security interest, encumbrance, restriction, lease, license, easement, or liability of any nature whatsoever, except (i) mortgages or security interests shown on the Financial Statements as securing specific liabilities or obligations, or (ii) liens for current taxes and assessments not yet due or payable or taxes the validity of which are being contested in good faith by appropriate proceedings, or (iii) those restrictions, easements and imperfections of title and encumbrances, if any, which, individually or in the aggregate, (a) are not substantial in character, amount or extent and do not detract from the value of the properties subject thereto in their current use in the business of the Companies, and (b) do not interfere with either the present and continued use of such property or the conduct of the Companies' normal operations; in each case in the same manner as the business of the Companies is currently conducted (the aforementioned exceptions collectively referred to as "Permitted Encumbrances").

3.22  Inventory.  Except as reserved on the Financial Statements in accordance with GAAP as historically and consistently applied by the Partnership and each of the Subsidiaries, and to the Knowledge of Owners, all items of the Partnership's and Subsidiaries' inventory and related supplies (including raw materials, tool room supplies, work-in-process and finished goods) are accurately valued and properly reflected on the Financial Statements consistent with past practices and are merchantable, or suitable and useable for the production or completion of merchantable products, for sale in the ordinary course of business as first quality goods at normal mark ups.  All inventory is located at facilities controlled by the Companies.

3.23  Real Property.  There is set forth in Schedule 3.23 a description of all real property, including buildings and other improvements thereon owned by the Companies or any of them (the "Real Property").  The Real Property, together with the real property leased and listed on Schedule 3.19, constitutes all the real property required to conduct the business of the Companies as conducted within the previous one (1) year period and there are no liens, claims or encumbrances which would have a material adverse effect on the operation of any of the Companies' businesses.  There are no claims made or, to the Knowledge of the Owners, threatened by any federal, state or municipal or other authorities in connection with the Real Property for any violation of any applicable law, ordinance or regulation which would adversely affect the conduct or business of the Companies in any material respect.  To the Knowledge of the Owners, all buildings and structures included in the Real Property are in good operating condition, normal wear and tear excepted, and all such Real Property conforms with all applicable ordinances, regulations, zoning and other laws in all material respects.

3.24  Receivables.  All receivables of the Companies (including accounts receivable, loans receivable and advances) that are reflected in the Financial Statements and all

such receivables of the Companies that will have arisen since the date thereof, shall have arisen only from bona fide transactions in the ordinary course of the Companies' operation of their respective businesses and shall be (or have been) fully collected when due, or in the case of each account receivable, within 365 days after it arose, without resort to litigation, in the aggregate face amounts thereof except to the extent of the normal allowance for doubtful accounts consistent with the Companies' prior practices and as reflected on the most recent annual Financial Statement.

3.25  Bank Accounts and Powers.  Schedule 3.25 lists (i) all accounts, safe deposit boxes and current receivable collection boxes maintained by the Companies at any bank or other financial institution and the names of the persons currently authorized to effect transactions in such accounts and pursuant to such resolutions or with access to such boxes; and (ii) the names of all persons, firms, associations, corporations or business organizations holding general or special powers of attorney from the Companies and a brief description of the terms thereof.

3.26  No Guarantees.  None of the obligations or liabilities of the Companies are guaranteed by, or subject to a similar contingent liability of, any other person, firm or corporation, nor have the Companies or any of them guaranteed, or otherwise become contingently liable for, the obligations or liabilities of any other person, firm or corporation.

3.27  Compliance with Applicable Laws.  The Companies have complied in all material respects with all laws, regulations, injunctions, decrees and orders applicable to them or to the operation of their respective businesses and have received no written notice of any alleged violation of any such law, regulation, injunction, decree or order for which the failure to comply would, in any individual case or in the aggregate, have a material adverse effect on the businesses of the Companies or any of them.  To the Knowledge of Owners, neither the ownership or the use of Companies' properties in the business, nor in the conduct of the business, has within the previous twelve (12) month period conflicted with the rights of any other person, firm or corporation or violates, with or without the giving of notice or the passage of time, or both, or will violate, conflict with or result in, a default, right to accelerate or loss of rights under, any terms or provisions of the Organizational Documents of any of the Companies as presently in effect, or any lien, encumbrance, mortgage, deed of trust, lease, license, agreement, understanding, law, ordinance, rule or regulation, or any order, judgment or decree to which the Companies are a party or by which any of them may be bound or affected.

3.28  Labor Matters.

3.28.1  Schedule 3.14 sets forth an accurate and complete list of all employment agreements, collective bargaining agreements, works council agreements, union contracts or similar types of agreements (including, without limitation, any side letters) by which any of the Companies is bound or covered.  Accurate and complete copies of all such agreements and contracts have been delivered to Purchaser prior to the date of this Agreement.

**3.28.2**  There is no strike or union organizational activity or any allegation, charge or complaint received of employment discrimination, unfair labor practice or other similar occurrence, pending or, to the Knowledge of the Owners, threatened against any of the Companies nor, have the Companies operated their respective businesses in such a way which, to the Knowledge of the Owners, would give rise to any such allegation, charge, or complaint.

**3.28.3**  All employees have been properly classified and no person is treated as an independent contractor or third party agency employee who should be treated as an employee under the laws of the country in which such individual performs services. Leased employees in the United States within the meaning of Section 414 (n) of the Internal Revenue Code have had their service as leased employees recognized for purposes of applicable Employee Benefit Plans in accordance with the terms of such plans and Internal Revenue Code Section 414(n).

**3.28.4**  The Partnership has delivered to Purchaser an accurate and complete list setting forth the current annual salary for the Companies' employees, and copies of bonus plans and a listing of all employee compensation in the previous one (1) year.

**3.29**  <u>Environmental Matters</u>.  Except as set forth on <u>Schedule</u> 3.29 and in Schedule 9.1.6:

**3.29.1**  The Companies have not deposited or caused to be deposited, on, in, under or about any production or any other facility, including without limitation into the ambient air, surface water, groundwater, land surface or subsurface strata, any solvents, pollutants, chemicals, flammables, contaminants, gasoline, petroleum products, crude oil, explosives, radioactive materials, hazardous materials, hazardous wastes, industrial or other toxic waste or substances, polychlorinated biphenyls or related or similar materials, asbestos or any material containing asbestos, any underground storage tanks, any air, soil or water contamination or any other substance or material (collectively, the "Hazardous Substances") in violation of or in a manner which creates a material liability under any applicable federal, state or local governmental law, rule, regulation or ordinance, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Section 1801, et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Sections 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. Sections 1251 et seq.), the Clean Air Act (42 U.S.C. Sections 7401 et seq.); the Toxic Substances Control Act as amended (15 U.S.C. Sections 2601 et. seq.), the Clean Water Act, as amended (33 U.S.C. Sections 1251 et. seq.) (collectively, all such laws, rules ordinances or regulations shall be referred to herein as the "Environmental Laws"). The Owners have no Knowledge of the existence of Hazardous Substances on, in, under or about the

 

Real Property or other property owned or controlled by the Companies at any time, other than naturally occurring Hazardous Substances;

3.29.2   The Companies have not used any production or any other facility owned or leased by them to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce, process or in any manner deal with Hazardous Substances, except in material compliance with applicable Environmental Laws;

3.29.3   There are no Hazardous Substances located on property owned by others that originated from the Companies' owned or leased production facilities that were disposed of not in material compliance with applicable Environmental Laws or that to the Owners' Knowledge are presently not in compliance with applicable Environmental Laws;

3.29.4   The Companies (a) hold all required registrations, permits, licenses, variances, exemptions, approvals and other authorizations which are required for each of them under federal, state and local laws and regulations relating to pollution or protection of the environment, including, but not limited to, all Environmental Laws and including all laws relating to emissions, discharges, releases, or threatened release of Hazardous Substances or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances, which are legally required for the operation of the businesses of the Companies as presently conducted or the ownership of the properties and assets of the Companies as of the date hereof (collectively the "Permits"); and (b) are in compliance with the terms of all Permits in all material respects;

3.29.5   The Companies are in compliance with all other limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in the Environmental Laws or contained in any regulation, code, plan, order, decree, judgment, injunction, notice or demand letter issued, entered, promulgated or approved thereunder in all material respects; and

3.29.6   There is, and for the last five (5) years has been, no civil, criminal or administrative action, suit, demand, claim, hearing, notice of violation, investigation, proceeding, notice or demand letter pending, or to the Knowledge of the Owners, threatened against the Companies or any of them relating in any way to (i) the Environmental Laws or any regulation, code, plan, order, decree, judgment, injunction, notice or demand letter issued, entered, promulgated, or approved thereunder, or (ii) relating to the release into the environment by any of the Companies of any Hazardous Substances whether or not occurring at or on a site owned, leased or operated by any of the Companies.

3.30   <u>Absence of Certain Business Practices</u>.  To the Knowledge of Owners, neither the Companies nor any officer, employee or agent of the Companies, nor any other person acting on their respective behalf, has given any gift or similar benefit to any

customer, supplier, governmental employee or other person who is in a position to help or hinder the business of the Companies (or assist in connection with any actual or proposed transaction) which (a) would subject the Companies or any of them to any damage or penalty in any civil, criminal or governmental litigation or proceeding; (b) if not given in the past, would have had a material adverse effect on the assets, business or operations of the Companies as reflected in the Financial Statements; or (c) if not continued in the future, would adversely affect in any material respect the Companies' assets, business, or operations, or which would subject any of the Companies to suit or penalty in any private or governmental litigation or proceeding.

3.32  Brokers.  Neither the Owners nor the Companies have directly or indirectly dealt with anyone acting on their behalf in the capacity of a finder or broker (or investment advisor) and neither has incurred, and shall not incur, any obligation for any finder's, broker's or investment advisor's fee or commission in connection with the transactions contemplated by this Agreement, except for employment of Growth Capital Partners, for which the Owners and not the Companies will be responsible for payment of all fees.

3.33  Warranty Accruals.  The Warranty Accruals provided in the Financial Statements are sufficient to cover all outstanding warranty claims based upon historical practices of the Partnership.

3.34  Import and Export Compliance.  The Companies have paid, or have made provision in the Financial Statements for the payment of, all material duties, tariffs, customs, penalties, merchandise processing fees or other payments required to be paid by them or any of them with respect to the importation or exportation of any merchandise by each of the Companies, and, to the Knowledge of Owners, each of the Companies is in material compliance with United States and foreign laws and regulations governing the importation or exportation of merchandise.

3.35  Accuracy of Information.  No representation or warranty made by the Owners and no certificate or document furnished or to be furnished by or on behalf of the Owners to Purchaser pursuant to this Agreement contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained therein not misleading.

3.36  Ownership of Real Property.  Prior to Closing, Partnership shall have transferred all right, title and interest in real property owned by the Partnership to Triple R Realty, L.P.  In the event such transfers have not been completed prior to Closing, the Owners, or their designee, shall accept transfer of all right, title and interest in such real property.

4.  REPRESENTATIONS AND WARRANTIES OF PURCHASER.  Purchaser represents and warrants to the Owners that:

4.1  Organization.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the corporate power to

 

carry on its business as it is now being conducted. Purchaser is duly qualified as a
foreign corporation to do business, and is in good standing, in each jurisdiction where
the failure to be so qualified would have a material adverse effect on its business, assets,
results of operation or financial condition.

4.2    No Conflicts. The execution, delivery and performance by Purchaser of this
Agreement and the consummation of the Transaction contemplated hereby, do not and
will not conflict with or result in a violation or a default under (with or without the
giving of notice or the lapse of time or both) (*i*) any law applicable to Purchaser; (*ii*) the
Certificate of Incorporation, By-laws or other organizational documents of Purchaser;
(*iii*) any provision of, grant to any third party the right to terminate or result in the
acceleration of any obligation under, any governmental license or other authorization,
loan document, agreement, contract, mortgage, lien, lease, instrument, order, arbitration
award, judgment or decree to which Purchaser is a party or by which Purchaser may be
bound or affected; or (*iv*) affect Purchaser's qualification to carry on its business, except,
in the case of clauses (*i*) and (*iii*), for such violations or defaults which would not have a
material adverse effect on the business, properties, financial conditions or operations of
Purchaser.

4.3    Corporate Power. Purchaser has the corporate power to enter into this
Agreement and to carry out the obligations hereunder. The execution and delivery of
this Agreement, and the consummation of the Transaction contemplated hereby have
been duly authorized by the Board of Directors of Purchaser, and no other corporate
proceedings on the part of Purchaser are necessary to authorize this Agreement and the
consummation of the Transaction contemplated hereby. No authorization, consent or
approval of, or filing with, any public body or authority is necessary for the
consummation of the Transaction contemplated by this Agreement. This Agreement
constitutes a valid and binding agreement of Purchaser enforceable in accordance with
its terms.

4.4    Brokers. Purchaser has not directly or indirectly dealt with anyone acting on its
behalf in the capacity of a finder or broker (or investment advisor) and has not incurred,
and shall not incur, any obligation for any finder's, broker's or investment advisor's fee
or commission in connection with the transactions contemplated by this Agreement.

4.5    Accuracy of Information. No representation or warranty made by Purchaser and
no certificate or document furnished or to be furnished by or on behalf of Purchaser to
the Partnership or any of the Owners pursuant to this Agreement contains or will contain
any untrue statement of a material fact, or omits or will omit to state a material fact
necessary to make the statements contained therein not misleading.

5.    COVENANTS BY THE OWNERS: During the period from the date of this
Agreement to the Closing, except as otherwise consented to by Purchaser in writing or
referred to in this Agreement, the Owners will cause the Companies with respect to 5.1.1
and will not authorize the Companies to, with respect to 5.1.2 to 5.1.8 to:



**5.1.1** Carry on their businesses in, and only in, the usual, regular and ordinary course in substantially the same manner as heretofore conducted and, to the extent consistent with such businesses, use all reasonable efforts to (*i*) preserve intact their present business organization, (*ii*) keep available the services of their present officers, employees, agents and independent contractors, (*iii*) preserve their relationships with customers, suppliers and others having business dealings with them to the end that the good will and going business shall be unimpaired at Closing; and (*iv*) cooperate with Purchaser with reasonable efforts to assist Purchaser in obtaining the consent of any landlord or other secured party to any lease or contract with the Companies where the consent of such landlord or other third party may be required by reason of the Transaction. Without limiting the generality of the foregoing prior to the Closing, the Companies will not, without Purchaser's prior written approval:

**5.1.2** Amend their respective Organizational Documents or change the number of directors of any of them;

**5.1.3** Acquire by merging or consolidating with, or agreeing to merge or consolidate with, or purchase substantially all the assets of, or otherwise acquire any business or any company, corporation, partnership, association or other business organization or division thereof;

**5.1.4** Sell, lease or otherwise dispose of any of its assets, except in the ordinary course of business and, except for the transfer of assets which are not material individually or in the aggregate to the assets, business, results of operations or financial condition of the Companies or any of them;

**5.1.5** Declare, set aside, make or pay any dividend or other distribution in respect of their Partnership Interest or purchase or redeem, directly or indirectly, any Partnership Interest;

**5.1.6** Issue or sell any ownership interest of any class or any options, warrants, conversion or other rights to purchase any such ownership interests or any securities convertible into or exchangeable for such ownership interests;

**5.1.7** Incur any additional indebtedness for borrowed money or issue or sell any debt securities other than in the ordinary course of business consistent with prior practice; and

**5.1.8.** Grant to any officer or employee any increase in compensation in any form in excess of the amount in effect as of the date of this Agreement, or any severance or termination pay, or enter into any employment agreement with any officer or management employee except with the consent of Purchaser.

**5.2** <u>Adverse Change</u>. The Owners will cause the Partnership to promptly advise Purchaser orally and in writing of any change in the financial condition, properties,

 

assets, liabilities, operations or business of the Companies which is or, may reasonably be expected to be materially adverse to any aspect of any of the Companies' businesses.

5.3  Consultation. The Owners shall cause the Partnership to consult with Purchaser with respect to (*i*) the cancellation of material contracts, agreements, commitments or other understandings or arrangements to which any of the Companies is a party, including, without limitation, purchase orders for any material item of inventory and commitments for material capital expenditures or improvements, (*ii*) the commencement of the orderly and gradual discontinuance of particular items or operations, and (*iii*) any material changes in the purchasing, pricing or selling policy of the Companies; provided, however, that nothing contained in this Section 5.3 shall require the Owners to take or fail to take any action that, in the Owner's reasonable judgment, is likely to give rise to a substantial penalty or a claim for damages by any third party against the Owners or the Companies, or is likely to result in losses to any of the Companies, or is otherwise likely to prejudice in any respect or to interfere with the conduct of the Companies' businesses and operations in the ordinary course consistent with prior practice, or is likely to result in a breach by the Owners or the Companies of their respective representations, warranties or covenants contained in this Agreement (unless any such breach is first waived in writing by Purchaser).

6.  **ADDITIONAL AGREEMENTS.**

6.1  Expenses. Whether or not the Transaction is consummated, all costs and expenses incurred in connection with this Agreement and the Transaction contemplated hereby shall be paid by the party incurring such expense. It is expressly understood and agreed that for purposes of this provision the parties hereto are the Purchaser and the Owners and not the Companies.

6.2  Publicity. At all times throughout and prior to the Closing, each party shall promptly advise and cooperate with and, except as required by law, obtain the consent of the other prior to issuing, or permitting any of the Companies, their subsidiaries, directors, officers, employees or agents, to issue any press release or other information to the press or any third party with respect to this Agreement or the Transaction contemplated hereby; provided that the foregoing shall not preclude communications or disclosures necessary (*i*) to implement the provisions of this Agreement; (*ii*) to allow each party to consult with such party's legal or financial advisors; (*iii*) to allow each party to consult with such party's immediate family; (*iv*) to comply with the HSR Act; or (*v*) to make such other disclosures as may be required by law. Following the Closing, no party will, except as permitted in the immediately preceding sentence, disclose the price terms of the Transaction without the consent of the other parties.

6.3  Confidentiality. Purchaser shall hold, and shall take all reasonable steps to cause its officers, directors, employees, representatives and advisors to hold in strict confidence and not use for its or their own benefit except in connection with this Agreement and the transactions contemplated hereby the documents and information furnished to it or them concerning the Companies and any analysis, reports or other

 

materials derived therefrom (collectively, the "Confidential Information") and, if this Agreement is terminated, shall, upon written request, cause all such Confidential Information and all copies thereof to be destroyed or returned immediately to the Companies or the Owners.

6.4    Regulatory Filings.    Purchaser and the Owners shall take all such actions as shall be reasonably necessary and will file and use their best efforts to have declared effective or approved, all documents and notifications with any government or governmental authority reasonably necessary or appropriate, in the opinion of Purchaser and its counsel and in the opinion of the Owners and their counsel, for the consummation of the Transaction contemplated hereby.

6.5    Notification of Certain Matters.    Each party shall give prompt notice to the other of (i) the occurrence or failure to occur of any event, which occurrence or failure such party believes would be reasonably likely to cause any representation or warranty on the part of such party contained in this Agreement to be untrue or inaccurate in any material respect as of the day of Closing, and (ii) any material failure of such party to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by such party hereunder.

6.6    Additional Agreements.    Subject to the terms and conditions provided herein and to fiduciary obligations under applicable law as advised by counsel, each of the parties hereto agrees to use all reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective as promptly as practicable the Transaction contemplated by this Agreement and to cooperate with each other in connection with the foregoing, including using best efforts to obtain all necessary consents, approvals and authorizations as are required to be obtained under any federal, state or foreign law or regulations, to defend all lawsuits or other legal proceedings challenging this Agreement or the consummation of the Transaction contemplated hereby, to cause to be lifted or rescinded any injunction or restraining order or other order adversely affecting the ability of the parties to consummate the Transaction contemplated hereby, and to effect all necessary registrations and filings.

6.7    Escrow.    The term "Escrowed Funds" shall mean Three Million Dollars ($3,000,000) to be withheld from the Purchase Price by ITW and deposited by ITW in an escrow account for a period of eighteen (18) months with Bank of America. The terms of the escrow are set forth in an Escrow Agreement substantially in the form attached hereto as Schedule 6.7.  The indemnification obligations under Section 9 may be satisfied by claims against the Escrow, but shall not be limited to the amount of the Escrow.

6.8    Covenant Not-To-Compete.

6.8.1    "Competitive Business" means the business of marketing and manufacturing specialty repair, maintenance and production support products for

Page 24

industrial, electronic and consumer markets worldwide, including but not limited to solvents, dusters, swabs and brushes, solder tips, shears, desoldering braid, solder pots, maintenance, repair and operation supplies and production supplies.

6.8.2    In consideration of the payment of the Purchase Price, and in order to induce Purchaser to enter into this Agreement and to consummate the Transaction contemplated hereby, the Owners hereby covenant and agree that for a period of five (5) years from and after the Closing Date they shall not directly or indirectly, (a) own, manage, operate, control, provide financing or otherwise engage directly or indirectly in a Competitive Business, or (b) solicit any customers of the Companies or ITW Chemtronics for any Competitive Business. The foregoing shall not be deemed to prevent the Owners from owning up to three percent (3%) in value or in voting power of the stock of any corporation which is engaged in any Competitive Business after the Closing if the stock of such corporation is listed on any national securities exchange or traded in the over-the-counter market in the United States of America.

6.8.2    Owners acknowledge that Purchaser would not have an adequate remedy at law for a breach of this covenant and hereby consent to the enforcement of this covenant by Purchaser by means of a temporary and/or permanent injunction issued by any court having jurisdiction thereof and agree that in any such court proceeding Purchaser shall be entitled to assert any claim it may have for damages resulting from the breach of this covenant in addition to seeking injunctive relief.

6.8.3    This covenant shall be construed as covering competition in each of the separate states, countries and other geographic areas in which the Companies and ITW Chemtronics conduct business as of the Closing. To the extent it is legally unenforceable in any state, country, or other geographic area; this covenant shall not thereby be affected with respect to any other state, country or geographic area.

6.9    **Third Party Consents.**  To the extent that consummation of this Agreement would diminish the Companies' rights under any contract or other instrument without the consent of another person, which consent has not been obtained, Owners shall use their reasonable efforts and Purchaser shall cooperate to obtain any such required consent(s) if deemed necessary and/or advisable as promptly as practicable. If any such consent shall not be obtained or if consummation of this Agreement would impair the Companies' rights under the instrument in question, Owners, to the maximum extent permitted by law and the instrument, shall act as the Company's agent in order to obtain for the Company the benefits thereunder and shall cooperate, to the maximum extent permitted by law and the instrument, with Purchaser and the Company in any other reasonable arrangement designed to provide such benefits to the Company and Purchaser.

6.10    **Distribution of Certain Assets.**  Prior to Closing the Owners shall cause the Partnership to distribute the following assets not used in conducting the business of the Partnership of an estimated aggregate value of less than $125,000: several pieces of art

currently located at the Partnership's headquarters; Mr. Russell's personal office furniture; and an automobile, currently located in Phoenix, Arizona, that is used by Mr. Richard Russell; provided that all such matters are properly reflected in the Closing Balance Sheet and disclosed on the appropriate schedule to this Agreement.

6.11     **Life Insurance.** Prior to Closing, the Owners shall cause the Partnership to transfer to Mr. Richard Russell a life insurance policy from Prudential Insurance having a death benefit of $150,000 and a cash value of approximately $67,000 and bearing a quarterly premium of $1,606. Mr. Russell shall acquire the benefits and assume the obligations of the policy.

6.12     **COBRA.** Mr. Richard Russell and his wife, Ms. Rita Russell, will receive COBRA benefits for 18-months after Closing, at an anticipated cost of $546 per month, to be paid for by Mr. Russell.

6.13     **ITW Employee Benefit Plan.** The Partnership's employees will become participants in ITW's employee benefit plans within two (2) years after Closing.

6.14     **Employment.** Mr. Grant Russell, Mr. James Witcher and Mr. Sam Spradlin will each be offered an employment agreement by the Purchaser. Said employment agreements shall provide for a term of at least two (2) years (to begin upon Closing) and shall provide that each employee shall receive his current base salary, subject to satisfactory performance consistent with ITW's principles of conduct. During the same two (2) year period each of said employees will also participate in ITW's bonus program available to ITW employees in similar positions. Mr. Bo Maurer will be offered an employment agreement by the Purchaser. Mr. Maurer's employment agreement shall provide for a term of at least one (1) year (to begin upon Closing) and shall provide that Mr. Maurer' shall receive his current base salary. During such time, Mr. Maurer shall participate in ITW's bonus program available to ITW employees in a similar position. The terms and conditions of employment are set forth in Exhibit 6.17 hereof.

6.15     Purchaser has completed Phase 2 Environmental Assessments during its due diligence, and Purchaser hereby agrees to provide Owners and Owners' counsel, Sprouse Shrader Smith P.C., with a complete copy of the sampling plan and sample data in connection with said Phase 2 Environmental Assessments as soon as practicably possible after Closing.

6.16     **No Additional Representations by Owners.** Purchaser acknowledges that neither the Owners nor any of the Companies nor any other person or entity has made any representation or warranty, expressed or implied, at common law, by statute or otherwise, as to the accuracy or completeness of any information regarding Owners, the Partnership, the Subsidiaries, or the assets of any of the Companies furnished or made available to Purchaser and its representatives, except as expressly set forth in this Agreement or in the Schedules attached hereto.

7.     **CONDITIONS.**



7.1    <u>Conditions to Purchaser's Obligations</u>.  Notwithstanding any other provisions of this Agreement, the obligation of Purchaser to effect the Transaction shall be subject to the fulfillment or written waiver of the following conditions:

7.1.1    All material permits, approvals and consents of any federal, state or other government or governmental authority necessary or appropriate for consummation of the Transaction shall have been obtained;

7.1.2    There shall not be any action taken, or any statute, rule, regulation or order enacted, entered, enforced or deemed applicable to the Transaction by any federal or state government or governmental authority and there shall not be in effect an order entered by any federal or state court which, in the sole reasonable judgment of Purchaser, (i) makes the consummation of the Transaction illegal; (ii) results in a material delay in the ability of Purchaser to consummate the Transaction; or (iii) imposes material limitations on the ability of Purchaser to exercise full rights of Partnership Interest or of a material portion of the assets or business of the Companies;

7.1.3    The applicable waiting period under any governmentally-imposed waiting period shall have expired or been terminated;

7.1.4    Any required consent to the Transaction under any agreement, contract or license (including such as may be required from any government or governmental authority), the withholding of which might have an adverse effect on the condition (financial or otherwise), properties, assets, business or operations of the Companies shall have been obtained;

7.1.5    The Owners shall have complied with the provisions of Section 3.16 hereof and shall have obtained and delivered to Purchaser the determination letter referred to therein;

7.1.6    The representations and warranties of the Owners contained in Sections 2 and 3 hereof shall be true and correct on and as of the Closing Date as though made on the Closing Date, and the Owners shall have complied with the covenants set forth in Section 5 hereof.

7.2    <u>Conditions to the Owners' Obligations</u>.  Notwithstanding any other provisions of this Agreement, the obligations of the Owners to effect the Transaction shall be subject to the fulfillment or written waiver of the following conditions:

7.2.1    All material permits, approvals and consents of any federal, state or other government or governmental authority necessary or appropriate for consummation of the Transaction shall have been obtained;

7.2.2    There shall not be any action taken, or any statute, rule, regulation or

 

order enacted, entered, enforced or deemed applicable to the Transaction by any federal or state government or governmental authority and there shall not be in effect an order entered by any federal or state court which, in the sole reasonable judgment of the Partnership and the Owners, (i) makes the consummation of the Transaction illegal; or (ii) results in a material delay in the ability of the Partnership or the Owners to consummate the Transaction;

7.2.3    The applicable waiting period under any governmentally-imposed waiting period, shall have expired or been terminated;

7.2.4    Any required consent to the Transaction under any agreement, contract or license (including such as may be required from any government or governmental authority), the withholding of which might have an adverse effect on the condition (financial or otherwise), properties, assets, business or operations of Purchaser shall have been obtained; and

7.2.5    The representations and warranties of the Purchaser contained in Section 4 hereof shall be true and correct on and as of the Closing Date as though made on the Closing Date, and the Purchaser shall have complied with all covenants set forth in this Agreement.

8.    <u>CLOSING.</u>

8.1    <u>Closing Date.</u>  The closing of the Transaction hereunder (the "Closing"), shall take place at the offices of Sprouse Shrader Smith P.C., 701 S. Taylor, Suite 500, Amarillo, Texas at 10:00 a.m. on the morning of January 13, 2006, or at such other time, place and manner as Purchaser and the Owners may mutually agree upon. The time and date on which the Closing is actually held is referred to herein as the "Closing Date."

8.2    <u>Certain Closing Deliveries.</u>

8.2.1    <u>Owners Deliveries.</u>  At the Closing, the Owners shall deliver to Purchaser a) a general instrument of sale, conveyance, assignment, transfer and delivery of the Partnership Interest; b) the minute books and ledgers of the Partnership and its subsidiaries; d) payoff letters from all debt-holders, including, but not limited to, Merrill Lynch Business Financial Services, Inc., Southwest Mezzanine Investments; and Scotiabank de Costa Rica, S.A. c) the Escrow Agreement; d) resignations of the officers and directors of the Companies; e) the lease for the Partnership's existing manufacturing facility in Amarillo, Texas ("Lease"), as set forth in Exhibit 8.2.1(e) hereof; f) the five year non-compete agreement executed by Mr. Richard Russell as set forth in Exhibit 8.2.1(f) hereof; and g) the employment agreements set forth in Exhibit 6.14 hereof ("Employment Agreements").

8.2.2    <u>Purchaser Deliveries.</u>  At the Closing, Purchaser shall deliver to the Owners a) immediately available wire transferred funds in the amount of the

 

Purchase Price, less the Assumed Debt and the Escrow Funds, as provided in Section 1.2; b) the Lease; c) the Escrow Agreement; d) the Employment Agreements; and e) the five year non-compete agreement executed by Mr. Richard Russell as set forth in Exhibit 8.2.1(f) hereof. The Purchase Price shall be disbursed as set forth in Exhibit 8.2.2.

9.  INDEMNIFICATION.

9.1  Owners. Subject to consummation of the Transaction, and further subject to the provisions of Section 10 of this Agreement, the Owners, individually and jointly agree that, notwithstanding the Closing and regardless of any investigation made by or on behalf of Purchaser or of any information Purchaser may have in respect thereof, the Owners will indemnify and save and hold Purchaser harmless from and against any cost, expense, damage, liability, loss or deficiency suffered or incurred (including, but not limited to all reasonable costs and expenses, including reasonable attorney's fees, incurred by Purchaser in connection with any action, suit, proceeding, demand, assessment or judgment incident to any of the matters indemnified against in this Section 9.1) by Purchaser arising out of or resulting from, and will pay Purchaser on demand the full amount (except as set forth below) of any sum which Purchaser may be obligated to pay and shall reasonably have paid in respect of:

9.1.1  Any inaccuracy in any representation or the breach of any warranty by the Owners in or pursuant to this Agreement;

9.1.2  Any failure of the Owners, the Partnership or the Subsidiaries duly to perform or observe any term, provision, covenant, agreement or condition in this Agreement required on the part of the Owners, the Partnership, the Subsidiaries or any of them, to be performed or observed prior to or at the Closing;

9.1.3  Any and all debts, liabilities or obligations of the Companies, direct or indirect, fixed, contingent or otherwise, which exist at or as of the date of the Closing or which arise after the Closing from any act, omission, transaction, circumstance, production or sale of goods or services, state of facts, environmental or other condition or event which occurred or existed on or before the date of the Closing, whether or not then known, due or payable, except to the extent accrued or reserved for in the Closing Balance Sheet and except as otherwise qualified, referred to or contemplated under this Agreement, including but not limited to the matters provided for or disclosed in Article III hereof and in the Schedules hereto;

9.1.4  Any tax liability (including penalties and interest) that may be assessed against any of the Companies, Purchaser or any other transferee, with respect to the operations of the Companies for all periods ending on or prior to the Closing Date and not accrued or reserved for in the Closing Balance Sheet;

9.1.5  The amount of any and all receivables of the Companies or any of them

Page 29

 

which are not collected in accordance with the provisions of Section 3.24; and

9.1.6   Any environmental claim or liability involving the compounds listed on Schedule 9.1.6 or any pollutant, contaminant, chemical, substance or condition that is discovered to have been present on the Property as of the Closing Date as a result of any investigation of the Property conducted by a third party (e.g., not by Purchaser or any affiliate thereof), and in each case which is in violation of, or in a manner which creates, a material liability under applicable Environmental Laws; and further provided, however that Owners shall have no obligation to indemnify Purchaser to the extent that any such Claim arises or results from the acts or omissions of the Purchaser, its successors or assigns, and the employees, agents, contractors, tenants and invitees of any of them. Owners further agree to accept tender from the Purchaser of any claim indemnified by Owners pursuant to this Section 9.1.6.

9.2   Purchaser. Subject to consummation of the Transaction, and further subject to the provisions of Section 10 of this Agreement, Purchaser agrees that, notwithstanding the Closing, and regardless of any investigation made by or on behalf of the Owners or of any information the Owners may have in respect thereof, Purchaser will indemnify and save and hold the Owners harmless from and against any cost, expense, damage, liability, loss or deficiency suffered or incurred (including, but not limited to all reasonable costs and expenses, including reasonable attorney's fees), incurred by the Owners in connection with any action, suit, proceeding, demand, assessment or judgment incident to arising out of or resulting from any of the matters indemnified against in this Section 9.2) and will pay the Owners on demand the full amount (except as set forth below) of any sum which the Owners may be obligated to pay and shall reasonably have paid in respect of:

9.2.1   Any inaccuracy in any representation or the breach of any warranty made by Purchaser, in or pursuant to this Agreement; and

9.2.2   Any failure of Purchaser duly to perform or observe any term, provision, covenant, agreement or condition in this Agreement required on the part of Purchaser, to be performed or observed prior to or at the Closing.

9.3   Mutual Provisions.

9.3.1   In the event of a dispute between the parties, each party shall bear its own cost and expenses incident to any suit, action or proceeding undertaken to resolve the dispute. Subject to Section 10 of this Agreement, all representations and warranties made by any party pursuant to this Agreement shall survive the Closing.

9.3.2   Where any representation or warranty contained in this Agreement is expressly qualified by reference to the Owner's Knowledge, information or belief, Owners confirm that they have no knowledge that such representation or warranty

Page 30

 

is not true and correct to the same extent provided in such representation or warranty and that they have made due and diligent inquiry as to the matters that are the subject of such representations and warranties, including due inquiry of appropriate members of management of the Companies including Grant Russell, James Witcher, Sam Spradlin, Bo Maurer and the plant managers at each of the Companies' facilities, and nothing has come to their attention during the course of such inquiry or otherwise which would cause such party in the exercise of due diligence, to believe that such representation and warranty is not true and correct in all material respects.

9.3.3   For purposes of determining whether there is an inaccuracy in, action, omission or statement of facts inconsistent with, any representation or warranty, the terms "material," "materially," and "material adverse effect," when applicable to such representation and warranty shall mean claims which total $20,000.00 for each individual claim or group of claims arising from the same or similar events, conditions or causes or conduct for which indemnification is being sought.

9.3.4   For purposes of calculating satisfaction of the "basket" and "cap" described in this Section 9, claims which do not meet the materiality limit provided in Section 9.3.3 shall be considered.

9.4   <u>Indemnification Procedures.</u>

9.4.1   If any third party shall notify either party to this Agreement (the "Indemnified Party") with respect to a matter (a "Third Party Claim") which may give rise to a claim for Indemnification against the other party (the "Indemnifying Party") under Section 9 of this Agreement, then the Indemnified Party shall promptly notify the Indemnifying Party thereof in writing within the time period set forth in Section 10.1 of this Agreement.   The Indemnifying Party shall have the right to defend the Indemnified Party against the Third Party Claim with counsel of its choice.

9.4.2   In no event shall any Indemnified Party consent to the entry of judgment or enter into any settlement with respect to any Third Party Claim without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably delayed or withheld. Each party to this Agreement shall provide to the other party on request all information and documentation reasonably necessary to support and verify any Losses which give rise to such claim for indemnification and shall provide reasonable access to all books, records and personnel in their possession or under their control which would have a bearing on such claim.

9.4.3   In the event that any Indemnified Party has a claim against any party obligated to provide indemnification pursuant to Section 9 hereof which does not involve a Third Party Claim, the Indemnified Party shall promptly notify the Indemnifying Party of such claim, specifying the nature of such claim and the amount or the estimated amount thereof to the extent then feasible.

9.4.4   Upon making any payment to an Indemnified Party for any

 

indemnification claim made hereunder, the Indemnifying Party shall be subrogated, to the extent of the payment, to any rights the Indemnified Party may have against any other persons or entities with respect to the subject matter underlying the indemnification claim. This Section 9.4.4 shall not apply to Third Party Claims which are settled pursuant to Section 9.4.2.

9.4.5   Each Indemnified Party shall be obligated in connection with any claim for indemnification under Section 9 to use all reasonable efforts to mitigate Losses upon and after becoming aware of any event that could reasonably be expected to give rise to the Losses.

10.   **LIMITATION ON INDEMNIFICATION.**

10.1   Term.   Purchaser's right to indemnification under Section 9 shall apply only if written notice setting forth in reasonable detail the nature of the claim for which indemnification has been sought has been delivered by hand or by mail by Purchaser to the Owners not later than two (2) years after the Closing Date; except that with respect to any liability or expense covered by Section 9.1.4, such right shall apply until the expiration of the applicable statutes of limitation or any extension thereof and with respect to any liability or expense covered by Section 9.1.6, such right shall apply for six (6) years after the Closing Date. The Owners' right to indemnification under Section 9 shall apply only if written notice setting forth in reasonable detail the nature of the claim for which indemnification has been sought has been delivered by Owners to the Purchaser not later than two (2) years after the Closing Date.

10.2   Basket.   The indemnities shall not apply to any cost, expense, damage, liability, loss or deficiency until the aggregate of all costs, expenses, damages, liabilities, losses or deficiencies ("Losses") exceed $75,000, whereupon the Owners will be liable for the full amount of all Losses suffered by Buyer in excess of such amount up to the limit specified in Section 10.3. The foregoing basket shall not apply to breaches of Section 3.9, 3.24 or 3.29, or to the Purchase Price Adjustment provisions of Section 1.3.

10.3   Cap.   The maximum amount of indemnification owed to either party by the other shall be the sum of Eighteen Million Dollars ($18,000,000). This maximum amount shall in no way limit Owners' obligation to Purchaser under the indemnities set forth in Section 9.1.4, 9.1.5, the Purchase Price Adjustment provisions of Section 1.3, or for fraud or willful misrepresentations.

10.4   Extension of Certain Claims.   If prior to the expiration of any of said periods set forth in Section 10.1 above, the Indemnified Party shall give written notice to the Indemnifying Party identifying any covenant, agreement, representation or warranty which is inaccurate or has otherwise been breached, setting forth in reasonable detail facts and circumstances showing that the Indemnified Party has suffered or incurred or may suffer or incur any damage, liability, loss or deficiency arising out of or resulting from such inaccuracy or breach, then the indemnity contained in Section 9 shall survive with respect to such covenant, agreement, representation or warranty until the

 

Indemnifying Party has indemnified and saved and held the Indemnified Party harmless therefrom or such matter is otherwise resolved.

10.5    Limitation on Types of Damages.  NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, NO PARTY SHALL BE LIABLE FOR SPECIAL, PUNITIVE, EXEMPLARY, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES, OR LOST PROFITS, WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY, INDEMNITY, OTHER LAW OR OTHERWISE AND WHETHER OR NOT ARISING FROM THE OTHER PARTIES' SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT; PROVIDED, HOWEVER, THAT THIS LIMITATION ON DAMAGES SHALL NOT APPLY IN THE EVENT OF FRAUD BY EITHER PARTY.

10.6    Further Matters.  Except as otherwise specifically provided in Section 9, no liability will be recoverable by or on behalf of Purchaser in respect of any representation, warranty or covenant to the extent that the Purchaser has already recovered an amount for such breach as a result of the Purchase Price Adjustment, or by the Purchaser or the Owners to the extent the event giving rise thereto was specifically disclosed in this Agreement or was caused by compliance with the requirements of this Agreement.

11.    DISPUTES.

11.1    Dispute Resolution.  Subject to the provisions of Section 11.5 any dispute arising out of or relating to this Agreement, including, but not limited to, claims for indemnification pursuant to Section 9 shall be resolved in accordance with the procedures specified in this Section 11, which shall be sole and exclusive procedures for the resolution of any such disputes.  Notwithstanding the foregoing, any dispute regarding the Closing Balance Sheet shall be resolved by the resort to the provisions of Section 1.3.

11.2    Negotiation Between Executives.  The parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by negotiation between the appointed representative of the Owners and executives of Purchaser who, if possible, are at a higher level of management than the persons with direct responsibility for administration of this Agreement.  Any party may give the other party written notice of any dispute not resolved in the normal course of business.  Within fifteen (15) days after delivery of the notice, the receiving party shall submit to the other a written response.  The notice and response shall include (a) a statement of each party's position, and (b) the name and title of the executive who will accompany the representative.  Within thirty (30) days after delivery of the disputing party's notice, the representatives of Owners and Purchaser shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary to attempt to resolve the dispute.  All reasonable requests for information made by one party to the other will be honored.

11.2.1 If the matter has not been resolved by these persons within sixty (60) days of the disputing party's notice, or if the parties fail to meet within thirty (30) days, either party may initiate mediation as provided hereinafter.



11.2.2 All negotiations pursuant to this clause are confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and State Rules of Evidence.

**11.3** <u>Mediation</u>. If the dispute has not been resolved by negotiation as provided herein, the parties shall endeavor to settle the dispute by mediation under the then current Center for Public Resources ("CPR") Model procedure for Mediation of Business Disputes. The neutral third party will be selected from the CPR Panels of Neutrals, with the assistance of CPR, unless the parties agree otherwise.

**11.4** <u>Litigation</u>. If the dispute has not been resolved by non-binding means as provided herein within 90 days of the initiation of such procedure, either party may initiate litigation (upon 30 days written notice to the other party); provided, however, that if one party has requested the other to participate in a non-binding procedure and the other has failed to participate, the requesting party may initiate litigation before expiration of the above period.

**11.5** <u>Choice of Forum and Venue</u>. All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York. The Owners and the Purchaser further agree that any dispute arising out of this Agreement may be decided by either the state or federal court sitting in New York City, New York. The Owners and the Purchaser shall each submit to the jurisdiction of those courts and agree that service of process by certified mail, return receipt requested, shall be sufficient to confer said courts with in personam jurisdiction.

**11.6** <u>Waiver of Jury Trial</u>. IN THE EVENT THAT ANY DISPUTE SHALL ARISE BETWEEN THE PARTIES HERETO, AND LITIGATION ENSUES, WITH RESPECT TO ANY LITIGATION ARISING OUT OF THIS AGREEMENT OR ANY RELATED TRANSACTION, THE PARTIES EXPRESSLY WAIVE ANY RIGHT THEY MAY HAVE TO A JURY TRIAL AND AGREE THAT ANY SUCH LITIGATION SHALL BE TRIED BY A JUDGE WITHOUT A JURY.

**11.7** <u>Provisional Remedies</u>. The procedures specified in this Section shall be the sole and exclusive procedures for the resolution of disputes between the parties arising out of or relating to this Agreement; provided, however, that either party, without prejudice to the above procedures, may file a complaint (for statute of limitations or venue reasons) or to seek preliminary injunction or other provisional judicial relief, if in its sole judgment such action is necessary to avoid irreparable damage or to preserve the status quo. Despite such action the parties will continue to participate in good faith in the procedures specified in this Section.

 

**11.8   Tolling Statute of Limitations.** All applicable statutes of limitation and defenses based upon the passage of time shall be tolled while the procedures specified in this Section are pending. The parties will take such action, if any required to effectuate such tolling.

**11.9   Performance to Continue.** Each party is required to continue to perform its obligations under this Agreement pending final resolution of any dispute arising out of or relating to this Agreement.

## 12.   COOPERATION.

Each party will give prompt written notice to the other of any claim which the party discovers or of which it receives notice after the Closing and which might give rise to a claim against the other under Section 9 hereof, stating the nature, basis and amount thereof. The Indemnified Party shall have the right to be represented, at its own expense, by advisory counsel and accountants, in case of any claim by a third party, any suit, any claim by any governmental body, or any legal, administrative or arbitration proceeding, with respect to which the Indemnified Party may have liability under the indemnity provisions contained in Section 9 hereof. The Indemnified Party shall make available to the Indemnifying Party, its attorney and accountants, at all times during normal business hours, all books and records in its possession of the Partnership or any of the Companies relating to such suit, claim or proceeding, and Purchaser and the Owners will render to each other such assistance as may reasonably be required of each other in order to insure proper and adequate defense of any such suit, claim or proceeding. The Indemnifying Party shall have the right initially to defend against any such suit, claim or proceedings, but if the Indemnifying Party shall elect not to so defend, then Indemnified Party shall be permitted to defend against such suit, claim or proceeding. If Purchaser or the Owners shall desire to effect a compromise or settlement of any such suit, claim or proceeding and any other party hereto shall refuse to consent to such compromise or settlement, then any party desiring to effect such compromise or settlement (in writing) shall be excused from the defense and such party's liability under Section 9 herein with respect to such suit, claim or proceeding shall be limited to the amount so offered in compromise or settlement.

## 13.   TERMINATION, AMENDMENTS AND WAIVER.

**13.1   Termination.** This Agreement may be terminated at any time prior to the Closing:

13.1.1 By mutual consent of Purchaser and the Owners, including without limitation in the situation where both Purchaser and the Owners mutually agree that any necessary regulatory approval may not be obtained; or

13.1.2 By Purchaser in the event of a Significant Material Adverse Change prior to Closing. "Significant Material Adverse Change" shall mean a change in the business, assets or prospects of the Partnership that would prevent Purchaser from

 

using the business and assets of the Partnership as contemplated by Purchaser on the date hereof and which cannot be resolved by Purchaser by resort to the indemnification provisions contained herein.

13.1.3      By either Purchaser or Owners if the conditions precedent to their respective obligations contained in Sections 7.1 or 7.2 hereof have not been met in all material respects through no fault of the terminating party by February 28, 2006.

13.2    <u>Effect of Termination</u>. If this Agreement is terminated and the transactions contemplated hereby are not consummated as described above, this Agreement shall become void and of no force and effect and no party hereto shall thereafter have any liability hereunder to the other parties hereto except for the provisions of Section 6.4 above.

13.3    <u>Amendment</u>. This Agreement and the <u>Schedules</u> hereto may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

14.    <u>GENERAL PROVISIONS</u>.

14.1    <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or on the third day following deposit with the United States Post Office if mailed by registered or certified mail (return receipt requested) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to Purchaser:

     Illinois Tool Works Inc.
     Attention: Hugh J. Zentmyer, Executive Vice President
     3600 West Lake Avenue
     Glenview, Illinois 60026

With copies to:

     Illinois Tool Works Inc.
     Attention: Corporate Secretary
     3600 West Lake Avenue
     Glenview, Illinois 60026

If to the Owners:

     Tech Spray Management Company, L.L.C.
     P.O. Box 949
     Amarillo, Texas 79105-0949.

   

Richard and Rita Russell
P.O. Box 3036
Carefree, Arizona 85377

With copies to:

Jeff Shrader
Sprouse Shrader Smith P.C.
701 S. Taylor, Suite 500
P.O. Box 15008
Amarillo, Texas 79105-5008

14.2   <u>Delivery.</u> This Agreement and any signed agreement or instrument entered into in connection herewith, and any amendments thereto or hereto, to the extent signed and delivered by means of a facsimile machine, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effects as if they were the original signed version thereof delivered in person.

14.3   <u>Interpretive Provisions.</u>

14.3.1  Whenever the context may require, a pronoun includes the corresponding masculine, feminine, and neuter forms. All references herein to Sections, Schedules and Exhibits are references to Sections of and Schedules and Exhibits to this Agreement unless the context requires otherwise. All attached Schedules and Exhibits shall be deemed incorporated herein as if set forth in full herein; and, unless otherwise defined therein, all terms used in any Schedule or Exhibit have the meaning ascribed to that term in this Agreement. The words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise expressly provided herein, any statute defined or referred to herein or in any contract, agreement or instrument that is referred to herein, means the statute as from time to time amended, modified or supplemented, including by succession of comparable successor statutes.. The Section headings of this Agreement are for the purpose of convenience only and were not intended to define or limit the contents of said Sections.

14.3.2  This Agreement shall be deemed to have been drafted by each of the parties, and no provision of this Agreement shall be interpreted in favor of or against any party because that party or that party's legal representative drafted that provision or this Agreement.

14.4   <u>Entire Agreement.</u> This Agreement (including the <u>Schedules</u> and Exhibits, and the other instruments delivered in connection herewith) and the Side Letter dated January 13, 2006 constitute the entire agreement and supersedes all other prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the

Page 37



subject matter hereof and may not be modified, amended or terminated except by a written agreement specifically referring to this Agreement and signed by all of the parties against which enforcement is sought.

14.5  **Rights of Third Parties.** Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon any other person or entity any rights or remedies under or by reason of any provision of this Agreement.

14.6  **Assignment.** This Agreement shall not be assigned or transferred by operation of law or otherwise (except to heirs or legatees of the Owners);

14.7  **Waiver.** No waiver of any breach or default hereunder shall be considered valid unless in writing and signed by the party giving such waiver and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

14.8  **Severability.** The provisions of this Agreement shall be deemed severable and if any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transaction contemplated hereby is not affected in any manner adverse to any party. Upon such determination that any term or other provision in this Agreement is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

14.9  Parent Guaranty.

(a)  The Purchaser is ultimately the wholly-owned subsidiary of Illinois Tool Works, Inc., a Delaware corporation (the "Parent"). The Parent unconditionally guarantees the due and punctual payment of all of the Purchaser's payment obligations set forth in this Agreement. This guaranty is an irrevocable guaranty of payment (and not just of collection) and shall continue in effect notwithstanding any extension or modification of the terms of this Agreement or any assumption of any guaranteed obligations by any other party.

(b)  The Parent also unconditionally guarantees the due and punctual performance and observance by Purchaser of all of the Purchaser's obligations under the terms of this Agreement.

(c)  The payment obligations of the Parent under Section 14.9(a) and the performance obligations of the Parent under Section 14.9(b) shall be absolute and unconditional irrespective of the validity, legality or enforceability of this Agreement or any other document related hereto, and shall not be affected by or contingent upon (i) the liquidation or dissolution of, or the merger or consolidation of the Purchaser into or with any corporation, or any sale or transfer by the Purchaser of all or any part of its property

or assets, (ii) the bankruptcy, receivership, insolvency, reorganization or similar proceedings involving or affecting the Purchaser, or (iii) any modification, alteration, amendment or addition of or to this Agreement.

14.10   Counterparts. This Agreement may be executed in two or more counterparts that together shall constitute a single Agreement.

[signatures on following page]

IN WITNESS WHEREOF, Purchaser and the Owners have caused this Agreement to be signed, all as of the date first written above.

ITW TECH SPRAY L.L.C.

PARENT

ILLINOIS TOOL WORKS INC.

By:   Gary Swink
Title:   Attorney in Fact

By:   Gary Swink
Title:   Attorney in Fact

OWNERS

TECH SPRAY MANAGEMENT
COMPANY, L.L.C.

Mr. Richard G. Russell

Name:
Title:

Ms. Rita Russell

IN WITNESS WHEREOF, Purchaser and the Owners have caused this Agreement to be signed, all as of the date first written above.

ITW TECH SPRAY L.L.C.

By:    Gary Swink
Title:   Attorney in Fact

OWNERS

_____
Mr. Richard G. Russell

_____
Ms. Rita Russell

PARENT

ILLINOIS TOOL WORKS INC.

By:    Gary Swink
Title:   Attorney in Fact

TECH SPRAY MANAGEMENT
COMPANY, L.L.C.

Name:
Title:

USDC SDNY

ITW Tech Spray, L.L.C. v. Tech Spray Management Company, L.L.C. et al

07 Civ 6676 (PAC)

# FIRST AMENDED COMPLAINT

---

# CERTIFICATE OF SERVICE

David M. Monachino (DM 1527)
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

Michael D. Wexler, Esq. (admitted *pro hac vice*)
Jason P. Stiehl, Esq. (admitted *pro hac vice*)
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000

Attorneys for Plaintiff ITW Tech Spray, L.L.C.

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
ITW Tech Spray, L.L.C.,                                       :    **ECF Case**
                                                              :
                            Plaintiff,                        :    07 Civ. 6676 (Judge Crotty)
                                                              :
                    v.                                        :    <u>**CERTIFICATE OF SERVICE**</u>
                                                              :    <u>**(AMENDED)**</u>
Tech Spray Management Company, L.L.C.,                        :
Richard Russell and Rita Russell,                             :
                                                              :
                            Defendants.                       :
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

I hereby certify the following counsel of record is being served on this 21st day of December 2007 with a copy of Plaintiff ITW Tech Spray, L.L.C.'s First Amended Complaint via Federal Express and via e-mail.

TO:    Vineet Bhatia, Esq.
       Susman Godfrey, LLP
       1000 Louisiana
       Suite 5100
       Houston, Texas 77002
       Email: vbhatia@susmangodfrey.com, mreeves@susmangodfrey.com


                                    _____/S/_____
                                    David M. Monachino (DM-1527)


NY1 26495859.2